# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| | § | |
| | § | |
| WILLIAM STEGALL, on Behalf of Himself and All Others Similarly Situated, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Case No. 05-10062 DPW |
| CHARLES L. LADNER, JAMES F. CARLIN, WILLIAM H. CUNNINGHAM, RONALD R. DION, STEVEN PRUCHANSKY, NORMAN H. SMITH, JOHN P. TOOLAN, JAMES A. SHEPHERDSON, DENNIS S. ARNOWITZ, RICHARD P. CHAPMAN, JR., WILLIAM J. COSGROVE, RICHARD A. FARRELL, WILLIAM F. GLAVIN, JOHN A. MOORE, PATTI McGILL PETERSON, JOHN W. PRATT, JOHN HANCOCK FINANCIAL SERVICES, INC., JOHN HANCOCK ADVISERS, LLC, INDEPENDENCE INVESTMENT, LLC, NICHOLAS-APPLEGATE CAPITAL MANAGEMENT, PZENA MANAGEMENT, LLC, SHAY ASSETS MANAGEMENT, INC., SUSTAINABLE GROWTH ADVISERS, LP, FUND ASSET MANAGEMENT, LP, AMERICAN FUND ADVISORS, INC. | § § § § § § § § § § § § § § § § § § § | |
| | § | |
| Defendants. | § | |
| | § | |
| | § | |
| | § | |
| | § | |

## PLAINTIFF'S MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS

## INTRODUCTION

Plaintiff William Stegall ("Plaintiff") brings this putative class action against the advisors, trustees and affiliates of the John Hancock Family of Mutual Funds (collectively the "John Hancock Defendants"). Plaintiff alleges that the John Hancock Defendants breached their fiduciary duties owed to Plaintiff and other John Hancock mutual fund holders and violated sections 36(a) and 36(b) of the Investment Company Act of 1940 ("ICA") by failing to ensure that the John Hancock funds participated in securities class actions for which they were eligible.

Defendants' Motion to Dismiss is without merit and should be denied. Rather than attack Plaintiff's Complaint based upon its merits as a direct action, Defendants deftly attempt to recast the matter as a derivative suit and proceed to argue why it fails as such. *See, e.g.* Defendants' Memorandum of Law in Support of Motion to Dismiss, at p. 2 ("Plaintiff's claims are derivative in nature"). While Defendants provide examples of how this matter *could* have been brought alternatively as a derivative action, they fail to cite a single case which holds that this matter cannot properly be brought as a direct action. Moreover, Defendants then argue that not even a derivative suit can be sustained. Under Defendants' view of the law, there is no procedural mechanism for Plaintiff and other investors to seek recovery for the injuries they have suffered, and Defendants can manage the putative class members' investments as they wish with impunity.

Even more illustrative than the contents of the Motion to Dismiss is what is omitted from the Motion. Defendants do not dispute, even in passing, the central element underlying Plaintiff's claims, namely that Defendants have failed to file proofs of claim in settled securities cases and, as a result, have prevented Plaintiff and the putative class from recovering money to which they were rightfully entitled. Defendants' malfeasance is emblematic of widespread problems in the mutual fund industry. Professors at Duke and Vanderbilt have conducted empirical studies and estimated that over seventy

percent of institutional investors have failed to participate in securities class action settlements. James D. Cox & Randal C.S. Thomas, *Leaving Money on the Table: Do Institutional Investors Fail to File Claims in Securities Class Actions?*, 80 WASH. U. L.Q. 855 (2002)[hereinafter Cox & Thomas](copy attached as Exhibit 1). Shortly after this case was filed, the Securities and Exchange Commission launched an investigation into the issue. Alison Sahoo, *SEC Probing Funds' Participation in Class Actions* (February 3, 2004), *at* www.ignites.com (Copy attached as Exhibit 2).

As demonstrated in this memorandum, Plaintiff has standing to bring these claims as a direct action and therefore as a putative class action, and has sufficiently plead claims for breach of fiduciary duty, negligence, violations of §§ 36(a) and 36(b), and an equitable remedy provided under § 47(b) of the ICA. Accordingly, Defendants' Motion should be denied.

## <u>ARGUMENT</u>

Defendants' claim that Plaintiff's complaint lacks the requisite specificity does not comport with federal notice pleading standards. *See EEOC v. J.H. Routh Packing Co.*, 246 F.3d 850, 851 (6th Cir. 2001) (noting that "The Federal Rules of Civil Procedure provide for a liberal system of notice pleading"). The purpose of this pleading standard is to protect the wronged party who finds himself in the very situation Plaintiff resides herein, where Defendants have perfect and full knowledge of the scope of the wrongdoing, and Plaintiff is forced to rely on publicly available information that admittedly does not fully tell the story. To allow Defendants to hide within their informational "black box" only perpetuates the problem Plaintiff has exposed and frustrates the purpose of pleading standards. Plaintiff's twenty page complaint clearly is not an attempt to fish for discovery. Plaintiff has alleged a harm that he has suffered, the manner in which he was harmed, and the persons and entities responsible.

When reviewing a motion to dismiss, the court must accept as true the well-pleaded factual allegations of the complaint and view those allegations in the light most favorable to the plaintiff. *Rogan v. Menino*, 175 F.3d 75, 77 (1st Cir. 1999)*; Aulson v. Blanchard*, 83 F.3d 1, 3 (1st Cir. 1996). In reviewing the complaint, however, courts "need not credit bald assertions, periphrastic circumlocutions, unsubstantiated conclusions, or outright vituperation." *Miranda v. Ponce Federal Bank*, 948 F.2d 41, 44 (1st Cir. 1991). A motion to dismiss tests the sufficiency of the complaint, not the merits of the suit. *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974) ("The issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims."), *overruled on other grounds*, 457 U.S. 800 (1982).

Dismissal under Rule 12(b)(6) is deemed proper only if "it appears beyond doubt that [the] plaintiff can prove no set of facts in support of his claims that would entitle him to relief." *Conley v. Gibson*, 355 U.S. 41, 45-46, (1957); *Miranda*, 948 F.2d at 44 (1st Cir. 1991). "In the precincts patrolled by Rule 12(b)(6), the demands on the pleader are minimal." *Gooley v. Mobil Oil Corp.*, 851 F.2d 513, 514 (1st Cir. 1988). Further, a plaintiff may later add allegations by affidavit or brief, even on appeal, to clarify allegations in the complaint. *Pegram v. Herdrich*, 530 U.S. 211, 229, n.10 (2000). Unless otherwise provided by Rule 9, the Federal Rules of Civil Procedure do not require a plaintiff to set out in detail facts upon which a claim is based. *Conley*, 355 U.S. at 47. A plaintiff is required only to provide a short and plain statement of the claim "that will give the defendant fair notice of the claim and the grounds upon which it rests." *Id.* (footnote omitted). In effect, "[a] court may dismiss a complaint only if it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations." *Hishon v. King & Spalding*, 467 U.S. 69, 73, 104 (1984); *see also Conley*, 355 U.S. at 45-46.

### A. PLAINTIFF HAS STANDING TO BRING CLAIMS AGAINST ALL FUNDS WITHIN THE JOHN HANCOCK FAMILY OF FUNDS

Defendants' entire argument regarding standing is based upon the incorrect premise that Plaintiff has, or should have, brought this matter as a derivative suit. Every case cited, and all analysis and argument proffered, is based upon this faulty predicate. To the contrary, however, Plaintiff intended to and rightfully brings this matter as a direct action and has standing to do so.

#### 1. Plaintiff Has Standing to Bring a Direct Action Against the Advisors, Directors, and Affiliates of the Investment Company in Which He Owns Shares

Mutual funds are not legal entities, are not organized in any corporate form, and are not required to register under the Investment Company Act or either of the Securities Acts. Investment companies, on the other hand, are legal entities, are organized under state law, and are registered with the SEC. 15 U.S.C. § 80a-8. Investment companies can and do issue series of shares of mutual funds. Mutual fund families may be comprised of one or more investment companies, which in turn may be comprised of one or more series of mutual funds. Mutual funds themselves are merely series of shares of registered investment companies–in essence, they are little more than accounting entries or a product sold and marketed for the purpose of generated pools of fee-paying customers for the investment advisors. *See, e.g.* David E. Riggs & Charles C.S. Park, "Mutual Funds: A Banker's Primer," 112 BANKING LAW JOURNAL 763, 766 (1995).

Recognizing this important distinction between mutual funds and investment companies, the ICA expressly grants standing to holders of registered investment companies, not mutual funds. *See* 15 U.S.C. § 80a-35. Section 36(b) of the ICA provides: "An action may be brought under this subsection . . . by a security holder of such *registered investment company* on behalf of such company." 15 U.S.C. § 80a-36(b) (emphasis added). Section 36(a) provides a cause of action for

breach of fiduciary duty "in respect of any *registered investment company.*" 15 U.S.C. § 80a-36(a) (emphasis added).

Plaintiff is an investor in the John Hancock Small Cap Fund, which is a mutual fund within a series of funds issued by the investment company John Hancock Investment Trust II. *See* Statement of Additional Information for John Hancock Funds (copy attached as Exhibit 3). The John Hancock Investment Trust II is an open-end management investment company consisting of three investment portfolios. Thus, Plaintiff has individual standing to pursue claims involving all of the funds within the John Hancock Investment Trust II.

### 2. Defendants' "Standing" Argument Is Premature Prior to a Motion for Class Certification

Once individual standing has been established, as has been done here, the analysis for the purpose of the Motion to Dismiss is concluded. The separate issue of whether a plaintiff can represent a putative class depends solely on whether the plaintiff meets the requirements of Rule 23 and is thus rightfully preserved for the class certification stage. *See, e.g. Payton v. County of Kane*, 308 F.3d 673, 680 (7th Cir. 2002), *cert denied*, 540 U.S. 812 (2003). As stated by the Supreme Court in *Sosna v. Iowa*:

> A named plaintiff in a class action must show that the threat of injury in a case such as this is "real and immediate," not "conjectural" or "hypothetical." . . . This conclusion does not automatically establish that appellant is entitled to litigate the interests of the class she seeks to represent, but it does shift the focus of examination from the elements of justiciability to the ability of the named representative to "fairly and adequately protect the interests of the class." Rule 23 (a).

419 U.S. 393, 402-403 (1975)(citations omitted).

Even assuming, *arguendo*, that ownership of the same investment company is not sufficient for individual standing, the Rule 23 inquiry, which Defendants advance under the guise of a "standing" argument, involves an examination of various factual issues and is not properly undertaken on a

motion to dismiss. *Gen. Tel. Co. of the Southwest v. Falcon*, 457 U.S. 147, 160 (1982) ("[T]he class determination generally involves considerations that are 'enmeshed in the factual and legal issues comprising the plaintiff's cause of action.'" (internal citations and internal quotation marks omitted)).

The critical distinction between Article III standing and the Rule 23 inquiry was clarified in *Fallick v. Nationwide Mut. Ins. Co.*, 162 F.3d 410 (6th Cir. 1998). In *Fallick*, an employee alleged that Nationwide breached its fiduciary duties with respect to the ERISA benefit plan of which he was a member and other ERISA plans of which he was not a member. The district court dismissed the claims as to all ERISA plans other than Fallick's plan on standing grounds. *Id.* at 411-12. The Sixth Circuit reversed, holding that the district court's reasoning was "fundamentally flawed" because it confused the issues of Article III standing for a plaintiff with the Rule 23 issues applicable to his ability to sue on behalf of a class. *Id.* at 422. The court concluded that "once a potential ERISA class representative establishes his individual standing to sue his own ERISA-governed plan, there is no additional constitutional standing requirement related to his suitability to represent the putative class of members of other plans to which he does not belong." *Id.* at 424.

The case law is clear that once a putative class representative has established individual standing, all further standing analysis stops until the class certification stage. Defendants are improperly attempting to incorporate class certification issues into the motion to dismiss.

>    **3.    Plaintiff May Represent Other Members of the Putative Class
>            Since His Claims Are Based on the Same Legal Theories and
>            Arise from the Same Scheme and Course of Conduct**

Although analysis of this issue is premature, the case law makes clear that, upon a showing that the requirements of Rule 23 are met, a named plaintiff may represent a class of investors that includes investors in funds in different investment companies within the same mutual fund family and managed by the same advisors. This is so because of the substantially identical nature of the process,

or lack thereof, for filing proofs of claim of the affected funds in the same mutual fund family, and the close interrelationship and juridical links of all the funds and persons and entities in the same mutual fund complex with each other. *See In re: Dreyfus Aggressive Growth Mut. Fund Litig.*, 2000 U.S. Dist. LEXIS 13469 (S.D.N.Y. Sept. 20, 2000)(certifying named plaintiffs who invested in the Dreyfus Aggressive Growth Fund to represent purchasers in the Dreyfus Premier Aggressive Growth Fund); *Fallick*, 162 F.3d at 412 (holding an individual in one ERISA plan can represent a class of participants in numerous plans other than his own); *Hicks v. Morgan Stanley & Co.*, 2003 U.S. Dist. LEXIS 11972, at *11 (S.D.N.Y. July 16, 2003).[1]

Each mutual fund within the John Hancock fund family was advised by the same investment advisors, and the claims of Plaintiff and all putative class members are based on the same legal theories. Every holder of each John Hancock fund suffered the same type of injury as a result of Defendants' failure to fulfill their respective fiduciary duties. Because of the dominant role played by the fund advisors and parents, by proving his claims, Plaintiff will substantially prove the claims of all other class members. *See, e.g., In re: Sumitomo Copper Litig.*, 182 F.R.D. 85, 94-95 (S.D.N.Y. 1998) ("Rule 23(a)(3) is satisfied when each class member's claim arises from the same course of events, and each class member makes similar legal arguments to prove the defendant's liability" (quoting *In re Drexel Burnham Lambert Group*, 960 F.2d 285, 291 (2d Cir. 1992)). Accordingly, the fact that plaintiff does not own shares in each and every fund series within the relevant investment companies will not be a significant issue at the class certification stage of this case.[2]

_____

[1]      *Cf. In re Prudential Sec. Inc.. Ltd. P'shp Litig.*, 163 F.R.D. 200, 208 (S.D.N.Y. 1995) (class representatives were not required to have invested in all limited partnerships at issue, where complaint alleged a "uniform course of improper conduct and standardized sales approach applied by defendants"); *Maywalt v. Parker & Parsley Petroleum Co.*, 147 F.R.D. 51, 56-57 (S.D.N.Y. 1993) (plaintiffs who invested in three limited partnerships could represent persons who had invested in two other limited partnerships, where the complaint alleged that investors in all five limited partnerships were victims of a single pattern of fraud by defendants).

[2]      Even if it had merit, Defendants' "standing" argument would not even provide a basis for denial of class certification. If any of Defendants' contentions were legitimate, there are more sensible procedural

### B.     PLAINTIFF'S CLAIMS ARE PROPERLY PLEAD AS A DIRECT ACTION

Plaintiff has plead a cause of action based upon an injury he suffered directly as a result of Defendants' conduct.  Although ignored by Defendants, numerous courts have found that an investor may bring a direct action, rather than a derivative action, under the ICA.[3]  A clearly stated objective of the statute is to "protect[] all classes of investment company security holders from the special interests of directors, officers . . . and preventing investment companies from failing to protect 'the preferences and privileges of the holders of their outstanding securities.'" 15 U.S.C. § 80a-1 (2005). This congressional goal has been edified recently by the holding in *Strougo v. Bassini*, 282 F.3d 162 (2d Cir. 2002).  There, the Second Circuit held that mutual fund investors have standing to bring direct actions asserting private rights of action under several sections of the ICA, including section 36(a). *Id*.  An action that is properly brought as a direct action may also be brought as a class action (presuming the requirements of Rule 23 are met); ergo, Plaintiff's claims are properly brought as a putative class action.

### 1.     Plaintiff's Claims Are Properly Brought as a Direct Action Because Plaintiff Alleges an Injury Directly to Plaintiff and a Breach of a Duty Owed Directly to Plaintiff

mechanisms for addressing these issues at the class certification stage.  For instance, the Court may  allow Plaintiff to proceed and add named plaintiffs at the class certification stage, after the close of discovery, or at another point prior to trial, or the Court may order Plaintiff to provide a list of additional plaintiffs, who can be added, and the Court can deem the complaints mended *nunc pro tunc* in this regard, if the court deems it necessary.

[3]     *Stougo v. Bassini*, 282 F.3d 162, 176–77 (2d Cir. 2002) (holding direct action was appropriate under 36(a), 36(b), and 48 of the ICA); *Langner v. Brown*, 913 F. Supp. 260, 266 (S.D.N.Y. 1996) (finding that remaining claims (§§ 36(b), 10(a), 17(a), 17(d) survived after dismissal of derivative claims); *Seidel v. Lee*, 1994 U.S. Dist. LEXIS 21534, at * 15–18 (D. Del. Oct. 14, 1994) (holding that ICA claims that affected plaintiff personally could be maintained as a direct action); *In re ML-Lee Acquisition Fund II, L.P.*, 848 F. Supp. 527, 562 (D. Del. 1994) (holding that suit was appropriate for class action).

Derivative and direct actions are not mutually exclusive; in fact, derivative and direct claims may be brought simultaneously.[4] *Empire Life Ins. Co. of America v. Valdak Corp.,* 468 F.2d 330, 334-35 (5th Cir. 1972); American Law Institute's PRINCIPLES OF CORPORATE GOVERNANCE: ANALYSIS AND RECOMMENDATIONS § 7.01(b) (1994). Under all state laws, the critical distinction between a derivative and a direct action is that in order to bring a direct action, the plaintiff must plead an injury sustained by the individual investor or the breach of a duty owed directly to the individual investor. *Frank v. Hadesman and Frank, Inc.,* 83 F.3d 158, 160 (7th Cir. 1996); *Strigliabotti v. Franklin Resources,* 2005 WL 645529, at *8 (N.D. Cal. March 7, 2005) (internal citations omitted); American Law Institute's PRINCIPLES OF CORPORATE GOVERNANCE: ANALYSIS AND RECOMMENDATIONS § 7.01 (1994). Under Massachusetts law, a shareholder may maintain a direct action for an injury that directly affects the shareholder, "even if the corporation also has a cause of action arising from the same wrong, if the shareholder can show that the wrongdoer owed him a special duty or that the injury suffered by the shareholder is separate and distinct from the injury sustained by the other shareholders or the corporation itself." *Farragut Mortgage Co., Inc. v. Arthur Anderson, LLP,* 1999 WL 823656, *18 (Mass. Super 1999) (citing *Barger v. McCoy Hillard Parks,* 488 S.E.2d 215, 219 (N.C. 1997); *see also Lapidus v. Hecht,* 232 F.3d 679 (9th Cir. 2000) (applying Massachusetts law). As Plaintiff will demonstrate, the injury sustained by Plaintiff was distinct from the Funds' injury (and from injuries to subsequent but present investors in those funds), and Defendants owe a fiduciary duty directly to Plaintiff, Class Members, and all other fund investors.

Because of the unique structure and operation of mutual funds and investment companies, it is the individual investors, rather than the funds, who directly suffer the consequences of Defendants' failure to ensure participation in securities class action settlements. "Mutual funds are fundamentally

---

[4]       The issue of whether this lawsuit could be brought, in the alternative, as a derivative action is not before the court at this time, and Plaintiff therefore takes no position on this issue.

different from most enterprises in both their structure and operation." David E. Riggs & Charles C.S. Park, "Mutual Funds: A Banker's Primer," 112 BANKING LAW J. 757, 763 (1995) [hereinafter Riggs & Park]. "A mutual fund is a 'mere shell,' a pool of assets consisting mostly of portfolio securities that belong to the individual investors holding shares in the fund." *Tennenbaum v. Zeller*, 552 F.2d 402, 405 (2d Cir. 1977); *see also* Riggs & Park, 112 BANKING LAW J. at 758 (mutual funds serve as "conduits between investors and investment managers for the rendering of the manager's services"). Mutual funds "do not typically have employees or any physical plant" and have "virtually no liabilities." *Id.* at 763, 767.

Each investor who pools his money with others in a mutual fund owns a proportional share of the total assets of the mutual fund. The value of each investor's portion of those pooled assets is determined by taking the market value of all of the fund's portfolio securities, adding the value of any other fund assets, subtracting fund liabilities (primarily fees paid to Defendants), and dividing the result by the number of shares outstanding. *United States v. Cartwright*, 411 U.S. 546, 548 (1973). This so-called "per share net asset value" (NAV) is computed daily so that any gain or loss in fund assets is immediately allocated to the individual investors as of that specific date. Riggs & Park, 112 BANKING LAW J. at 764. Accordingly, mutual funds are unlike conventional corporations in that any increase or decrease in fund assets is immediately passed on or allocated to the fund investors as of the date of the relevant recalculation of the NAV.

Recognizing the unique structure and operation of mutual funds, the court in *Strigliabotti v. Franklin Resources* recently rejected the same argument that Defendants make here and allowed the plaintiff to proceed with a direct action. 2005 WL 645529, at *8 (copy attached as Exhibit 4). In *Strigliabotti,* plaintiff alleged that the defendant fund advisors charged excessive fees. *Id.* Defendants contended that the fees were paid by the fund rather than the individual investors, and therefore the

injury was sustained by the fund.  The Court rejected this argument as illusory, noting that "[e]very dollar of expense borne by the fund is distributed to the shareholders, as a pro rata deduction from the net asset value per share." *Id.* at \*7.  The Court explained: "the financial harm from overcharges is harm to the individual investors, who own the Funds' assets and bear its expenses directly on a pro rata basis." *Id.* at \*8.

The same reasoning applies here, where Plaintiff and the putative class members  are injured directly by Defendants' actions because had Defendants ensured that the Funds participated in the securities class action settlements, the settlement funds would have increased the total assets held by the Funds.  Such increase would have been distributed immediately to the then-current investors on a pro rata basis upon the recalculation of the NAV.

There is no concrete injury to the Fund itself; similarly, there is no injury whatsoever to shareholders who invest in the fund subsequent to the time of injury.[5]  If this action were structured as a derivative action, it would not as accurately nor as justly compensate the class of individuals actually harmed by Defendants' conduct.  Instead, the recovery in a derivative action allocated to the Fund would immediately be distributed through the recalculation of the Net Asset Value to the then-current shareholders, some of whom did not own shares at the time of injury and *none* of whom would own the same portion of the fund as they did at the time of injury.  Furthermore, under a derivative scenario, all persons who owned shares at the time of injury but redeemed those shares before resolution of this action would be unjustly excluded from the recovery.  Accordingly, since Plaintiff has alleged a direct injury to himself and the putative class members, this case is properly brought as a direct action.

---

[5]          In contrast, in the context of a traditional corporation, there would be no direct, objective or calculable correlation between the value of an individual share and any gains or losses in the small portion of that corporation's assets that may be invested in the market, since the value of a share of a traditional corporation is based upon numerous, subjective market forces, related to factors both internal and external to the corporation.

In addition, Defendants have breached a fiduciary duty owed directly to Plaintiff and the putative class members. The directors of the fund owe a fiduciary duty directly to the investors. *See, e.g.,* Cox & Thomas, 80 WASH. U. L.Q. at 860, 863. Further, given that a mutual fund is merely "a conduit for the rendering of investment management services, " Riggs & Park, 112 BANKING L.J. at 758, the advisors and their affiliates owe fiduciary duties directly to the individual investors just as they do to any other investors whom they advise. *Panfil v. Scudder Global Fund, Inc.,* 1993 WL 532537, at *4 (N.D. Ill. 1993)*; Mann v. Kemper Financial Co., Inc.,* 618 N.E.2d 317, 327 (Ill. App. Ct. 1992); *see also* Cox & Thomas, 80 WASH. U. L.Q. at 863 (fund advisor is "a vendor of services to the mutual fund company, seen as having a fiduciary obligation to the fund and to the fund's shareholders").

Defendants' claims that they owe no duty to Plaintiff and other shareholders is the height of hypocrisy. When Defendants are seeking investors' money, they highlight the financial services they provide directly to the investors. For example, John Hancock promotes that "when you invest with John Hancock Funds you are investing with one of the most recognized and respected names in the financial services industry. Our parent company has been helping individuals and institutions increase and protect wealth since 1862."[6] John Hancock Asset Management's plea for trust is inconsistent with its instant position that it owes no duty directly to shareholders. In the same document, Defendants state "Our shareholders come first. We work hard to provide you with the products you need to build a solid financial foundation. We believe in the value of the advice, and partner with financial professionals in a commitment to help you reach your long-term investing goals." *Id.* When it is convenient to entice or placate shareholders, no attempt is made to differentiate between a duty owed to the fund or to the shareholders. In fact, just the opposite is true as Defendants affirmatively

---

[6]    "Why John Hancock Funds?," *available at,*   Http://jhfsh.jhfunds.com/common (copy attached as exhibit 5).

proclaim a duty owed to shareholders, and the funds are merely "products."  It is only when an investor seeks to enforce one of his rights that Defendants manufacture a legal barrier between themselves and their investors.

As has been shown, Plaintiff is owed a duty by Defendants and has personally and individually suffered harm as a result of Defendants' breach of that duty.  Accordingly, Plaintiff's allegations of breaches of duties owed directly to them and the putative class members provide a separate premise for pursuing this action directly.

### 2.    Rule 23.1 Does Not Apply to this Direct Action

Defendants assert that Plaintiff failed to comply with F.R.C.P. 23.1.  However, as a direct action rather than derivative action has been plead, compliance with F.R..C.P 23.1 is inapplicable.

### C.    FEDERAL ICA CLAIMS ARE PROPERLY ASSERTED BY PLAINTIFF

### 1.    Statutory Intent, Congressional History, and Long Established Jurisprudence Support Plaintiff's Private Right of Action under ICA § 36(a)

In determining whether to imply a private right of action, this court must look to the statutory language, congressional intent, and the statute's legislative history. *Alexander v. Sandoval*, 532 U.S. 275, 286–88 (2001).  As a general matter, a statute creates a private right of action if its language is "phrased in terms of the persons benefitted." *Gonzaga Univ. v. Doe*, 536 U.S. 273, 283 (2002).  The Congressional declaration of policy in the ICA specifically addresses the plight of investors like the plaintiff:

> "it is hereby declared that the policy and purposes of this title, in accordance with which the provisions of this title shall be interpreted, and are to mitigate and, so far as is feasible, to eliminate the conditions enumerated in this section which adversely affect the national public interest and the interest of investors."

15 U.S.C. § 80a-1.

Consistent with this declaration of policy, federal courts have long recognized implied private rights of action under numerous sections of the ICA .[7]  More specifically, over the course of the last four decades, courts in nearly every circuit have implied such actions under section 36(a) of the ICA.  See e.g., *Fogel v. Chestnutt,* 668 F.2d 100 (2d Cir. 1981) (recognizing implied rights of action for damages under section 36(a) of the ICA of where advisers or directors breach fiduciary duty); *McLachlan v. Simon*, 31 F.Supp.2d 731, 737 (N.D.Cal.1998) (clearly holding that a private right of action exists under § 36(a)); *Young v. Nationwide Life Ins. Co.*, 2 F.Supp.2d 914, 925–26 (S.D. Texas 1998) (stating, "this Court is also persuaded that a private cause of action should and does exist under § 36(a) of the ICA"); *In re Nuveen Fund Litig.*, 1996 WL 328006, at *6 (N.D.Ill. June 11, 1996) ("Accordingly, the court accepts Magistrate Judge Bobrick's recommendation to imply private rights of action under ICA § 34(b) and ICA § 36(a)."); *Seidel v. Lee*, 1994 WL 913930, at * 2 (D.Del. Oct. 14, 1994) (refusing to dismiss plaintiffs' 36(a) individual claims); *In re ML-Lee Acquisition Fund II, L.P.*, 848 F.Supp. 527, 539–45 (D.Del.1994) ("Thus, the Court believes Congress intended courts to continue to imply private rights of action for conduct proscribed under section 36(a)"); *Esplin v. Hirschi*, 402 F.2d 94, 103 (10th Cir.1968), *cert. denied*, 394 U.S. 928 (1969) (court considering issue of private right of action on its own motion); *Levitt v. Johnson*, 334 F.2d 815, 819 (1st Cir.1964), *cert. denied*, 379 U.S. 961 (1965) (finding private right of action was consistent with policy and case law),

---

[7]      *See, e.g., Bancroft Convertible Fund, Inc. v. Zico Investment Holdings Inc.*, 825 F.2d 731, 733 (3d Cir. 1987) (holding private right of action is proper under ICA § 10); *Meyer v. Oppenheimer Mgmt. Corp.*, 764 F.2d 76, 87–88 (2d Cir. 1985) (finding private rights of action under ICA §§ 15(f) and 36(b)); *Esplin v. Hirschi*, 402 F.2d 94, 102–03 (10th Cir. 1968); *Taussig v. Wellington Fund, Inc.*, 313 F.2d 472, 475–76 (3d Cir. 1963) (finding private right of action under 35(d)); *Brown v. Bullock*, 294 F.2d 415, 421 (2d Cir. 1961) (implying private right under §§ 15 and 37)); *In re Nuveen Fund Litig.*, 1996 U.S. Dist. LEXIS 8071, (implying private rights of action under §§ 34 (b), 36(a)); *Langner v. Brown*, 913 F. Supp. 260, 268–70 (S.D.N.Y. 1996) (implying private rights of action under §§ 10(a), 36(b), 17(a), 17(d), 20); *Blatt v. Merrill Lynch, Pierce, Fenner & Smith Inc.*, 916 F. Supp. 1343, 1349 (D.N.J. 1996) (implying private rights of action under §§ 7(d), 13(a)(3)); *Carr v. Equistar Offshore, Ltd.*, 1995 U.S. Dist. LEXIS 13703, at * 42–45 (S.D.N.Y. Sept. 21, 1995) (finding private right of action under § 7(d)); *Seidel v. Lee*, 1994 U.S. Dist. LEXIS 21534, at * 20–24 (D. Del. Oct. 14, 1994) (implying rights of action under §§ 36(a), 56(a), 57(a), 57(d)), 17(j)); *In re ML-Lee Acquisition Fund II, L.P.*, 848 F. Supp. 527, 541 (D. Del. 1994) (finding private rights of action under §§ 17(j), 36, 48, 57).

*Bancroft Convertible Fund, Inc. v. Zico Inv. Holdings, Inc.*, 825 F.2d 731, 735 (3d Cir.1987) (holding

that creation of private right of action under §36(b) did not destroy private rights of action under other

sections of the ICA). Only the Eighth Circuit refused to imply a private cause of action, but that

holding was thrown into doubt by a later decision of that circuit. *See Brouk v. Managed Funds, Inc.*,

286 F.2d 901, 912 (8th Cir.1961), *cert. denied*, 366 U.S. 958), *vacated as moot per curiam*, 369 U.S.

424 (1962), *later questioned in Greater Iowa Corp. v. McLendon*, 378 F.2d 783, 793 (8th Cir.1967).

An important consideration in these decisions is that implied rights of action under section

36(a) have consistently been supported by the legislative history each time the ICA has been amended.

For example, in *Bancroft*, the Third Circuit stressed that Congress expressly encouraged private

actions in the legislative history to the 1980 amendments:

> "The Committee wishes to make plain that it expects the courts to imply private rights
> of action under this legislation, where the plaintiff falls within the class of persons
> protected by the statutory provision in question. Such a right would be consistent with
> and further Congress' intent in enacting that provision, and where such actions would
> not improperly occupy an area traditionally the concern of state law. In appropriate
> instances, for example, breaches of fiduciary duty involving personal misconduct
> should be remedied under Section 36(a) of the Investment Company Act. With respect
> to business development companies, <u>the Committee contemplates suits by shareholders
> as well as by the Commission, since these are the persons the provision is designed to
> protect, and such private rights of action will assist in carrying out the remedial
> purposes of Section 36.</u>"

*Bancroft Convertible Fund v. Zico Holdings Inv.*, 825 F.2d at 736 (*quoting* H.R.Rep. No. 1341, 96th

Cong., 2d Sess. 28-29 (1980), *reprinted in* 1980 U.S.C.C.A.N. 4800, 4810-11) (emphasis added)).

The Third Circuit concluded: "Clearly, the Committee Report expressly approves the position of those

courts which, following the 1970 amendments, held that private causes of action should be implied

from the Investment Company Act." *Id*. at 733, 736.

After reviewing this and other legislative history, the court in *Young v. Nationwide Life Ins.*,

reached the same conclusion.  2 F. Supp.2d at 925.  The *Young* court also highlighted the 1969

amendments: "Furthermore, when §36 was amended in 1969 and an express private remedy was added to subsection (b), the legislative history indicates that 'the fact that subsection (b) specifically provides for a private right of action should not be read by implication to affect subsection (a)'" *Id.* (*quoting* S.Rep. No. 91-184, at 16 (1969)). The *Young* court concluded: "In this case, there is only one definitive answer that can be gleaned from the legislative history of the 1980 amendments: Congress expects courts to imply private rights of action. The Court cannot ignore such strong Congressional sentiments." *Id.*[8]

Relying on *Olmstead v. Pruco Life Ins.*, 283 F.3d 429 (2d Cir. 2002) and *Chamberlain v. Aberdeen Asset Management Ltd.*, 2005 WL 195520 (E.D.N.Y., Jan. 21, 2005), Defendants ask this Court to ignore the above-referenced Congressional sentiments and to abandon the decades of jurisprudence discussed above. It is important to note that in *Olmstead*, the Second Circuit addressed claims under ICA sections 26(f) and 27(i), neither of which is at issue here. However, in *Strougo v. Bassini,* 282 F.3d 162, (2d Cir. 2002), decided contemporaneously with *Olmstead,* the Second Circuit squarely addressed § 36(a). The Second Circuit joined the many other circuit and district courts in implying a private right of action, explaining: "We thus see nothing in the general policies of the ICA that would militate against importing Maryland's rules of shareholder standing for claims brought for alleged violations of the ICA sections cited by the plaintiff.... We hold that the plaintiff's alleged injuries associated with coercion support direct claims under both Maryland law and, in this case, §§ 36(a), 36(b), and 48 of the ICA." *Id.* at 176–77.

Further, Defendants' reliance on *Chamberlain v. Aberdeen Asset Mgmt. Ltd.*, 2005 WL 195520 (E.D.N.Y., Jan. 21, 2005) is improper because, as Defendants recognize, that opinion has been vacated. Although there has been some controversy among the lower courts over whether decisions

---

[8]    Additionally, another court stated that the legislative history addressing 36(a) demonstrates an "enthusiastic expression of [congressional] intent" *In re: Nuveen Fund Litig.*, 1996 WL 328006, at *6 (N.D. Ill. June 11, 1996).

should be vacated pursuant to a settlement, the U.S. Supreme Court has approved the procedure. *See*

*Clark Equipment Co. v. Lift Parts Manufacturing Co., Inc.,* 972 F.2d 817 (7th Cir. 1992) (and cases

cited therein). Regardless, once a decision has been vacated, the decision has no precedential authority.

*Garcia v. Spun Steak*, 998 F.2d 1480, 1487, n.1 (9th Cir. 1992)..

In summary, because this action is brought by a mutual fund investor, pursuant to statutory

provisions intended to protect such a class, jurisprudence implying private rights of action under the

ICA, legislative history, and statutory intent all support a private right of action to vindicate the rights

asserted by Plaintiff.

**2.    Plaintiff Has Sufficiently Pled a Claim under ICA § 36(a)**

ICA § 36(a) prohibits " any act or practice constituting a breach of fiduciary duty involving

personal misconduct in respect to the registered investment company."   15 U.S.C.   § 80a-35(a).

Contrary to Defendants' argument, violations of section 36(a) are not limited to the context of "self-

dealing."  In *Young v. Nationwide Life Ins. Co.*, 2 F. Supp. 2d at 927, the Court specifically rejected

this argument, relying, in part, on the legislative history, which provides that "any '*nonfeasance of*

*duty or abdication of responsibility* would constitute a breach of fiduciary duty involving personal

misconduct.'" *Id.* (*quoting* S.Rep. No. 91-184 at 16 (1970), *reprinted in* 1970 U.S.C.C.A.N. 4897,

4931 (emphasis added)); *see also* H.R. Rep. No. 96-1341, *reprinted in* 1980 U.S.C.C.A.N. 4800, 4808

("The Committee believes that the type of misconduct covered by [§ 36(a)] . . . extends to personal

misconduct evidenced by misfeasance or nonfeasance in carrying out legal responsibilities *as well as*

*self-dealing* and other examples of unjust enrichment." (emphasis added);  *In re: Nuveen Fund Litig.*,

1996 WL 328006, at *12 (N.D. Ill. June 11, 1996) ("[n]onfeasance of a duty or abdication of

responsibility would constitute a breach of fiduciary duty involving personal misconduct" in proper

cases).  Accordingly, by pleading nonfeasance and malfeasance on the part of Defendants in failing

to maximize the investors' financial return and by failing to ensure participation in securities class

actions, Plaintiff has properly pled a claim under section 36(a) of the ICA and Defendants' motions to dismiss should be denied.[9]

###         3.        Plaintiff Has Sufficiently Pled a Claim under ICA § 36(b)

ICA § 36(b) provides a federal remedy for breaches of fiduciary duty by Fund advisors and their affiliates. While there must be some relationship between the fees paid to the Fund, Defendants, and the wrongful conduct alleged, the focus of Plaintiff's allegations need not be entirely on fees. For example, courts have "permitted challenges under section 36(b) for breaches of fiduciary duty as long as they result in or pertain to excessive fees." *Rohrbaugh v. Inv. Co. Inst.*, 2002 U.S. Dist. LEXIS 13401, at *32 (D.D.C. July 2, 2002); *see also Galfand v. Chestnutt Corp.*, 545 F.2d 807, 811-12 (2d Cir. 1976)(permitting a §36(b) claim against an investment adviser who withheld information regarding his proposed contract for management fees).

Plaintiff has alleged that as a result of systematic breaches of fiduciary duty, Defendants are not entitled to any compensation from Plaintiff and the Class. Compl. at ¶¶ 1, 33, 48. *Krantz v. Prudential Invs. Fund Mgmt. L.L.C.*, 77 F.Supp.2d 559, 565 (D.N.J. 1999)(holding that "receipt of compensation while breaching a fiduciary duty violates Section 36(b), 15 U.S.C. § 80a-35(b)"); *Letsos v. Century 21-New West Realty*, 675 N.E.2d 217 (Ill. App. 1996); *Royal Carbo Corp. v. Flameguard, Inc. et al.*, 229 A.D.2d 430 (N.Y. App. Div. 1996) ("it is well settled that one who owes a duty of fidelity to a principal and who is faithless in the performance of his or her services is generally not entitled to recover compensation, whether commissions or salary."); RESTATEMENT (SECOND) OF AGENCY § 469 (1958) ("An agent is entitled to no compensation for conduct which is disobedient or which is a breach of his duty or loyalty; if such conduct constitutes a willful and deliberate breach of his contract of services, he is not entitled to compensation even for properly performed services for

---

[9]        Defendants' arguments related to the Business Judgment Rule are irrelevant since this case has been brought directly rather than as a derivative action. Moreover, the factual issues raised by Defendants as to whether the advisor defendants have *sole* responsibility for ensuring participation in securities class action settlements is a factual dispute not properly raised in a Motion to Dismiss.

which no compensation is apportioned").  As such, Plaintiff has alleged that *any and all* compensation Defendants received for their services to fund shareholders is excessive.

Defendants' argument that Plaintiff has failed to plead **with sufficient specificity** his claims with respect to the connection between Defendants' breaches of fiduciary duty and excessive compensation implies a heightened pleading standard that does not apply to ICA claims.  To sufficiently plead ICA claims, Plaintiff must set forth only "a short and plain statement of the claim showing that the pleader is entitled to relief"  Fed. R. Civ. P. 8(a)(2); *Migdal v. Rowe-Price Fleming Int'l*, 248 F.3d 321, 326 (4th Cir. 2001).  Plaintiff need only provide a "factual basis for believing that a legal violation has actually occurred." *Migdal* at 328.  "It is unnecessary for the plaintiff to set forth evidentiary details to support this allegation," or to plead evidentiary support for each element of the claim which must be established at trial.  *Pfeiffer v. Bjurman, Barry & Assocs.*, 2004 U.S. Dist. LEXIS 16924, at *15 (S.D.N.Y. Aug. 26, 2004) (citing *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 512 (2002)).

Plaintiff has established the sufficient nexus between Defendants' conduct, and the excessive fees Defendants have received from Plaintiff and other putative Class Members as a result. Accordingly, Plaintiff has adequately plead a claim under §36(b).

## 4.    ICA  § 47(b) Provides a Remedy for Violations of Other ICA Sections

As Defendants recognize,  ICA § 47(b) provides a remedy rather than a distinct cause of action or basis for liability.  *Galfand v. Chestnutt Corp.*, 545 F.2d at 813–14.  This section provides an equitable remedy upon a showing of a violation of other sections of the ICA, stating: "[a] contract that is made, or whose performance involves, a violation of this subchapter ... is unenforceable by either party."  15 U.S.C. § 80a-46(b).  Therefore, Plaintiff does not need to show independent standing to pursue a claim under section 47(b).  Instead, Plaintiff's Complaint  seeks  the  relief provided by 47(b)

(rescission of the contract and forfeiture of fee) as an equitable remedy for Defendants' violation of sections 36(a) and 36(b) of the ICA.   Complaint ¶¶ 46-48.

## CONCLUSION

Plaintiff has standing to file the claims contained in his complaint, and has plead them sufficiently.  Accordingly, Defendants' Motion to Dismiss should be denied.

Dated: May 26, 2005

<div style="margin-left:40%">

Respectfully submitted,

By:    /s/ David Pastor
David Pastor (BBO #391000)
GILMAN AND PASTOR, L.L.P.
60 State Street; 37th Floor
Boston, MA 02109
(617) 742-9700
(617) 742-9701 fax

Randall K. Pulliam
BARON & BUDD, P.C.
3102 Oak Lawn Ave.; Suite 1100
Dallas, Texas 75219-4281
(214) 521-3605
(214) 520-1181 fax

Hank Bates
J. Allen Carney
Brooke Augusta Owen
CAULEY BOWMAN CARNEY & WILLIAMS
11311 Arcade Dr., Suite 200
Little Rock, Arkansas 72212
(501) 312-8500
(501) 312-8505 fax

**PLAINTIFF'S COUNSEL**

</div>

# EXHIBIT 1

# LEAVING MONEY ON THE TABLE: DO INSTITUTIONAL INVESTORS FAIL TO FILE CLAIMS IN SECURITIES CLASS ACTIONS?

JAMES D. COX[*]
RANDALL S. THOMAS[**]

Commencing two decades ago, and continuing today, the institutional investor is the most significant focus in reform efforts for securities markets and the American corporation. Whether the question is the type of disclosures that must be made in connection with a public offering,[1] the scope of nonpublic offerings,[2] or making the corporation more responsive to owners,[3] the focus is on the significant trading and ownership interest of institutional investors. As is well understood, such emphasis on financial institutions in reforming corporate and securities laws is based upon their ownership of, and trading in, the stock of publicly held corporations. For example, financial institutions own nearly 50% of the equity securities listed on the New York Stock Exchange (NYSE) and account for approximately 75% of the daily trading volume on the NYSE.[4] The ownership and trading

---

    * Brainerd Currie Professor of Law, Duke University School of Law.
    ** Professor of Law, Vanderbilt University Law School.
    We would like to thank Edward Labaton, the Institute for Law and Economic Policy, and its members for their assistance in gathering the data used in this project. We gratefully acknowledge the research assistance of Carl C. Carl, Katherine Knight Schultz, and Jian Wang.

    1. The SEC's integrated disclosure procedures and shelf registration process is heavily dependent upon the view that the securities of companies eligible to use the integrated disclosure system are traded in an efficient market. *See* Adoption of Integrated Disclosure System, Securities Act Release No. 33-6383 (Mar. 3, 1982), 47 Fed. Reg. 11,819 (Mar. 19, 1982); Randall S. Thomas & James F. Cotter, *Measuring Securities Market Efficiency in the Regulatory Setting*, 63 LAW & CONTEMP. PROBS. 105, 109 (Summer 2000). That determination in part rests upon a belief that institutional investors are both significant traders and owners of such securities.

    2. Though Rule 144A is technically a resale exemption, not an issuer exemption, it was developed to facilitate capital raising by issuers by permitting securities to be effectively syndicated to financial institutions, qualified institutional buyers, who are generally defined as an entity having a securities portfolio of at least $100 million. Institutional investors also are swept within the definition of an accredited investor to whom the issuer has no obligation to provide investment information as a condition of selling its securities. *See* 17 C.F.R. § 230.502(a) (2001) (Securities Act Rule 502(a)); 17 C.F.R. § 230.506 (2001) (Securities Act Rule 506).

    3. *See, e.g.*, Bernard S. Black, *Agents Watching Agents: The Promise of Institutional Investor Voice*, 39 U.C.L.A. L. REV. 811 (1992); John C. Coffee, Jr., *Liquidity Versus Control: The Institutional Investor as Corporate Monitor*, 91 COLUM. L. REV. 1277 (1991). *Cf.*, Edward B. Rock, *The Logic and (Uncertain) Significance of Institutional Shareholder Activism*, 79 GEO. L.J. 445 (1991).

    4. At the close of the third quarter of 2001 financial institutions held 50.8% of all publicly traded equities. *See* NYSE Fact Book 2000, at 61 (citing Federal Reserve Board "Flow of Funds," *available at* www.federalreserve.gov). The best indication of the overall volume of institutional

percentages are equally high for securities listed on the North American Securities Dealers Exchange (Nasdaq).[5]

Though we also champion the vast potential that has been accorded institutional investors, we examine here one area where financial institutions are claimed to be guilty of passivity equal to that of the "small investors": do financial institutions fail to submit claims for their losses in settled securities class actions? In other words, do institutions frequently leave money on the table that is theirs for the asking?

## I. THE UNEVEN ROLE OF THE INSTITUTIONAL INVESTOR IN PROSECUTING SECURITIES CLASS ACTIONS

In their now classic article, Professors Elliott Weiss and John Beckerman marshalled data collected from eighty-two class action settlements to reveal that the fifty largest claimants in these class actions had an average allowed loss of $597,000 and accounted for 57.5% of the total allowed loss.[6] More significantly, the largest and the second-largest claimants accounted for 13.1% and 6.7%, respectively, of the total recognized losses of a subset of twenty class actions within their overall sample.[7] From this finding, Weiss and Beckerman argued that judges considering settlements in securities class actions should harness the economic self-interest of such a larger claimant(s) by designating those with significant losses as the suit's lead plaintiffs.[8] Doing so would address the broadly recognized concern that class actions are "lawyer driven," and that it is the economic interests of the classes' attorneys, not the classes' representatives, that decide such important issues as whether the claim should be prosecuted, settled, or pursued to the next level.[9] Though

---

trading is the data regarding "block" trades, i.e., trades of a least 10,000 shares for an individual stock. For 2001, block trades represented 48.1% of total trading volume on the NYSE, a decline however from a high of 57% in 1995. *Id.* at 99. More generally, see Jerome Markam, *Protecting the Institutional Investor—Jungle Predator or Shorn Lamb,* 12 YALE J. ON REG. 345, 347-48 (1995).

5. The data set forth *supra* note 4 regarding institutional holdings of traded equities does not distinguish between NYSE- and Nasdaq-listed securities. However, Nasdaq reports that at the end of 2000 some 40.3% of the Nasdaq National Market Securities was held by institutions (whereas institutions owned 37.8% of all Nasdaq-traded securities, which rises to 47.4% when measured by value). http://www.marketdata.nasdaq.com/asp/Sec4TSO.asp. Block trades represent 25% of the trading volume in Nasdaq National Market Securities. *See* http://www.marketdata.nasdaq.com/asp/Sec4Blockvol.asp.

6. Elliott J. Weiss & John S. Beckerman, *Let the Money Do the Monitoring: How Institutional Investors Can Reduce Agency Costs in Securities Class Actions,* 104 YALE L.J. 2053, 2089 (1995).

7. *Id.* at 2090.

8. *Id.* at 2105-09.

9. The literature on this point is vast. *See, e.g.,* John C. Coffee, Jr., *Rescuing the Private Attorney General: Why the Model of the Lawyer as Bounty Hunter Is Not Working,* 42 MD. L. REV. 215 (1983); John C. Coffee, Jr., *Understanding the Plaintiff's Attorney: The Implications of Economic*

Weiss and Beckerman reasoned that courts had the inherent power to take such steps, Congress decided not to leave such matters to the individual judgment of the presiding judge. Thus, with the enactment of the Private Securities Litigation Reform Act of 1995 (PSLRA),[10] formal procedures for the appointment of a lead plaintiff were mandated for securities fraud class actions.

Section 21D(a)(3) of the Securities Exchange Act[11] sets forth the procedures and criteria for the appointment of lead plaintiffs. Within twenty days of the filing of the complaint, notice must be published "in a widely circulated national business-oriented publication or wire service" inviting class members to apply to be the suit's representative.[12] Not later than ninety days after the publication of such notice, the court must appoint a lead plaintiff from those who have applied.[13] The most significant factor supporting a presumption of who is the "most adequate plaintiff" is the claimant that "has the largest financial interest" in the suit.[14] The next provision underscores the strength of this presumption by providing that it can only be overcome by proof that the party having the largest financial interest will not adequately represent the class or is subject to unique defenses.[15]

Thus far, the debate surrounding the selection of a lead plaintiff has focused on the propriety of aggregating investor losses so as to enjoy the benefits of the before-described presumption.[16] This, of course, is not just a

---

*Theory for Private Enforcement of Law through Class and Derivative Actions,* 86 COLUM. L. REV. 669 (1986); Jill E. Fisch, *Class Action Reform: Lessons from Securities Litigation,* 39 ARIZ. L. REV. 533 (1997); John Macey & Geoffrey Miller, *The Plaintiffs' Attorney's Role in Class Actions and Derivative Litigation: Economic Analysis and Recommendations for Reform,* 58 U. CHI. L. REV. 1 (1991); Randall S. Thomas & Robert G. Hansen, *Auctioning Class Action and Derivative Lawsuits: A Critical Analysis,* 87 NW. U. L. REV. 423 (1993).

10. Private Securities Litigation Reform Act of 1995, Pub. L. No. 104-47, 109 Stat. 937 (1995).

11. 15 U.S.C. § 78u-4(a)(3) (2001).

12. Section 78u-4(a)(3)(A)(i). Additional notice can be required by the presiding court. *Id.* at § 78u-4(a)(3)(A)(ii).

13. Section 78u-4(a)(3)(B)(i).

14. Section 78u-4(a)(3)(B)(iii)(I). The other two factors listed are that the designee was the party to the original complaint or petitioned to be the lead plaintiff and "otherwise satisfies the requirements of Rule 23 of the Federal Rules of Civil Procedure." *Id.* Since any plaintiff must meet the latter requirement, and the court is unlikely to be disposed to seek out a representative who is not before it, the relative size of the claimant naturally becomes the determining factor of whether the presumption applies.

15. Section 78u-4(a)(3)(B)(iii)(II).

16. *See, e.g.,* Jill E. Fisch, *Aggregation, Auctions, and Other Developments in the Selection of Lead Counsel under the PSLRA,* 64 LAW & CONTEMP. PROBS. 53, 65-78 (Spring/Summer 2001) (arguing thi aggregation weakens the relationship between lead plaintiff and class counsel); R. Chris Heck, Comment, *Conflict and Aggregation: Appointing Institutional Investors as Sole Lead Plaintiffs under the PSLRA,* 66 U. CHI. L. REV. 1199, 1220-21 (1999) (suggesting that courts must restrain

tussle among competing class members but has serious ramifications for the plaintiffs' securities bar. Under the PSLRA, the lead plaintiff, subject to the approval of the court, has the power to select and retain counsel.[17] Any doubt about a class counsel's stakes regarding who is the lead plaintiff was resolved by In re *Microstrategy, Inc. Sec. Litig.*,[18] where initially Mr. Mazza was appointed lead plaintiff because he had the greatest loss among the five applicants.[19] Mr. Mazza's selection of Firm *A* as class counsel was approved.[20] Later, he withdrew as lead plaintiff for personal reasons.[21] Thereafter, following motions to be appointed as lead plaintiff to replace Mr. Mazza, the Minami family and Local 144 Nursing Home Pension Fund were appointed co-lead plaintiffs.[22] The Minami family's losses of $900,000 were the greatest among the other petitioners, and Local 144's losses of $600,000 were deemed to qualify it as co-lead plaintiff.[23] They each had their own choice of counsel: Firm *B* for the Minami family and Firm *C* for Local 144.[24] Both requests were approved by the court, with the effect that the Firm *A* ceased to be engaged in the suit[25] and could only watch from the sidelines as the parties entered into a subsequent settlement that ultimately resulted in the new class counsel being awarded $27.6 million.[26] Thus, who is the lead plaintiff matters, and matters a lot, to the attorneys who seek to represent the class.

Because class counsel appointments depend upon who is selected as the lead plaintiff,[27] the lead plaintiff provision effectively stimulates a tournament among competing attorneys to identify themselves with investors whose losses are so significant that they may qualify as the most adequate plaintiff. As such, the lead plaintiff provision has not eliminated the strong

---

aggregation to avoid lawyers assembling groups in ways that restore control over the litigation to themselves).

17. Section 78u-4(a)(3)(B)(V).

18. Fed. Sec. L. Rep. (CCH) ¶ 91,632 (E.D. Va. 2001).

19. *Id.* at 97,736 n.10.

20. *Id.*

21. *Id.*

22. *Id.*

23. *Id.*

24. *Id.*

25. *Id.*

26. *Id.* at 97,740 n.37.

27. And, with the decision in *In re Cendant Corp. Sec. Litig.*, 264 F.3d 201 (3d Cir. 2001), the lead plaintiff is all the more important in identifying who will be class council. *Cendant* held that in most instances where the court has appointed a lead plaintiff, it would be inappropriate for the trial court to select counsel through a competitive bidding process. Prior to *Cendant*, many courts severed the process of appointing lead plaintiff from the selection of counsel and discharged the latter responsibility by inviting interested firms to engage in competitive bidding. *See generally* Fisch, *supra* note 16, at 78-95.

interest of class counsel in the initiation of securities class actions; they remain lawyer-driven notwithstanding the PSLRA.[28]

Table 1 presents the results of our search of the Westlaw ALLFED library database for opinions bearing on courts' appointments of lead plaintiffs. Between January 1, 1996, and December 15, 2001, we found thirty-six reported opinions dealing with the presiding court's selection of a lead plaintiff.

Table 1

SUMMARY OF FIVE-YEAR HISTORY OF SELECTING LEAD PLAINTIFF

| | |
|---|---|
| Cases without an Institutional Petitioner | 11 |
| Cases with Competing Institutional Petitioners | 12 |
| Cases with Single Institutional Petitioner and Institutional Petitioner Selected | 8 |
| Individual/Group Selected Over Institution | 5 |

The above data seems to show that when there is a contest between a financial institution and an individual, or group of individuals, vying to be the lead plaintiff, the institution generally is determined to be the most adequate plaintiff. In twenty out of twenty-five cases where institutions applied to be lead plaintiffs, they were selected. However, our curiosity is piqued by the absence of a petitioning institutional investor in one-third of our sample. We also wonder what happened in the five instances in which the court selected a group of individuals over the petitioning institution.

Our intuition is that, on average, institutional investors are more likely to trade significantly larger blocks of shares than individuals over time. We further speculate that institutional trading overall is more likely to represent a significant percentage of the trading in a company's shares during the class action interval in a securities fraud settlement. If this so, why then do we see that in a significant portion of the reported decisions appointing a lead plaintiff, there is not any financial institution seeking to represent the class? And, in the few instances where a group of individuals was preferred over a petitioning financial institution, why were they preferred? Why were there not other financial institutions who sought to be appointed that had larger losses, larger than both those of the institution that did petition and also those

---

28. *See, e.g.,* In re Razorfish, Inc. Sec. Litig., 143 F. Supp.2d 304 (S.D.N.Y. 2001) (describing the contest among law firms who competed to be counsel for a securities class action by advancing their respective candidates to be the lead plaintiff. The court concluded that "the instant case illustrates . . . securities class litigation continues to be lawyer-driven in material respects and the reforms Congress contemplated in the Reform Act can be achieved, if at all, only with some help from the courts"). *Id.* at 307.

of the group of individuals ultimately appointed lead counsel?

In section IV, we further address these concerns indirectly, by examining another phenomenon: whether institutions not only fail to step up to be a lead plaintiff, but whether they also fail to submit claims to the settlement administrator who is dispensing funds from settled securities class actions. However, we first need to make clear the institutional investors' obligations, or lack thereof, to file suit or make claims in these cases.

## II. THE INSTITUTIONAL INVESTOR AS A FIDUCIARY

What are the legal compulsions for the institutional investor to petition to be a lead plaintiff? To file a claim in a settled case? Should the institutional investor on both counts just stay in bed? When the institutional investor, such as an investment bank, acts for its own account, it has no obligation except the general social obligation to take care of itself without being a burden to others. Thus, it might refuse to harness its self-interest to the prosecution of the securities class action. And should it choose not to file a claim when the case is settled, its slovenly action is celebrated by other class members because there is more money to distribute to them. However, typically institutional investors are acting as representatives for others. As such, they are easily classified as fiduciaries. The source of this obligation varies from institution to institution, but as will be seen, their obligation to file claims in settled securities class actions appears not to vary. This fiduciary command, however, falls on the fund's managers, not on the institution itself.[29]

### A. Private Pension Funds

Since 1974, the fount of private pension funds managers' fiduciary obligations has been the Employee Retirement Income Security Act (ERISA), which, among other features, sets forth certain fiduciary obligations.[30] The fiduciary obligation provisions of ERISA are a central aspect of its protections of employee benefit rights.[31] The exact boundaries of ERISA's fiduciary requirements are decided within its broad command in

---

29. *See* Weiss & Beckerman, *supra* note 6, at 2112 ("It is the managers of the institutional investors, not the institutions themselves, that are fiduciaries."). On the general topic of the fiduciary responsibilities of the institution as a lead plaintiff, see Craig C. Martin & Mathew H. Metcalf, *The Fiduciary Duties of Institutional Investors in Securities Litigation,* 56 BUS. LAW. 1381 (2001).

30. *See* 29 U.S.C. §§ 1001-1144 (2001).

31. *See generally* Deborah A. Geier, *ERISA: Punitive Damages for Breach of Fiduciary Duty,* 35 CASE W. RES. 743, 746 (1985). The Act's duties extend not only to one who exercises control over the fund, but also to those who render advice. *Id.* at 747-48.

section 404 that imposes on managers a duty to use the degree of skill, care, and prudence of a reasonable person "in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims."[32]  Though this standard has a similar ring to that found in everyday tort law decisions, it is generally understood that ERISA is even more exacting in its demands than what prevails at common law.[33]  ERISA also imposes an affirmative obligation of loyalty on fund managers by its requirement that these plan fiduciaries must discharge their duties solely in the interests of the fund's participants and beneficiaries.[34]

The fiduciary duty embodied in ERISA can be traced to the common law of trusts and therefore embodies the obligation to preserve and maintain fund assets.[35]  It is on this foundation that Professors Weiss and Beckerman extrapolate an obligation for fund managers to consider initiating suit where necessary to protect, maintain, or reclaim fund property that is the subject of their trust.[36]  Pursuit, however, is not mandated if the manager's decision not to act is reasonably based. Thus, in *McMahon v. McDowell*, the court held an ERISA fiduciary did not breach its duty to the fund by failing to take steps to enforce a claim, and could even abandon the claim, if the fiduciary reasonably believed that action would be futile.[37]

This holding has significant implications for our interpretation of PSLRA's provisions. Because the PSLRA bars discovery prior to the court's consideration of the defendants' motion to dismiss, the information bearing on the suit's merits that is available even to the most sophisticated investor is extremely limited.[38]  Hence, to the extent there are nontrivial costs to an institution from petitioning to become a lead plaintiff, not to mention the uncertainty of whether the institution will be selected, these costs may weigh more heavily than the expected benefits to the institution from the suit, not to mention its participation in the suit. Thus, though the private pension fund's managers may theoretically face liability for imprudently assessing whether to serve as a lead plaintiff for a securities class action claim, there would be

32.  29 U.S.C. § 1104.
33.  *See, e.g.,* Susan J. Stabile, *Pension Plan Investments in Employer Securities: More Is Not Always Better,* 15 YALE J. ON REG. 61, 71 (1998).
34.  29 U.S.C. § 1104. The force of each of these duties is underscored by ERISA's provision that damages or equitable relief can be sought against any fiduciary who breaches his or her duties under the Act. *See* 29 U.S.C. § 1109(a).
35.  *See, e.g.,* Central States Southeast & Southwest Areas Pension Fund v. Cent. Trans., Inc., 472 U.S. 559 (1985).
36.  *See* Weiss & Beckerman, *supra* note 6, at 2116.
37.  794 F.2d 100, 110 (3d Cir. 1986).
38.  Randall S. Thomas & Kenneth J. Martin, *Using State Inspection Statutes for Discovery in Federal Securities Fraud Action,* 77 B.U. L. REV. 69, 71 (1997).

many potential justifications for them to assume a posture of rational apathy. However, with respect to failing to submit a claim to an administrator in a settled action for proven losses, we think there would be far fewer instances in which apathy would be a reasonable response to its fiduciary obligations.[39]

## B. Public Pension Funds

Though nonfederal public pension funds are specifically exempted from ERISA,[40] the fiduciary obligations that apply to public pension fund managers are no less demanding than the ERISA standards for our purposes. State pension funds are governed by the general state laws pertaining to trusts and investments. In addition, there are special pension fund legislative requirements at the state, county, and even municipal levels.[41] For example, California sets forth fiduciary obligations for its retirement pension fund in its Constitution, embracing a standard very similar to that found in ERISA.[42] By contrast, New York does not have either a constitutional or statutory standard, but because such managers are deemed trustees, they are subject to the common law fiduciary standard that applies to trustees generally.[43] Furthermore, a detailed list of similar fiduciary principles is set forth in the Uniform Management of Public Employee Retirement Systems Act that has now been adopted in sixteen states.[44] Because of the great similarity in the

---

39. *See* Weiss & Beckerman, *supra* note 6, at 2117. To be sure, if the expected payment from the fund was dwarfed by the cost to prepare and submit the claim, the fiduciary, consistent with its fiduciary obligations, could choose not to submit the claim. Beyond this limited instance, it would be difficult to envision bases that would be consistent with the fiduciary being rationally apathetic.

40. *See* 29 U.S.C. § 1003(b)(1) (2001).

41. *See generally* BETTY LINN KRIKORIAN, FIDUCIARY STANDARDS IN PENSION AND TRUST FUND MANAGEMENT (1989).

42. *See* CAL. CONST. art. XVI § 17(c) (2001) ("[D]ischarge their duties . . . with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with these matters would use in the conduct of an enterprise of a like character and with like aims.").

43. *See* Krikorian, *supra* note 41, at 346. *See also* N.Y. RETIRE. & SOC. SEC. LAW §§ 176–79 (McKinney 2001).

44. A trustee or other fiduciary shall discharge duties with respect to a retirement system:

(1) solely in the interest of the participants and beneficiaries;

(2) for the exclusive purpose of providing benefits to participants and beneficiaries and paying reasonable expenses of administering the system;

(3) with the care, skill, and caution under the circumstances then prevailing which a prudent person acting in a like capacity and familiar with those matters would use in the conduct of an activity of like character and purpose;

(4) impartially, taking into account any differing interests of participants and beneficiaries;

(5) incurring only costs that are appropriate and reasonable; and

(6) in accordance with a good-faith interpretation of the law governing the retirement program and

functions performed by public pension fund managers and private pension fund managers, and because of the nearly identical scope of their fiduciary obligations, there is every reason to expect that the obligations of public pension fund managers with respect to pursuing a securities claim will be the same as that for private pension fund managers.[45]

## C. Mutual Fund Managers

The Investment Company Act of 1940[46] sought to protect investors in registered mutual funds by, among other steps, imposing on the fund advisors and their directors certain fiduciary obligations, as well as by creating a wide range of prophylactic requirements.[47] In addition to the fiduciary obligations imposed by the Investment Company Act, advisors are subject to the demands of the Investment Advisers Act of 1940.[48] Furthermore, the Investment Company Act does not preempt state law fiduciary standards that apply generally to officers and directors of mutual fund companies,[49] so the directors and managers of mutual funds have the same fiduciary obligations to their shareholders as do directors and managers of other corporations.[50] Of special interest here is that the fund's advisor, a vendor of services to the mutual fund company, is seen as having a fiduciary obligation to the fund and to the fund's shareholders.[51] In this respect, mutual funds are quite different from, say, General Motors, whose various suppliers of services and goods are not deemed to have a fiduciary relationship to General Motors'

---

system.
The Uniform Management of Public Employee Retirement Systems Act § 7 (1997), *available at* http://www.law.upenn.edu/bll/ulc/ulc_frame.htm (visited Feb. 9, 2002). Section 11 of the Act imposes personal liability upon fiduciaries who breach an obligation under the Act.

45.  The Uniform Act's obligations are derived from ERISA and the law of trusts. *See* Steven L. Willborn, *Public Pensions and the Uniform Management of Public Employee Retirement Systems Act*, 51 RUTGERS L. REV. 141, 145 (1998).

46.  15 U.S.C. § 80a-1 et seq. (2001).

47.  *Id.*

48.  15 U.S.C. § 80b-1 et seq. (2001).

49.  *See* Green v. Fund Asset Mgmt., L.P., 245 F.3d 214, 225-26 (3d Cir. 2001) (holding that Congress did not intend by enacting section 36(b) of the Investment Company Act authorizing suits for excessive management fees to preempt state law fiduciary principles that apply to the directors' decision to award excessive compensation).

50.  *See generally* Symposium Panel, *Mutual Fund Regulation in the Next Millennium: I. Fund Governance*, 44 N.Y.L. SCH. L. REV. 431 (2001).

51.  *See* TAMAR FRANKEL, THE REGULATION OF MONEY MANAGERS: THE INVESTMENT COMPANY ACT AND THE INVESTMENT ADVISORS ACT 343 (2000) (suggesting that an advisor has a fiduciary relationship that calls for it to act primarily for the benefit of the other in matters connected to its undertaking). The advisor's duties are determined in this regard by reference to the principles of common law regarding agents, and, because they are closely analogous to brokers, advisors are subject to more demanding standards than agents. *Id.* at 372.

stockholders.

So understood, the mutual fund's directors, officers, and advisors are all subject to a fiduciary duty to not act negligently, although negligence in this context involves some element of intent such that the standard is more akin to that of recklessness.[52] Nevertheless, the objective standard applied remains that of the level of skill and prudence that the reasonable person would exercise in a similar undertaking for a similar institution.[53]

### D. Insurance Company Managers

Insurance companies are exempt from the Investment Company Act[54] and are instead regulated by state insurance codes and commissioners.[55] Most states do not impose a fiduciary obligation on insurance companies to their policyholders; fiduciary duties do exist on the part of directors and officers to shareholders for nonmutual insurance companies.[56] This said, some courts nevertheless have recognized that some functions are trustee-like and have imposed fiduciary obligations on the insurance company's management when performing tasks such as collecting premiums and managing company funds.[57] Under this view, imprudence in pursuing assets that belong to the insurance company would constitute a breach of fiduciary duties if company reserves are reduced because of management's lack of prudence.

When the insurance company has stockholders, the fiduciary demands on its directors and officers should be the same as with any corporation. Subsumed within the corporate directors' and officers' fiduciary obligations is the duty to be attentive to acts or practices that will harm the corporation.[58]

---

52. *Id.* at 645-46.
53. *Id.* at 657-58.
54. *See* Section 3(c)(3), 15 U.S. C. § 80a-3(c)(3) (2001).
55. This arrangement reflects the impact of the McCarran-Ferguson Act, 15 U.S.C. §§ 1011-1015 (2001), which exempts insurance companies from most federal regulatory provisions, except the antitrust laws.
56. *See* Theodore Allegaert, Comment, *Derivative Actions by Policyholders on Behalf of Mutual Insurance Companies*, 63 U. CHI. L. REV. 1063, 1071 (1996).

> The relationship between mutual insurance policyholders and their company derives historically from statutes under which mutual companies are chartered and from the contractual terms of issued policies. Incident to membership in a mutual company, the policyholder acquires certain proprietary interests, yet these interests are not fiduciary and certainly are not akin to partnership. In addition, membership places the policyholders in a creditor-like contractual relationship with the company.

*Id.*

57. *See generally id.* at 1072.
58. Consider here the observation of *In re Caremark Int'l, Inc., Derivative Litigation* by Chancellor William Allen:

> [A] director's obligation includes a duty to attempt in good faith to assure that a corporation

To this end, there is a well-recognized obligation for boards of directors to assure compliance systems and standard operating procedures that are reasonable given the nature of the firm's activities.[59] This obligation is heightened by the general awareness that class action settlements frequently yield large awards to financial institutions, such as those described by Weiss and Beckerman. Thus, it is not a big step to conclude that just as the mutual funds (and insurance companies) must assure the safety of the securities that are within the firm's portfolio, they should also assure that appropriate procedures are in place to claim material amounts that may be due the mutual fund (or insurance company) in a class action settlement. What is material is a relative inquiry. In the context of filing a claim with a settlement administrator for a settled class action, it would seem that materiality is best assessed in terms of the relationship between the cost of submitting the claim and the expected payment from the settlement. The costs of filing such claims appear at first blush to be trivial, and therefore we would expect most funds that traded during the class period to seek a recovery.

On the other hand, there are many more persuasive reasons that can support the directors' or officers' decision not to become a lead plaintiff. There is a question of the resources required to see that task through to the end. Those without experience in such matters may easily overestimate the burdens of being a lead plaintiff. Or they may correctly estimate that, given the firm's limited resources, the expected benefits of such intervention on its part are on average insufficient reward for the effort entailed. Also, there are distinct advantages to free-riding on the efforts of others. If there is no reason to believe that the firm's position will be improved by pursuing recovery as the lead plaintiff, rational apathy is both efficient and understandable.[60]

---

information and reporting system, which the board concludes is adequate, exists, and that failure to do so under some circumstances may, in theory at least, render a director liable for losses caused by noncompliance with applicable legal standards.

698 A.2d 959, 970 (Del. Ch. 1996). *See generally* JAMES D. COX ET AL., CORPORATIONS § 10.4 (2002).

59. *See, e.g., In re* Caremark, 698 A.2d at 970.

60. A less acceptable reason is suggested by WILLIAM M. O'BARR & JOHN M. CONLEY, FORTUNE AND FOLLY: THE WEALTH AND POWER OF INSTITUTIONAL INVESTING (1992). Their study of the culture of selected financial institutions found that, with the exception of public pension funds, managers were sensitive to the fact that their employer was or could be a vendor of products that the class action defendant consumes. Hence, a visible participation in the suit would seriously jeopardize the company's, bank's, or insurer's long-term interests.

### E. Bank Common Trust Funds

Common trust funds operated by banks are exempt from the Investment Company Act of 1940,[61] but their managers are subject to the common law fiduciary duties of trustees. Though the specifics of a trustee's fiduciary duty varies from state to state, the American Law Institute's Restatement of Trusts captures the position adhered to by most of the states:

> A fiduciary has a duty to take reasonable steps to realize on claims that are the property of the trust ... but should do so only when she believes that the probable benefit to the trust will exceed the costs the trust reasonably can expect to incur. On the other hand, a fiduciary cannot properly abandon claims affecting the trust property unless it reasonably appears that a suit would be futile or the expense of litigation or the character of the claim would make it reasonable not to bring suit.[62]

In short, the obligations of the bank trustee are no different from those we have seen apply to other fiduciaries.

### F. Synthesis: Institutions Are Normally Obligated to File Claims in Securities Settlements, But May Rationally Choose Not to Be Lead Plaintiffs

Felix Frankfurter's famous observation regarding fiduciaries[63] underscores the opacity that surrounds the meaning and, more particularly, the demands of being a fiduciary. Whatever the vagueness of fiduciary obligations in other contexts, in the context of the institutional investor's obligations to its investors, beneficiaries, policyholders, etc., there is amazing uniformity. Though such institutions cannot abandon without reason a claim against a third party, financial institutions are not under an affirmative obligation to pursue inchoate claims. The speculative nature of the claim, coupled with the uncertainty that the institution's decision to serve as a lead plaintiff will make a difference, makes apathy the reasonable and rational

---

61.  See 15 U.S.C. § 80a-3(c)(3) (2001).
62.  Weiss & Beckerman, *supra* note 6, at 2113 (citing Restatement of Trusts, Second, § 177, 192).
63.  See Sec. Exch. Comm'n v. Chenery Corp., 318 U.S. 80 (1943).
   [T]o say that a man is a fiduciary only begins analysis; it gives direction to further inquiry. To whom is he a fiduciary? What obligations does he owe as a fiduciary? In what respect has he failed to discharge these obligations? And what are the consequences of his deviation from duty?
*Id.* at 85-86.

course much of the time.

But when the claim is no longer inchoate, so that money is to be received by submitting proof of the institution's trading during the fraud interval, the justifiable bounds of rational apathy are seriously constricted. The benefits of filing and perfecting these claims are much more concrete, especially when the fund managers are gauging their performances in comparison to market benchmarks. What is then a reasonable course of action should be guided again by comparing the costs to submit the claim with the expected award from the settlement, but we expect this to be a one-sided calculation in favor of filing for any actively trading institution.

### III. PUTTING THE ODOR OF MONEY IN THE AIR: THE PROCEDURAL ASPECTS OF NOTIFYING CLAIMANTS

Settlements of securities class actions require the approval of the court. The truly final disposition of the case occurs when the settlement administrator, who is either appointed by the court or simply selected by the suit's attorneys, submits its report of how the settlement was distributed. The settlement administrator earns its fees not by simply writing checks, but also by its extensive efforts to assure that all reasonable efforts have been taken to give potential claimants notice of the settlement and how those investors can submit their claims so as to be eligible to participate in a settlement.

Professional settlement administrators for class actions always face a challenging task in distributing settlement funds to those entitled to be members of the class. In securities class actions, not only is there the serious administrative task of assuring that those filing claims are entitled to participate in the settlement,[64] but imparting notice of the settlement to class members is also difficult. Giving notice to potential class claimants is complicated by several factors.[65]

The first step customarily followed by the settlement administrator is obtaining from the transfer agent for the security's issuer the list of registered stockholders. However, if the issuer is bankrupt or otherwise not in existence

---

64. This task is further complicated when the terms of the settlement provide for differing recoveries within the class action period based upon when a particular claimant's securities transaction occurred.

65. The following description of the steps settlement administrators pursue is based on numerous conversations the authors have had with several administrators. *See also* Aff. Biran Burke, *In re* Health Mgmt. Systems Sec. Litig. (S.D.N.Y. 2001); Aff. Ellen Riley, *In re* Physicians Computer Network, Inc. Sec. Litig. (D.N.J. 2000); Aff. Shandarese Garr, in In re Engelhard Sec. Litig. (D.N.J. 2000); Aff. Ellen Riley, Alpern v. Utilicorp United, Inc. (W.D. Mo. 2000); Aff. G. Peter Buchband, Wright v. BT Office Products Int'l, Inc. (S.D.N.Y 1999); Aff. G. Peter Buchband, State of Wis. Board v. Goldfield (D.N. Tex. 1999).

at the time of the settlement, the transfer agent generally possesses no reliable records. In any case, settlement administrators do not rely solely on the transfer agent's records when such records are available. Because most investors hold their securities in street names, the list of registered holders from the transfer agent will report a significant number of holders as CEDE & Co., the depository for most brokers. The settlement administrator maintains in its database a list of over 2000 brokers that participate in the Depository Trust Company (the so-called DTC Participant List).[66] Using the DTC Participant List, the settlement administrator forwards to each such broker a notice of settlement, generally with a special notice asking that the broker assist in informing its customers who possibly are included in the settlement. The brokers respond by identifying the addresses of their customers whose trading occurred during the class action period. They then either provide a printed or electronic version of the customers' addresses or forward labels with the customers' addresses. Some brokers prefer to circulate the claims notices directly to their customers and, therefore, obtain from the settlement administrator an ample supply of settlement notices that the broker can then forward directly to the appropriate customers. Institutional investors who prefer anonymity may not be totally visible to the settlement administrator during this stage of the administrator's work. For example, an institution that depends upon an advisor or advisors to file the required Form 13F may not be directly identified to the settlement administrator so that the notice of settlement is directed to the advisor and not to the institution itself. When this occurs, the ball is in such advisor's court. Just as for the broker whose customer holdings are recorded in street name, the advisor has an obligation to forward the settlement notice to the institution. Thus, the notices of settlement that are circulated customarily request that the notice be directed to the securities' beneficial owners, if other than the advisor.[67] A further step of circulating notice is the publication of the settlement notice in the national media, such as *The Wall Street Journal*, *Financial Times*, *USA Today*, or *Investors Business Daily*.

The reader should be impressed with the steps taken by settlement administrators to assure that those investors with claims learn of them and submit proof of their claim to the administrator. Assurance that their steps are reasonable occurs at several levels. First, all aspects of the settlement are

---

66. This list is updated annually by the Depository Trust Company (DTC).

67. Note that the settlement administrator does not know ex ante that the advisor's listed holdings are held solely as an agent for another, although there is more than ample reason to expect this is true a significant percentage of the time. Thus, the settlement administrator's request that the settlement notice should be forwarded is couched in less than mandatory language.

subject to the court's watchful eye. Though some judicial eyes are sharper than others, the settlement administrators have learned to apply the highest standards consistently across all settlements. Courts customarily ask the administrator to set forth in writing all of the steps they have taken to assure that potential claimants are duly informed. Second, the steps followed by settlement administrators parallel in many respects those required by the Securities and Exchange Commission (SEC) in an analogous area, the distribution of proxy materials, annual reports, and other company notices to investors.

The SEC has long toiled in meeting the challenge of assuring that company communications—particularly proxy statements—could reach the company's beneficial owners.[68] With 70% and 80% of all outstanding shares held in street name,[69] the SEC's task is a formidable one. To assure that corporate releases reach those who have an economic stake in the company, the SEC rules impose a series of responsibilities upon banks and brokers who hold shares as nominees for the beneficial owners.[70] The baseline requirement is that companies registered under either the Securities Exchange Act or the Investment Company Act of 1940 must, at least twenty days before the record date for a meeting, employ a search-card procedure whereby they ask the nominee (broker, bank, or other party) to tell them the number of copies of the company proxy materials they need in order to send them to all of the beneficial owners the nominee represents.[71] Nominees are also required to identify the number of shares owned by each beneficial

---

68. For a complete analysis of the history and details of the SEC's regulation in this area, see RANDALL S. THOMAS & CATHERINE T. DIXON, ARANOW & EINHORN ON PROXY CONTESTS FOR CORPORATE CONTROL (3d ed. 1999).

69. *See, e.g.,* Exchange Act Release No. 34-38406 (Mar. 14, 1997), 62 Fed. Reg. 13,922 (Mar. 24, 1997). Legal title is customarily recorded in the name of CEDE & Co., the nominee of Depository Trust Company, an entity that owes much of its existence to the efficiency of not depending upon individual owners to physically delivery share certificates to an intermediary each time the securities are sold.

70. As originally enacted, section 14(b) of the Securities Exchange Act conferred upon the SEC very general rule-making authority regarding the obligations of broker-dealers with respect to proxy solicitations of their customers' shares in companies listed on a national securities exchange. A 1964 amendment not only expanded the scope of the SEC's authority to over-the-counter securities but clarified that its authority included "requiring . . . broker-dealers to transmit proxy solicitation materials to their customers . . . ." *See* Pub. L. No. 88-467, 78 Stat. 565, 88th Cong., 2d Sess. (1964). The final expansion occurred in 1985 when its authority was extended to banks. *See* Pub. L. No. 99-222, 99 Stat. 1737 (1985).

71. Exchange Act Rule 14a-13(a), 17 C.F.R. 240.14a-13(a) (2001). Banks frequently are themselves but nominees of other banks who are nominees of another bank or the beneficial owner. This results in a "piggyback" system whereby each bank nominee has one day to respond by identifying their respondent bank. *Id.*

owner.[72]

Direct mailings of routine annual reports by the company to many beneficial owners are also possible if the company has compiled lists of nonobjecting beneficial owners.[73]

Thereafter, the issuer may mail its materials directly to any nonobjecting stockholders and provide the nominee with a sufficient number of the materials to be forwarded to the objecting owners.[74] Alternatively, the issuer may provide the nominee with enough sets of the materials for all the owners it represents, whether they are objecting or non-objecting holders.[75] As part of this process, the SEC has imposed an affirmative obligation upon the brokers and banks that serve as nominees to forward to these beneficial owners the proxy statements and other information given to them by the issuer, and to respond to requests by the issuer to provide a list of the nonobjecting beneficial owners.[76]

There is no statutory mandate for the settlement of class actions equivalent to the mandate in Section 14(b) of the Securities Exchange Act with respect to the circulation of a notice of settlement. Nevertheless, the fiduciary relationship between customers, whether widowers or large financial institutions, and their broker-advisors embodies an affirmative command that the notices be forwarded to the beneficial owners. Moreover, settlement administrators pursue additional steps to assure that all possible participants in a settlement receive notice of a claim, not the least of which is publishing notice of a settlement in the national press. To be sure, advisors might not forward the notice, and beneficial owners may turn a blind eye to the reality that securities class actions are prevalent and that significant funds are regularly distributed to institutional claimants in such settlements.

## IV. DO INSTITUTIONS FILE CLAIMS IN SECURITIES FRAUD SETTLEMENTS?

In recent months, there have been allegations raised in the popular press and elsewhere that institutional shareholders are giving up "hundreds of millions of dollars in class action settlements for which they are eligible simply by neglecting to file claims."[77] These claims, however, are based

---

72. *Id.*

73. Exchange Act Rules 14b-1, 17 C.F.R. 240.14b-1 (2001), and 14b-2, C.F.R. 240.14b-2 (2001), govern this process.

74. Exchange Act Rule 14a-13(b), 17 C.F.R. 240.14a-13(b) (2001).

75. *Id.*

76. Exchange Act Rule 14b-1, 17 C.F.R. 240.14b-1 (2001) (broker-dealers) and Rule 14b-2, 17 C.F.R. 240.14b-2 (2001) (banks).

77. *See, e.g.,* Christiane Bird, *Pension Funds Miss Out on Much Cash by Failing to File in Class-*

largely on "informal and anecdotal evidence," although there has been at least one attempt by the National Association of State Auditors, Comptrollers and Treasurers to collect survey data from a broad sample of institutions.[78] This survey showed that about one-third of the thirty-three respondent institutions had made no recovery of any asset losses in the prior five years, a time period in which more than 700 securities class action cases were settled.[79] Given the enormous share of the stock market that is held by institutional shareholders (25% for public pension funds and another 35% by corporate funds) and the tremendous amount of money available in these settlements (estimated at $8.39 billion over the past three years), a logical inference from these responses is that it is "highly unlikely any significant public fund invested in the market could possibly have been ineligible to participate in class action recoveries through this 5-year span."[80] In other words, it appears, based on the limited evidence compiled to date, that some institutional investors are not filing claims in securities fraud class action settlements and are therefore leaving potentially large sums of money on the table.

In this section, we explain our efforts to develop a data set that can be used to test these claims. First, we explain how we collected our data and some of the strengths and limitations of the sources that we have used. Then, we give some very preliminary results based on the small number of settlements that we have been able to obtain sufficient information about to date.

## A. The Data

In order to get a better sense of how many institutions are both eligible to make claims and actually do perfect such claims in these settlements, we needed to first generate a sample of securities fraud settlements. We enlisted the aid of three settlement administrators to help us identify a group of securities fraud class action settlements and asked them to send us the settlement notices from these cases. We used these notices to gather a wide variety of information about these cases, including the identity of the lead plaintiff for post-PSLRA cases, and the class period for each case.

We then set about generating two additional types of data. First, for each

---

*Action Cases*, WALL ST. J., Sept. 4, 2001, at A10.

78. *Id.*

79. ALAN P. CLEVELAND, CLASS ACTION CLAIM MANAGEMENT: A FIDUCIARY MANDATE (2001) (mimeo on file with author).

80. *Id.*

settlement for which we received a settlement notice, we considered the company settling the case as a potential member of our sample. For each sample company, we needed to determine which institutions held stock in the company at the beginning of the class period, and which institutions traded in the company's stock over the fraud interval. To do this, we used data taken from Form 13Fs filed by institutional investors. In particular, we used the Spectrum 3 database, which lists each company for which institutional investors have reported stock ownership, the names of those institutional investors that reported holding the company's stock, the size of the institutions' share holdings in each quarter, and the changes in these institutions' share holdings on a quarterly basis during the class interval. For those sample companies that were listed in Spectrum 3, we extracted this information and used it to create a spreadsheet that reflected all of the institutions reporting trades—and the size of those trades—in the sample company during the class period.[81]

The reporting institutions for Form 13F include a very broad group of organizations. The list not only includes the types of financial institutions whose general fiduciary obligations were earlier examined in Part II—private and public pension funds, mutual funds, insurance companies, and bank common funds—but also hedge funds, foundations, endowments, and even partnerships. This means that our sample includes a wide range of different types of institutional investors, allowing us to determine if different groups of these investors vary in the frequency with which they file claims in these cases.

We realize that our reliance on data reported in Form 13Fs as our source of information about institutional shareholders' stock ownership and trading is subject to several criticisms, including that institutions often delay reporting changes in their holdings on a timely basis, and that they may not report all changes in their stock holdings. Equally limiting is that the Form 13F is frequently filed by an advisor to the financial institution under the advisor's name and not under the name of the institution.[82] These problems may in part be a result of the SEC's failure to review these filings and the lack of financial or other penalties for late or inaccurate institutional filings.

However, in the end, this is the only publicly available data source on institutional shareholder stock ownership in individual companies. The only alternative way of generating the data that we need on holdings and changes in holdings is to ask those institutions that held shares in the sample

---

81.  Some companies were not listed in Spectrum 3, and are therefore not included in our sample.
82.  Moreover, advisors can, and frequently do, serve more than one institution and as a matter of expediency aggregate their holdings for all advisees when reporting on Form 13F.

companies to provide us with this information directly, if they still have it. While we may choose to pursue this avenue farther down the road, at the moment we must be content with using the Spectrum 3 data to determine whether institutional investors have potential claims that they should file in these settlements.

After we generated a list of the institutional investors that held stock in the sample companies and traded in the stock during the class interval, we examined our data to see if these institutions filed claims in the securities class action settlements. We asked the three settlement administrators that had provided us with the notices of settlements if they would be willing to help us determine if the institutions that we had identified as potential claimants actually filed claims in the settlements that they administered. We provided them with our spreadsheets listing the institutions that we had identified as trading stock in the sample companies during the class period and asked them to compare our list with the list of claimants in their databases so that we could determine how well the two data sets matched one another.

One problem with this methodology is that some institutional investors use third-party advisors as money managers to manage some or all of their portfolio. In these circumstances, the third-party advisors will often be responsible for filing claims in securities fraud settlements. If the third-party advisor files the claim in its own name—not in the institutional investor's name—then we also need to determine the name of the beneficial owner of the securities so that we can get the information that we need. For that reason, we asked the three settlement administrators to search their databases not only for those claims filed by institutional investors in their own names, but also for third-party advisor claims that identified the institutional investors as the beneficial owners. We were informed that they would provide us with lists designating such beneficial owners.

One of the settlement administrators, who we will call Admin One, made the comparisons that we asked for for a group of forty-one sample companies and sent us a spreadsheet listing all of the institutional shareholders that we had identified; whether they had made a claim or not; the size of the claim that they made, if any; and the amount of their recovery. Admin One advised us that they believed that they were able to accurately determine roughly 85% to 90% of the time whether the institutions that we had identified as potential claimants had made claims or not. They reported that they believed, based on their prior experience in administering settlements, that the third-party advisors probably omitted to provide complete information about the beneficial ownership of some subset of the remaining 10% to 15% of the institutions we identified. Thus, for the sample of companies that we

obtained from Admin One, we recognize that our data probably contain a reasonable number of omitted claims. We cannot correct the data for this problem without additional information from the institutional investors themselves.

The other two settlement administrators, Admin Two and Admin Three, gave us different sets of information. Admin Two provided us with two sets of data about eleven sample companies: the first was a summary list of all claimants, including the size of their losses and amounts of their awards; the second was a more detailed listing of the particulars of each claimant's trading in the sample company's securities during the class period. Using this information, we were able to pull out a list of institutional investors making claims and the size of their claims that we compared to our data on the institutional investors that were eligible to make claims in these cases. As with the data provided by Admin One, there are undoubtedly some claims misidentified as being made by third-party advisors, which should be classified as being made by institutions. We anticipate this error to affect our sample data for the same reasons given by Admin One. We note that we were unable to identify as many of the beneficial owners for claims filed by banks acting as custodians in the Admin Two data set because of the way the data were given to us. This will have the effect of decreasing the number of (usually small) claimants that we can identify because their claims are filed by the banks that are the custodians for their shares.[83]

Admin Three provided us only with a list of the largest 100 actual claimants for a sample of ten companies. We should be able to compare this list with the data that we had assembled on institutional investor holdings. However, we cannot determine for those institutions whose names do not appear on the list of the largest claimants if they actually filed claims. At the time of this writing, Admin Three has not provided us with any further data in this regard to this point. As a result, we decided to wait until we received more information from Admin Three before continuing to work with their data.

*B. Preliminary Analysis*

From the data provided by Admin One and Admin Two, we were able to perform some preliminary statistical analysis. Despite the differences in the

---

83. To make the data more comparable between the Admin One and Admin Two data sets, we will need to aggregate all of the beneficial owners claiming through banks in the Admin One data set. Although this will reduce the number of identified claimants, it will result in creating comparable numbers of institutional investor claims.

two data sets, we extracted similar sets of results from them. For both samples, all of the settlements involved purchaser classes. We were able to determine the number of Form 13F filers that had reported purchases during the sample period and to compare that list with the names of the beneficial owners that were filing claims in the settlements. Thus, we are able to calculate the percentage of Form 13F traders that file claims in each settlement. Table 2 sets forth this information by sample company, as well as data on the average size of the claim for each institution that filed a claim. We note that we have incomplete information on several of the companies (indicated by dashes and not included in the totals for any of the columns).

Table 2

ADMIN ONE DATA ON SETTLEMENTS; 13F DATA ON FILING

| Sample Company Number | Number Filing | Number Trading | Percentage Filing | Av. Loss (dollars) |
|---|---|---|---|---|
| 1 | 4 | 22 | 18.18% | 29,813 |
| 2 | 121 | 265 | 45.66% | 19,640 |
| 3 | 3 | 29 | 10.34% | 102,466 |
| 4 | 2 | 76 | 2.63% | 13,998 |
| 5 | 1 | 41 | 2.44% | 55,975 |
| 6 | 71 | 312 | 22.76% | 26,317 |
| 7 | 0 | 13 | 0% | —— |
| 8 | 4 | 47 | 8.51% | 8,049 |
| 9 | —— | —— | —— | —— |
| 10 | 9 | 73 | 12.33% | 328,006 |
| 11 | 11 | 83 | 13.25% | 54,152 |
| 12 | —— | —— | —— | —— |
| 13 | 25 | 76 | 32.89% | 215,947 |
| 14 | 12 | 108 | 11.11% | 10,178 |
| 15 | 7 | 22 | 31.82% | 166,915 |
| 16 | —— | —— | —— | —— |
| 17 | 2 | 35 | 5.71% | 270,811 |
| 18 | 2 | 12 | 16.67% | 39,522 |
| 19 | —— | —— | —— | —— |
| 20 | 20 | 54 | 37.04% | 137,309 |
| 21 | —— | —— | —— | —— |
| 22 | —— | —— | —— | —— |
| 23 | —— | —— | —— | —— |

| Sample Company Number | Number Filing | Number Trading | Percentage Filing | Av. Loss (dollars) |
|---|---|---|---|---|
| 24 | 221 | 820 | 26.95% | 45,912 |
| 25 | 601 | 1,345 | 44.68% | 2,551 |
| 26 | 180 | 452 | 39.82% | 5,983 |
| 27 | 5 | 19 | 26.32% | 17,467 |
| 28 | 0 | 6 | —— | —— |
| 29 | 31 | 145 | 21.38% | 38,450 |
| 30 | 0 | 8 | —— | —— |
| 31 | 1 | 47 | 2.13% | 26,371 |
| 32 | 39 | 180 | 21.67% | 218,139 |
| 33 | 0 | 18 | —— | —— |
| 34 | 1 | 13 | 7.69% | 775,395 |
| 35 | 15 | 54 | 27.78% | 2,228 |
| 36 | —— | —— | | |
| 37 | 4 | 49 | 8.16% | 31,915 |
| 38 | 0 | 4 | —— | |
| 39 | 12 | 37 | 32.43% | 133,270 |
| 40 | 385 | 961 | 40.06% | 5,803 |
| 41 | 2 | 34 | 5.89% | 91,463 |
| 42 | 0 | 4 | —— | —— |
| | | | | |
| **Total/Averages** | **1,791** | **5,464** | **32.78%** | **102,644** |

The Admin Two data gave us a slightly different look at the settlement process. They provided us disaggregated data on all of the claims made in each of the settlements, although they did not match our list of Form 13F filers with their database for us. While there remains much analysis to be done on the information they provided us, at this point we choose to generate results that are comparable in nature to those shown above. In Table 3, we present the same percentage of Form 13F traders that filed claims in each settlement, as well as data on the average size of the claim made by each institution.

Table 3

ADMIN TWO DATA ON SETTLEMENTS; 13F DATA ON FILING

| Sample Company Number | Number Filing | Number Trading | Percentage Filing | Average Loss (dollars) | Recovery Percentage | Average Award (dollars) |
|---|---|---|---|---|---|---|
| 1 | 2 | 7 | 28.6% | 263,050 | 18.89% | 46,690 |
| 2 | 11 | 60 | 18.5% | 705,275 | 48.79% | 344,104 |
| 3 | 8 | 27 | 29.6% | 356,448 | 5.25% | 18,714 |
| 4 | 2 | 8 | 25.0% | 127,500 | 49.26% | 62,807 |
| 5 | 0 | 1 | 0% | — | N/A | — |
| 6 | 8 | 51 | 15.7% | 150,507 | 12.12% | 18,241 |
| 7 | 14 | 55 | 25.5% | 48,227 | 23.91% | 11,531 |
| 8 | 7 | 25 | 28.0% | 322,971 | N/A | N/A |
| 9 | 13 | 50 | 26.0% | 657,216 | 5.84% | 38,281 |
| 10 | 17 | 90 | 18.89% | 1,919,254 | N/A | N/A |
| 11 | 37 | 144 | 25.69% | 60,289 | 100.23% | 60,428 |
| | | | | | | |
| Total/ Averages | 119 | 517 | 23.01% | 461,074* | 33.04%** | 75,112** |

\* Excluding Case 5.
\*\*Excluding Cases 5, 8 and 10.

The most obvious result that can be seen in Tables 2 and 3 is the low percentage of Form 13F traders that appear to file claims in these settlements. Looking at the last row of each table, we have calculated the averages across all of the settlements in the two samples to give the reader a flavor of the data. Looking across this row in Table 2, we find an average filing percentage for eligible claims of 32.78%, whereas in Table 3, the average percentage of Form 13F filers perfecting their claims is 23.01%.[84] If all those institutions filing Form 13Fs indicating trades during the class period were also filing and perfecting claims in these settlements, we would see 100% averages here.

Average loss is substantial in both samples. For Table 2, the average loss is $102,644; in Table 3, the average loss is $461,074. Although there are some large variations across the different settlements, the magnitude of these averages would seem to indicate that many institutions have suffered significant losses in these cases. Of course, what determines the value of filing a claim is not the loss suffered, but the recovery expected. Here, our

---

84. Note that this is the percentage of filers whose claims are filed and accepted as valid by the settlement administrators. At present, we are not calculating the percentage of 13F filers who file claims that are disallowed. Based on our review of the data, adding these ineligible claimants would slightly increase the number of filers in some settlements.

data is less complete, as we are only able to calculate average awards for the settlements in Table 3. With due regard for the small number of settlements in this group, we can see that average recovery rates are about one-third of losses, resulting in an average award for those eight companies of $75,112. To our eyes, this would seem to be a significant return on the small costs (in terms of time and money) of filing a claim in a securities fraud class action settlement.

One implication of the recovery percentages in the Admin Two data set should also be pointed out. As these percentages are for the most part below 100%, increasing the number of claims filed by institutional investors will result in lower average recoveries for all of these investors. This will have the effect of reducing the monetary incentives for these shareholders to file claims, although we cannot be sure by how much.

We repeat again that caution must be exercised in interpreting these numbers. While we are sure that there is some under-reporting of claimants due to problems in determining with complete accuracy the identities of the institutions filing claims in the settlements, we believe, based on our conversations with the settlement administrators, that their process accurately identifies a high percentage of the beneficial owners that file in these settlements. In addition, the Form 13F data itself may be inaccurate, although we note in this regard that institutions that fail to file Form 13Fs are not included in our sample. In fact, we only include those institutions that report their purchases during the class period, which should understate the number of institutions that could file claims in the settlements because it excludes institutions that traded during the class interval but failed to timely report these trades on their Form 13Fs. Thus, we believe that we have been conservative in selecting the trading institutions that we are seeking to match up with the filing institutions in the settlements. Of course, we would prefer to correct for these problems before concluding that our results will hold up, but at this point, we do not see how we can make these corrections without getting information from the institutions themselves, assuming that the information still exists and that the institutions would be willing to share it.

## V. WHY AREN'T INSTITUTIONS FILING?: A RESEARCH AGENDA

We have attempted to answer the question of whether institutional investors are leaving money on the table by failing to file claims in securities fraud class actions. We think that their fiduciary duties to file such claims are

clearly established by existing law[85] and that the costs of filing such claims are likely to be trivial. Thus, even if the benefits from filing are small, institutional investors should be filing claims in these settlements.

We conclude that it appears that many of these investors are failing to file such claims. Despite all of the flaws in our data, the percentage of institutional investors that we can identify that are actually filing such claims is well below the number that should be filing these claims. At the same time, the average recoveries in these settlements seem well in excess of what would cover the costs of making such claims. While we are well aware that there are those in the field that believe otherwise—and we stand ready to be convinced by further evidence—we think that we have offered the most complete picture of the problem to date.[86]

What we lack most at the moment is a convincing explanation of why these institutions are not filing claims in all securities fraud class action settlements. Two potential explanations have been offered: first, that there are potential misunderstandings by institutions of the amount that they can recover in these cases;[87] and second, that these shareholders do not understand that filing claims is part of their legal duty to their beneficiaries.[88]

Based on comments that we have received from attorneys that practice in the area, and based on our own research, we think that there are several more plausible hypotheses that should be explored. One strong candidate as an explanation is that institutions are rational economic beings that make cost-benefit calculations concerning whether or not to file claims in these settlements. They may expect to receive small recoveries in these cases, even if their losses are large, because some settlements pay out only pennies on the dollar. Or the recovery amounts may seem large to outsiders but may be very small in relationship to the size of the institutions' portfolios and therefore have no material impact on their returns. We think that this is an important avenue for further research that we intend to pursue. In particular, we need to inquire further into the underlying claims for the different institutions to look at the distribution of claims, and we need to ask such questions as whether

85. It bears repeating that the Form 13F filers are a diverse lot. They are not restricted to large public pension funds that are often discussed when considering shareholder activism, nor even to institutions that have fiduciary obligations to a set of beneficial owners. We hope to refine our results to try to sort out the different types of institutions into different categories as we work further with the data that we have and hope to get in the future.

86. We note that our results are consistent with those in the only other systematic attempt to address this issue of which we are aware. See, e.g., Cleveland, supra note 79.

87. Douglas McKeige, *Leaving Money on the Table: Are You Collecting on Your Claims?*, 3 INSTITUTIONAL INVESTOR ADVOCATE 1 (2001).

88. Cleveland, supra note 79.

the average figures reported in Tables 2 and 3 conceal a large number of small claimants for whom filing will result in small gains. We also need to look at the average recoveries for those institutions that did not file claims in order to calculate what they would have recovered if they had filed. Furthermore, we intend to get a better handle on the costs of filing claims and whether these costs vary significantly over different investors with different trading volumes and patterns. We also intend to consider the level of detail that is required for perfecting the claims. More generally, we intend to examine the effect of the size of the settlement, the size of the individual institution's potential recovery, the size of the institution's stake in the company being sued in the case, the size of the case (including how well publicized the settlement is), and the length of time between the settlement and the time that the claims arose. All of these are important factors in determining filing rates for institutional investors.

A second potentially important explanation for the institutions' failure to file claims is that they do not have personnel that are assigned to handle these claims. In other words, if the notice of settlement comes in, who does it get routed to? If it goes to the trading desk, the traders may believe that their job is to make money for the firm through the purchase and sale of securities, not by filing claims. Thus, they may do nothing with the claim. Similarly, if the institutional investor is delegating the responsibility for filing claims to the custodian of their securities, typically a bank or broker, the custodian may fail to understand what it needs to do in order to file and perfect a claim. Many potential pitfalls of this nature may exist at different institutions and play a major role in explaining their failures to file.

A third possible reason for institutions' failure to file claims may be that they never receive the notices of settlement. Most institutions hold their stock in street name, with the beneficial owners holding legal title through a depository trust.[89] When a company settles a securities fraud case, the notice of settlement must filter its way through the chain from the depository trust, to the broker or bank holding the shares in the institution's name, all the way down to the institutional investor. There is no legal obligation imposed on the banks or brokers to insure that these notices arrive at the door of the institutional investors.[90] So we cannot be sure that institutions are even aware of the settlements when they arise.

---

89. Thomas & Dixon, *supra* note 68.

90. If it turns out that many notices are not being received by the institutions, then it may be necessary for the SEC to consider implementing rules that require banks and brokers to forward these notices to all the beneficial holders whose shares that they hold. New rules analogous to those adopted for shareholder voting would seem to be in order. *See* Thomas & Dixon, *supra* note 68.

These potential explanations for institutional investors' failure to file calaims in securities fraud class action settlements may also be complementary. In other words, some institutions may decide not to file because the returns are too small, others may not file because they are not receiving notice of the settlements, and a third group may not have personnel assigned to process claims.

The policy implications of our results depend importantly on which hypotheses are correct and if so, what the costs and benefits are of addressing them. For example, it might be relatively cheap for the SEC to draft rules to address widespread failures in the system that notify institutions of class action settlements. It would be more costly to require institutions to assign personnel to process claims in these settlements. Finally, it may or may not be even more expensive to create a legal duty to file claims even where the dollar amounts of the claims are low. We look forward to addressing these issues more fully in later research.

# EXHIBIT 2

## Sara Hansard - [FundLaw] SEC Probing Funds' Participation in Class Actions

| | |
|---|---|
| **From:** | JMB@stradley.com |
| **To:** | <fundlaw@yahoogroups.com> |
| **Date:** | 2/3/05 8:50 PM |
| **Subject:** | [FundLaw] SEC Probing Funds' Participation in Class Actions |

Ignites.com, a mutual fund news service, reports that the Securities and Exchange Commission's Office of Compliance Inspections and Examinations has sent letters to fund companies concerning the process they use to address class action lawsuits filed against companies in which their funds invest. The letters seek information on the process firms use to decide whether or not to participate in a class action, the written policies and procedures they have on file that describe that process, the number of class actions the adviser has participated in, and the number of class actions from which it has abstained. The letters follow press reports of class action lawsuits against mutual funds for allegedly failing to participate in class actions to recoup losses from corporate scandals. The Ignites.com article *is* reproduced below.

John M. Baker          <JMB@Stradley.com>
Stradley, Ronon, Stevens & Young, LLP    http://www.stradley.com
1220 19th Street, N.W., Suite 600, Washington, DC  20036
(202) 419-8413       Fax (202) 822-0140
FundLaw Listowner    http://groups.yahoo.com/group/fundlaw

Here's the article:

SEC Probing Funds' Participation in Class Actions
  By Alison Sahoo

The SEC has launched a probe looking into the process fund shops use to address class action lawsuits filed against companies in which their funds invest.

The SEC's Office of Compliance Inspections and Examinations has sent out a round of letters seeking four key pieces of information, according to a copy of the letter obtained by ignites.

It wants to know the process firms use to decide whether or not to participate in a class action, the written policies and procedures they have on file that describe that process, the number of class actions the advisor has participated in and the number of class actions from which it has abstained.

More specifically, the letter asks firms to discuss the steps they take and factors they consider in deciding whether or not to participate in each class action suit. The SEC also wants written policies and procedures that include the process for determining eligibility in class actions and any filing proofs of claim.

The letter also requests the total number of class actions a firm has participated in and the total amount of money it has collected from the suits dating from January 1, 2003 through December 31, 2004.

The letter, dated January 18, 2005, was issued the same day Ignites published a story reporting on a new type of class action suit being filed against mutual funds.

The suits, filed earlier this month, target numerous fund companies and allege they had a fiduciary responsibility to fund shareholders to try to recoup some of the losses incurred from corporate scandals at firms like WorldCom, Adelphia and Enron. By not participating in class action suits against those corporations, however, the funds failed to collect damages on behalf of their shareholders, leaving millions of dollars on the table, the suits allege.

Janaya Moscony, president of compliance consulting firm SEC Compliance Consultants, says she believes the letter was sent to a random sample of firms.

"I think the SEC is trying to keep informed of what's going on," she says.

In the past, SEC examiners have not widely asked about firms' polices on class action suits, she says. She guesses that most firms probably don't have extensive written policies on the topic.

"People might have unwritten policies, or they will adopt written policies and procedures as a result of this letter," says Moscony.

There are a lot of good reasons for firms to be more vigilant about the issue. Lipper vice president Jeff Keil says damages collected in class actions could provide an easy way for funds to goose performance.

"If you get assets coming back, in essence it's a performance bump," he says. "You would think they would want to chase after that money."

Class action attorney Steve Sprenger of Sprenger + Lang says the fiduciary issues should be the primary consideration, however.

"If mutual fund firms aren't participating in class action suits where there could be recoveries, they're not helping the people who are investing in their funds," he says.

That's particularly true, says Sprenger, since funds tend to hold large blocks of shares, so settlements could be significant.

Moscony says it's hard to say what will come from the SEC inquiry. In the case of a serious problem, she says, guidance or rulemaking is a possibility. But there are a lot of other issues on the SEC's agenda competing for staff time and resources.

For example, Division of Investment Management chief Paul Roye recently remarked at an industry conference that the SEC was hoping to finalize the hard 4 p.m. close rule and mandatory redemption fee rule over the next several months.

On the other hand, says Moscony, if the inquiry doesn't turn up much, nothing may happen at all. The SEC often collects information to better understand the industry, she notes, but doesn't always release it to the public.

Of course, examiners could also cite individual firms for deficiencies if it finds them grossly negligent.

"They could file a deficiency based upon the firm not adhering to its fiduciary duty," she says. "You can wrap up most things under that."

~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~
> This article is from ignites at www.ignites.com.
> If you don't get ignites and want to, email access@ignites.com
or call Jon Abelack at (212) 949-4288, ext 133.

..............................................

# EXHIBIT 3

# JOHN HANCOCK SMALL CAP EQUITY FUND

### Class A, Class B, Class C, Class I and Class R Shares
### Statement of Additional Information

### March 1, 2005 as revised May 16, 2005

This Statement of Additional Information provides information about John Hancock Small Cap Equity Fund (the "Fund") in addition to the information that is contained in the combined John Hancock Equity Funds current Prospectus for Class A, B and C and in the Fund's current Class I share and Class R share prospectuses (the "Prospectuses"). The Fund is a diversified series of John Hancock Investment Trust II (the "Trust").

This Statement of Additional Information is not a prospectus. It should be read in conjunction with the Prospectus. This Statement of Additional Information incorporates by reference the Fund's Annual Report. A copy of the Prospectus or Annual Report can be obtained free of charge by writing or telephoning:

John Hancock Signature Services, Inc.
1 John Hancock Way, Suite 1000
Boston, Massachusetts 02217-1000
1-800-225-5291

## TABLE OF CONTENTS

|  | Page |
|---|---|
| Organization of the Fund | 2 |
| Investment Objective and Policies | 2 |
| Investment Restrictions | 14 |
| Those Responsible for Management | 16 |
| Investment Advisory and Other Services | 26 |
| Additional Information about the Portfolio Managers | 29 |
| Distribution Contracts | 33 |
| Sales Compensation | 35 |
| Net Asset Value | 38 |
| Initial Sales Charge on Class A Shares | 39 |
| Deferred Sales Charge on Class B and Class C Shares | 42 |
| Eligible Investors for Class R Shares | 46 |
| Special Redemptions | 46 |
| Additional Services and Programs | 46 |
| Purchase and Redemptions through Third Parties | 48 |
| Description of the Fund's Shares | 48 |
| Tax Status | 49 |
| Calculation of Performance | 54 |
| Brokerage Allocation | 57 |
| Transfer Agent Services | 60 |
| Custody of Portfolio | 60 |
| Independent Registered Public Accounting Firm | 60 |
| Appendix A- Description of Investment Risk | A-1 |
| Appendix B-Description of Bond Ratings | B-1 |
| Appendix C-Proxy Voting Summary | C-1 |
| Appendix D-Policy Regarding Disclosure of Portfolio Holdings | D-1 |
| Financial Statements | F-1 |

# EXHIBIT 4



Slip Copy                                                      Page 1

2005 WL 645529 (N.D.Cal.)

(Cite as: 2005 WL 645529 (N.D.Cal.))

---

H

**Motions, Pleadings and Filings**

Only the Westlaw citation is currently available.

United States District Court,
N.D. California.
Susan STRIGLIABOTTI, et al., Plaintiffs,
v.
FRANKLIN RESOURCES, INC., et al.,
Defendants.
No. C 04-00883 SI.

March 7, 2005.

Ronald Lovitt, Henry I. Bornstein, J. Thomas Hannan, Lovitt & Hannan, Inc., San Francisco, CA, Gary A. Gotto, Phoenix, AZ, Gretchen Freeman Cappio, Lynn Lincoln Sarko, Michael Dean Woerner, Tana Lin, Keller Rohrback, LLP, Seattle, WA, James C. Bradley, Michael J. Brickman, Nina H. Fields, Richardson Patrick Westbrook & Brickman, Charleston, SC, Ron Kilgard, Keller Rohrback, P.L.C., Phoenix, AZ, for Plaintiffs.

Anthony Zaccaria, Daniel A. Pollack, Edward T. Mcdermott, Pollack & Kaminsky, New York, NY, Dale M. Edmondson, Meredith N. Landy, O'Melveny & Myers, Menlo Park, CA, Jessica Anne Hoogs, O'Melveny & Myers LLP, San Francisco, CA, for Defendants.

ORDER PARTIALLY GRANTING AND
PARTIALLY DENYING DEFENDANTS'
MOTION TO DISMISS

ILLSTON, J.

*1 On February 4, 2005, the Court heard oral argument on defendants' motion to dismiss the complaint. Having carefully considered the arguments of counsel and the papers submitted, the Court hereby PARTIALLY GRANTS and PARTIALLY DENIES defendants' motion.

BACKGROUND

This action is brought by shareholders of several mutual funds ("Funds") created, sold, advised, and managed as part of the Franklin Templeton fund family ("the Fund Complex"). Specifically, the Funds are Templeton Growth Fund, Franklin Balance Sheet Investment Fund, Franklin U.S. Government Securities Fund, Franklin Flex Cap Growth Fund, Franklin DynaTech Fund, Franklin Income Fund, Franklin Small-Mid Cap Growth Fund, Franklin Biotechnology Discovery Fund, Mutual Shares Fund, and Franklin Utilities Fund. First Am. Compl. ("Am.Compl.") at ¶ 1. [FN1]

FN1. On March 4, 2004, plaintiffs filed this action on behalf of five funds; they amended the complaint on June 3, 2004, adding Franklin Income Fund, Franklin Small-Mid Cap Growth Fund, Franklin Biotechnology Discovery Fund, Mutual Shares Fund, and Franklin Utilities Fund as plaintiffs, and adding as defendants Franklin Mutual Advisers, LLC, and Franklin Templeton Services, LLC.

Defendants are Franklin Resources, Inc., Templeton Global Advisors, Ltd., Franklin Advisory Services, LLC, Franklin Advisers, Inc., Franklin Templeton Distributors, Inc., Franklin Mutual Advisers, LLC, and Franklin Templeton Services, LLC. Id. at ¶ 2. The companies are various investment advisors affiliated with a single parent company, also a defendant, Franklin Resources, Inc. ("Franklin Resources"), a publicly traded company incorporated in Delaware and headquartered in San Mateo, California. Id. Plaintiffs allege that defendants receive advisory fees from the Funds for investment advisory services and administrative services, and these fees are based on a percentage of the net assets of each

---

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                Page 2

2005 WL 645529 (N.D.Cal.)

(Cite as: 2005 WL 645529 (N.D.Cal.))

of the Funds. *Id.* at ¶ 5. Defendants also charge distribution fees for marketing, selling, and distributing mutual fund shares to new shareholders under "Distribution Plans" adopted pursuant to Rule 12b-1, 17 C.F.R. § 270.12b-1. *Id.* at ¶ 8. These distribution fees are based on a percentage of the net assets of each of the funds in the Fund Complex and amount to more than $7 million annually. *Id.* Plaintiffs allege that the advisory fees charged by defendants are higher than those for other funds for which defendants perform equivalent services and that the distribution fees are excessive, in violation of Rule 12b-1 and § 36(b) of the Investment Company Act ("ICA"). Plaintiffs specifically claim that, despite significant growth in the Funds since 1983, the Funds have not benefitted from the economies of scale and instead have been charged advisory and distribution fees that are disproportionately large in relation to the services provided. *Id.* at ¶ 14.

Plaintiffs seek to either rescind the investment advisory agreements and Distribution Plans and recover the total fees charged by defendants, or, in the alternative, to recover the excess profits resulting from economies of scale wrongfully retained by defendants, and any other excessive compensation or improper payments received and retained by defendants in breach of their fiduciary duty under § 36(b), 15 U.S.C. § 80a-35(b), and state law. *Id.* at ¶ 27. The complaint alleges (1) breach of fiduciary duty under § 36(b) for excessive investment advisory fees; (2) breach of fiduciary duty under § 36(b) for excess profits from economies of scale; (3) breach of fiduciary duty under § 12(b) for excessive Rule 12b-1 distribution fees and extraction of additional compensation for advisory services; (4) violation of § 12(b) for unlawful distribution plans; (5) breach of fiduciary duty under California law; (6) civil conspiracy to breach fiduciary duty under California law; (7) common law aiding and abetting breaches of fiduciary duty by Franklin Resources; (8) "acting in concert" under § 876(b) of the Restatement (Second) of Torts; (9) breach of Cal. Business & Professions Code § 17200; (10) breach of Cal. Business & Professions Code § 17500; and (11) common law unjust enrichment.

*2 Now before the Court is defendant's motion to dismiss the complaint pursuant to Federal Rule of Civil Procedure 12(b)(6). Both parties have also filed Requests for Judicial Notice ("RJN"). [FN2]

FN2. The Court GRANTS both RJNs.

LEGAL STANDARD
Under Federal Rule of Civil Procedure 12(b)(6), a district court must dismiss a complaint if it fails to state a claim upon which relief can be granted. The question presented by a motion to dismiss is not whether the plaintiff will prevail in the action, but whether the plaintiff is entitled to offer evidence in support of the claim. *See Scheuer v. Rhodes,* 416 U.S. 232, 236, 94 S.Ct. 1683, 1686, 40 L.Ed.2d 90 (1974), overruled on other grounds by *Davis v. Scherer,* 468 U.S. 183, 104 S.Ct. 3012, 82 L.Ed.2d 139 (1984).

In answering this question, the Court must assume that the plaintiff's allegations are true and must draw all reasonable inferences in the plaintiff's favor. *See Usher v. City of Los Angeles,* 828 F.2d 556, 561 (9th Cir.1987). Even if the face of the pleadings suggests that the chance of recovery is remote, the Court must allow the plaintiff to develop the case at this stage of the proceedings. *See United States v. City of Redwood City,* 640 F.2d 963, 966 (9th Cir.1981).

"The court may also consider documents attached to the complaint in connection with a FRCP 12(b)(6) motion to dismiss." *Parks Sch. of Business, Inc. v. Symington,* 51 F.3d 1480, 1484 (9th Cir.1995) (quoting *Cooper v. Bell,* 628 F.2d 1208, 1210 n. 2 (9th Cir.1980)). "If a plaintiff fails to attach to the complaint the documents on which it is based, defendant may also attach to a FRCP 12(b)(6) motion the documents referred to in the complaint." *Lee v. City of Los Angeles,* 250 F.2d 668, 688-89 (9th Cir.2001)). "In addition, whether requested or not, the court may consider documents whose contents are alleged in a complaint and whose authenticity no party questions, but which are not physically attached to the plaintiffs' pleadings." *In re Silicon Graphics Sec. Litig.,* 183 F.3d 970, 986 (9th Cir.1999)). "On a motion to dismiss, [the

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy

2005 WL 645529 (N.D.Cal.)

**(Cite as: 2005 WL 645529 (N.D.Cal.))**

Page 3

court] may take judicial notice of matters ... outside the pleadings." *MGIC Indem. Corp. v. Weisman,* 803 F.2d 500, 504 (9th Cir.1986).

If the Court dismisses the complaint, it must then decide whether to grant leave to amend. The Ninth Circuit has repeatedly held that "a district court should grant leave to amend even if no request to amend the pleading was made, unless it determines that the pleading could not possibly be cured by the allegation of other facts." *Lopez v. Smith,* 203 F.3d 1122, 1130 (9th Cir.2000) (citations and internal quotation marks omitted).

## DISCUSSION

I. Section 36(b) claims

An action may be brought under Section 36(b) by a security holder of a registered investment company "on behalf of such company" against an investment adviser, "or any affiliated person of such investment adviser," for breach of fiduciary duty with respect to compensation or payments paid to the investment adviser. 15 U.S.C. § 80a-35(b). Plaintiffs bring Counts I, II, and III under Section 36(b) of the Investment Company Act of 1940 ("ICA") on behalf of the Funds. Defendants' motion attacks these claims on two grounds: (1) that the Complaint does not plead sufficient facts that the fees charged are "so disproportionately large that they bear no reasonable relationship to the services rendered"; and (2) that defendants Franklin Resources and Franklin Templeton Services must be dismissed from these claims because they are not "recipients" of compensation or payments, as Section 36(b) requires.

A. Sufficiency of facts

*3 To state a claim under Section 36(b), a plaintiff must allege that an advisory fee is "so disproportionately large that it bears no reasonable relationship to the services rendered and could not have been the product of arm's-length bargaining." *Gartenberg v. Merrill Lynch Asset Mgmt. Inc.,* 694 F.2d 923, 928 (2d Cir.1982). Federal courts have identified the relevant factors in applying this standard: "(a) the nature and quality of the services

provided to fund shareholders; (b) the profitability of the fund to the adviser-manager; (c) fall-out benefits; (d) economies of scale; (e) comparative fee structures; (f) the independence and conscientiousness of the trustees." *Krinsk v. Fund Asset Mgmt., Inc.,* 875 F.2d 404, 409 (2d Cir.1989).

Relying on *Migdaly, Rowe-Price-Fleming Int'l, Inc.,* 248 F.3d 321, 327 (4th Cir.2001) and *Sheldon Krantz v. Prudential Inv. Fund Mgmt.,* 305 F.3d 140 (3d Cir.2002), defendants argue that plaintiffs have failed to plead facts that would show "a disproportionality between fees charged and services rendered," Defs.' Mot. at 2:22-23, because they have not specified what services were rendered by defendants, what amounts were charged in fees, or any other circumstances of the relationship between the fees and services. *Id.* at 3:3- 11. Defendants contend that while the complaint references the *Gartenberg* factors, it fails to allege any underlying facts. Plaintiffs contend that they have alleged a factual basis for each of the six *Gartenberg* factors and that *Migdal* and *Sheldon Krantz* involved significantly different and more deficient complaints.

The Court agrees with plaintiffs. In *Migdal,* the plaintiffs alleged several facts as evidence of excessive fees--the amount of fees charged, that other funds offered lower rates, that the funds did not meet their benchmark performance standards, and that the advisers' earnings increased by more than 20 percent despite the funds' underperformance--but said nothing about the services rendered in return. The district court permitted the plaintiffs to amend their complaint twice, but ultimately concluded that plaintiffs had failed to address the relationship between the fees and services. The Fourth Circuit affirmed, finding that the one-sided nature of the allegations was fatal to the complaint. In *Krantz,* the complaint contained a very brief (three-sentence) statement of the Section 36(b) excessive fee allegation but no facts to support it. The Third Circuit adopted the *Migdal* court's approach and found that the plaintiffs had "failed to allege any facts indicating that the fees received were disproportionate to services rendered." *Krantz,* 305 F.3d at 143.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy

2005 WL 645529 (N.D.Cal.)

(Cite as: 2005 WL 645529 (N.D.Cal.))

Here, plaintiffs have alleged facts about the disproportionate relationship between fees and services. The complaint alleges that defendants charge plaintiffs much higher fees than other clients for equivalent advisory services, and offers an example of the lower fee schedule utilized in a contract with New York State. Am. Compl. ¶ 6-7; 65. The Funds have grown in size from $2 billion in assets in 1983 to $300 billion in assets in 2003, while the nature of the services rendered has not changed, resulting in disproportionately large advisory fees. *Id.* at ¶¶ 13-14. It alleges that defendants "have retained excess profits resulting from economies of scale ... [which] are a product of the dramatic growth in assets managed by Defendants, caused in part by 1) marketing programs paid for with the distribution fees charged to Plaintiffs, and 2) Defendants' ability to provide the identical investment advisory services they provide Plaintiffs to other clients at little or no additional cost." *Id.* at ¶ 15.

*4 The Court finds that these allegations suffice under Rule 8's liberal pleading standard. Unlike in *Migdal,* where the plaintiffs alleged only half of the equation (facts about the high fees but no facts about the services), plaintiffs here state the services rendered to plaintiffs ("[d]efendants buy and sell, at their discretion, stocks, bonds, and other securities for the Funds. This is precisely the same service provided to Defendants' institutional and other clients."). *Id.* at ¶ 46. Unlike the allegations in both *Migdal* and *Krantz,* the complaint specifically describes the disproportionate relationship between these services and the fees charged according to the *Gartenberg* factors. And unlike the allegations in *Yampolsky v. Morgan Stanley Investment Advisers,* 2004 WL 1065533 (S.D.N.Y. May 12, 2004), which defendants cite in their reply brief, plaintiffs do not simply rely on "speculation, inference and generalized observations about the securities industry from public figures." 2004 WL 1065533 at *2. Accordingly, the Court DENIES defendant's motion to dismiss Counts I, II, and III.

B. Franklin Resources and Franklin Templeton Services as defendants

Defendants also argue that Franklin Resources and Franklin Templeton Services are not proper defendants for the Section 36(b) claim because neither is "the recipient of such compensation or payments." Plaintiffs contend that the statute's language allows actions brought "against [an] investment adviser, or any affiliated person of such investment adviser," and that these defendants qualify both as affiliates and as persons receiving compensation.

Section 36(b) provides:

An action may be brought under this subsection by the Commission, or by a security holder of such registered investment company on behalf of such company, against such investment adviser, or any affiliated person of such investment adviser ... for breach of fiduciary duty in respect of such compensation or payments paid by such registered investment company or by the security holders thereof to such investment adviser or person. With respect to any such action the following provisions shall apply: ...

(3) No such action shall be brought or maintained against any person other than the recipient of such compensation or payments, and no damages or other relief shall be granted against any person other than the recipient of such compensation or payments.

15 U.S.C. § 80a-35(b), (b)(3).

Plaintiffs base their contention that Franklin Resources and Franklin Templeton Services are "affiliated persons" on the fact that Franklin Resources is the "parent company, and control person," of all defendants, and Franklin Templeton Services is a wholly owned subsidiary of Franklin Resources under common control with the other defendants. [FN3] Pls.' Opp'n at 8 n. 7. Plaintiffs argue that Franklin Resources is a control person because the adviser defendants are wholly-owned subsidiaries of it, and Franklin Resources determines their policies and practices with respect to fees.

FN3. The ICA defines "affiliated person" as: (A) any person directly or indirectly owning, controlling, or holding with power

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy

2005 WL 645529 (N.D.Cal.)

(Cite as: 2005 WL 645529 (N.D.Cal.))

to vote, 5 per centum or more of the outstanding voting securities of such other person; (B) any person 5 per centum or more of whose outstanding voting securities are directly or indirectly owned, controlled, or held with power to vote, by such other person (C) any person directly or indirectly controlling, controlled by, or under common control with, such other person." 15 U.S.C. §§ 80a-2(3)(A)-(C). "Control" is defined as "the power to exercise a controlling influence over the management or policies of a company, unless such power is solely the result of an official position with such company." *Id.* at § 80a-2(9).

**\*5** However, as defendants point out, Section 36(b) subsection (3) apparently limits liability to "recipients of such compensation," and Franklin Resources' control person status is not relevant to this analysis. The complaint does not allege which defendants received fees, and specifically does not mention any non-adviser defendant receiving fees from the Funds. In their Opposition, plaintiffs state that these two defendants "receive compensation from the Funds and Plaintiffs,' Pls.' Opp'n at 9:8-9, but the Court agrees that they have not made this allegation in the complaint.

Consequently, Counts I, II, and III are DISMISSED as to defendants Franklin Resources and Franklin Templeton Services with leave to amend to add any allegations that these two non-advisers receive compensation within the meaning of Section 36(b).

II. Section 12(b) claim

Count IV alleges a violation of ICA Section 12(b), which provides: "[i]t shall be unlawful for any registered open-end company ... to act as a distributor of securities of which it is the issuer ... in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors." 15 U.S.C. § 80a-12(b). Defendants move to dismiss this claim on grounds

that (1) there is no private right of action under this section of the ICA; and (2) even if a cause of action can be maintained, plaintiffs have failed to satisfy the requirements of Federal Rule of Civil Procedure 23.1 for derivative claims.

A. Private right of action under Section 12(b)

Defendants argue that Section 12(b) does not create either an express or implied cause of action for private parties. Section 12(b) clearly contains no express private right of action. To demonstrate an implied right of action, plaintiffs must show congressional intent to authorize private enforcement of the section. *Gonzaga Univ. v. Doe,* 536 U.S. 273, 283-86, 122 S.Ct. 2268, 153 L.Ed.2d 309 (2002); *Alexander v. Sandoval,* 532 U.S. 275, 286-88, 121 S.Ct. 1511, 149 L.Ed.2d 517 (2001). The Supreme Court has been reluctant to imply private rights of action without clear congressional intent, and lower courts have applied these precedents to the ICA. *See, e.g., Olmstead v. Pruco Life Ins. Co.,* 283 F.3d 429, 432 (2d Cir.2002) (ICA §§ 26(f) and 27(i)).

For a statute to create a private right, it must be "phrased in terms of the persons benefited," *Gonzaga,* 536 U.S. 283, and it must also evince an "intent to create not just a private right but also a private remedy." *Sandoval,* 121 S.Ct. at 1519. Defendants argue that Section 12(b) does not contain "rights-creating language," and that the absence of language authorizing shareholder actions (like that appearing in Section 36(b)) further demonstrates the lack of a private right. In addition, relying on the Second Circuit case of *Krinsk v. Fund Asset Mgmt., Inc., supra,* 875 F.2d 404 (2d Cir.1989), they contend that Section 36(b) is plaintiffs' only remedy for the excessive fee claims. Plaintiffs counter that Section 12(b) does contain language from which a private right of action may be implied; that congressional pronouncements on the ICA and court decisions finding private rights of action in other ICA provisions suggest a right of action under Section 12(b); and that *Krinsk* is distinguishable.

**\*6** The Ninth Circuit has not yet addressed this

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                    Page 6

2005 WL 645529 (N.D.Cal.)

**(Cite as: 2005 WL 645529 (N.D.Cal.))**

question. In *Krinsk*, the Second Circuit considered whether Congress intended a private right of action under Section 12(b) where the plaintiff had an adequate remedy under Section 36(b). *Krinsk* involved a § 12(b) claim based on an allegedly excessive distribution fee where the fee was calculated as a percentage of the assets in the fund regardless of the number of securities sold. Because this type of claim was covered by Section 36(b), and because the plaintiff had included a distribution fee claim as part of his Section 36(b) action, the district court concluded that the claims were indistinguishable and there was no private right of action under § 12(b). The Court of Appeals affirmed, though it declined to reach the issue of whether a private right of action might exist for other Section 12(b) claims, like those alleging that a distribution plan fails to conform to the mechanical requirements of Rule 12b-1.

Here, plaintiffs argue that *Krinsk* is not on point because their Section 12(b) claim is entirely distinct from Count III, the Section 36(b) claim based on "Excessive Rule 12b-1 Distribution fees and Extraction of Additional Compensation for Advisory Services." Am. Compl. at 27. According to plaintiffs, the Section 36(b) claim alleges a breach of fiduciary duty with respect to receipt of compensation, while their Section 12(b) claim alleges that "the Distribution Plans have failed to accomplish what they [were] designed to do," and that the Distribution Plans do not comply with a mechanical Rule 12b-1 requirement. Pls.' Opp'n at 11:23-12:5; *see* Am. Compl. ¶ 75(c). Thus, they contend that their Section 12(b) claim is not precluded by *Krinsk*, and that the Court should consider whether a private right of action exists and find that it does.

The Court finds *Krinsk* persuasive in this case and applicable to these facts. Contrary to plaintiffs' contention, their Section 12(b) claim is not "entirely distinct" from Count III. Under Section 36(b), plaintiffs allege that "[t]he distribution fees charged and received by Defendants or their affiliates were designed to, and did, extract additional compensation for Defendants' advisory services in violation of Defendants' fiduciary duty under §

36(b)," and that "[i]n failing to pass along economies-of-scale benefits from the distribution fees, and in continuing to assess distribution fees pursuant to plans of distribution despite the fact that no benefits inured to Plaintiffs, Defendants have violated, and continue to violate, the ICA." *Id.* at ¶ ¶ 87-88. The Section 12(b) claim alleges that defendants violated § 12(b) and 17 C.F.R. § 270.12b-1 "by accepting excessive or inappropriate compensation in violation of the fiduciary duty owed by them to the Funds"; that they have "spent fund assets on distribution over and above the limits imposed on 12b-1 payments, hiding such payments in brokerage expense costs"; that they have "treated individual fund shareholders such as Plaintiffs improperly by diverting their 12b-1 payments to illicit rebates or illicit payoffs to fiduciaries ... with no corresponding benefits flowing to Plaintiffs or the other fund shareholders"; that "[t]he wrongful rebates and other payments represent undisclosed discriminatory diversions of fund assets in breach of Defendants' fiduciary duties"; and that defendants have violated § 12(b) and Rule 12b-1 "by accepting excessive or inappropriate compensation, or by making improper uses of fund assets, in violation of the fiduciary duty owed by them to the Funds." Am. Compl. ¶¶ 93-97. The gravamen of both claims is breach of fiduciary duty, a claim expressly authorized under Section 36(b), and fully remediable through plaintiffs' Section 36(b) claim. Consequently, the Court need not reach the question of whether an implied right of action exists generally under Section 12(b).

*7 Defendants' motion to dismiss Count IV is GRANTED and the claim is DISMISSED with prejudice.

B. Rule 23.1 requirements

Because the Court concludes that there is no private right of action under Section 12(b), it does not reach the question of whether plaintiffs must comply with Rule 23.1 in asserting this claim.

III. Counts V-XI (state law claims)

Plaintiffs have brought seven state claims: breach

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy

2005 WL 645529 (N.D.Cal.)

(Cite as: 2005 WL 645529 (N.D.Cal.))

Page 7

of fiduciary duty; civil conspiracy to breach fiduciary duties; common law aiding and abetting breaches of fiduciary duty by Franklin Resources; acting in concert under Restatement (Second) of Torts § 876(b); a violation of Cal. Bus. & Profs. Code § 17200; a violation of Cal. Bus. & Profs. Code § 17500 by Franklin Resources (California False Advertising Law); and common law unjust enrichment. Defendants move to dismiss plaintiffs' state claim claims on multiple grounds: (1) supplemental jurisdiction (assuming dismissal of the federal claims); (2) failure to comply with the requirements of Rule 23.1 for derivative actions; and (3) failure to plead sufficient facts for each claim. Because the Court has not dismissed plaintiffs' Section 36(b) claims, it retains jurisdiction over this action, including any pendent state law claims. Accordingly, it will consider the issue of whether the state claims are direct or derivative and then discuss each claim in turn.

A. Derivative claims versus direct claims

Defendants contend that plaintiffs' state law claims are derivative claims, because of language in the complaint stating that "[t]his action is a derivative action brought by Plaintiffs on behalf of the Funds." Am. Compl. ¶ 39. As plaintiffs point out, this sentence actually ends "pursuant to §§ 36(b) and 12(b)" of the ICA, *id.*, and thus pertains only to the federal claims. Plaintiffs argue that their state law claims are brought based on individual injuries suffered by themselves and other investors, not injury to the Funds themselves, because of the unique nature and structure of mutual funds.

Under California law, derivative suits are brought when the alleged injury is an injury to the corporation. *Jones v. H.F. Ahmanson & Co.*, 1 Cal.3d 93, 106, 81 Cal.Rptr. 592, 460 P.2d 464 (1969). A mutual fund issues redeemable securities, and the value of mutual fund shares is computed daily "by taking the market value at the time of all portfolio securities, adding the value of other assets and structuring liabilities, and dividing the result by the number of shares outstanding." *United States v. Cartwright*, 411 U.S. 546, 548, 93 S.Ct. 1713, 36 L.Ed.2d 528 (1973). Every dollar of expense borne

by the fund is distributed to shareholders, as a pro rata deduction from the net asset value per share. Fees, likewise, are paid by individual investors. As a result of this financial structure, plaintiffs argue, the investors--not the Funds--have paid overcharges and been injured by them. The injury to each shareholder can be "severed from any injury to other shareholders because each shareholder had a distinct and separate amount directly and permanently subtracted from the value of his or her shares." Pls.' Opp'n at 23:2-4.

*8 Applying the rule of *Jones v. H.F. Ahmanson*, the Court is persuaded that plaintiffs' state claims are direct claims. In determining whether a claim is derivative or direct, the central question is whether there is a corporate injury alleged. Corporate injury is required under the state laws of all states of incorporation for the Funds. *See Jones*, 1 Cal.3d at 106, 81 Cal.Rptr. 592, 460 P.2d 464; *Tooley v. Donaldson, Lufkin & Jenrette, Inc.*, 845 A.2d 1031, 1039 (Delaware); *Strougo v. Bassini*, 282 F.3d 162, 172 (2d Cir.2002) (Maryland); *Blasberg v. Oxbow Power Corp.*, 934 F.Supp.2d 21, 26- 27 (D.Mass.1996) (Massachusetts). Here, plaintiffs do not allege injury to the Funds themselves, but rather individual injury. Indeed, the financial harm from overcharges is harm to the individual investors, who own the Funds' assets and bear its expenses directly on a pro rata basis. Accordingly, the requirements of Rule 23.1 do not apply to these claims. In addition, these requirements do not apply to actions under § 36(b) of the ICA, and thus plaintiffs were not required to make a pre-suit demand on the board of directors of the Funds. *Daily Income, Inc. v. Fox*, 464 U.S. 523, 104 S.Ct. 831, 78 L.Ed.2d 645 (1984).

B. Individual claims

1. Breach of fiduciary duty

Defendants contend that Count V should be dismissed because it claims a breach by all defendants of duties to all plaintiffs, without further allegations of where the fiduciary relationships run. Plaintiffs argue that Rule 8 does not require this level of detail, that their allegations are sufficiently

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy

2005 WL 645529 (N.D.Cal.)

**(Cite as: 2005 WL 645529 (N.D.Cal.))**

specific, and that fiduciary duties are alleged for each defendant to each Fund for which it provided advisory services. The Court agrees with plaintiffs that the claim comports with the requirements of notice pleading. Defendants' motion to dismiss is DENIED as to Count V.

**2. Civil conspiracy**

Defendants' motion to dismiss Count VI is based on the assumption that Count V will be dismissed and that there can be no secondary liability without primary liability. Because the Court has denied defendant's motion as to Count V, Count VI survives as well.

**3. Aiding and abetting**

Defendants advance the same "secondary liability" argument for dismissal of Count VII, and the Court rejects it on the same basis. Defendants also contend that this claim is defective because it alleges deliberate fraud by Franklin Resources without complying with the heightened pleading requirements of Rule 9(b). Plaintiffs argue that this claim goes beyond its one allegation of concealment, that Rule 9(b) does not apply because the essence of the claim is not fraud but rather control by Franklin Resources, and, in the alternative, that the lone concealment allegation complies with Rule 9(b) because it states that Franklin Resources assisted in the breach of fiduciary duty by "withholding material information (such as the availability of other advisors to render advisory services at substantially lower prices)." Am. Compl. ¶ 110. The Court agrees with plaintiffs that this aider/abettor claim is not based on deliberate fraud and is therefore not subject to Rule 9(b). The allegations in the complaint are sufficient to state a claim.

*\*9 Consequently, defendants' motion is DENIED as to this claim.

**4. Acting in concert**

Here, defendants argue that the complaint is deficient because it does not allege two defendants

with knowledge who give each other assistance or encouragement, as Restatement (Second) of Torts § 876(b) requires. Rather, only Franklin Resources is alleged to have "acted in concert." Plaintiffs argue that its allegations about Franklin Resources' acts as the parent corporation to determine the fee policies and practices of other defendants suffice for Rule 8.

The Restatement provides for liability "for harm resulting to a third person from the tortious conduct of another" if one party "knows that the other's conduct constitutes a breach of duty and gives substantial assistance or encouragement to the other." Restatement (Second) of Torts § 876(b). The Court finds that plaintiffs' allegations state a claim under the Restatement by stating that Franklin Resources determined the fee policies and practices of the other defendants and "gave the other Defendants substantial assistance, advice, direction and/or encouragement to act as they did in breaching their fiduciary duties." *See* Am. Compl. ¶ ¶ 113-114. Defendants' motion is DENIED as to this claim.

**5. Section 17200**

For this claim, the parties dispute the applicability of a recent decision by the California Court of Appeal, *Bowen v. Ziasun Technologies, Inc.,* 116 Cal.App.4th 777, 11 Cal.Rptr.3d 522 (2004), holding that Section 17200, California's Unfair Competition Law, does not apply to securities transactions. 116 Cal.App.4th at 786, 11 Cal.Rptr.3d 522. Plaintiffs contend that *Bowen* is limited to violations of the Unfair Competition Law in the purchase or sale of securities, like the fraudulent "Ponzi" scheme at issue in that case, and that a "continuous pattern of unfair business practices that occurred after the securities were purchased" is still actionable under the statute. Pls.' Opp'n at 28:17-18. Defendants argue that *Bowen* applies to all claims that "implicate[ ] securities transactions" or "implicate[ ] matters regulated by the federal securities laws," Defs.' Mot. at 13:3-4, because of "the comprehensive regulatory umbrella of the Securities and Exchange Commission over such transactions." *Bowen,* 116 Cal.App.4th at 789 n. 9, 11 Cal.Rptr.3d 522.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

The Court is aware of no authority observing the distinction plaintiffs propose between fraud in the sale of securities transactions and the misleading acts of charging excessive fees to mutual fund holders and misrepresenting the fairness of those fees. However, the Court cannot conclude that *Bowen'* s holding is quite as broad as defendants suggest. The California courts have expressly held that federal securities laws do not preempt Section 17200 generally. *Roskind v. Morgan Stanley Dean Witter & Co.*, 80 Cal.App.4th 345, 95 Cal.Rptr.2d 258 (2000); *Bowen*, 116 Cal.App.4th at 790, 11 Cal.Rptr.3d 522. In addition, *Bowen* and the cases on which it rests all dealt with fraud in the sale of securities. *See, e.g., Spinner Corp. v. Princeville Dev. Corp.*, 849 F.2d 388 (9th Cir.1988). Moreover, even the broad language of the *Bowen* case is limited to "securities *transactions,"* and does not encompass all situations where securities are somehow implicated but not purchased or sold. The Court finds that Section 17200 may be used to challenge an alleged scheme to overcharge investors in the management of securities.

***10** Accordingly, defendant's motion to dismiss is DENIED as to Count IX.

6. Section 17500

Defendants contend that this claim "expressly rests on fraud" and therefore requires compliance with Rule 9(b). Plaintiffs do not respond directly to this argument but rather contend that Franklin Resources was aware of the excessive fees being charged by the other defendants and made misleading public statements about its companies' commitment "to policies that protect the best interests of all our shareholders," to "high quality" and "outstanding" customer service, and to "frugality." Am. Compl. ¶¶ 127-29. Defendants counter that these statements are mere "puffery" and cannot support a false advertising claim.

The Court agrees with defendants that plaintiffs must plead with greater particularity to state a claim for false advertising, and that the statements alleged to be misleading here are not sufficient. Accordingly, this claim is DISMISSED with leave to amend.

7. Unjust enrichment

As for Count V, defendants contend that the claim is vague and fails to allege which specific defendants were unjustly enriched at the expense of which plaintiffs, and by how much. The Court rejects this contention, finding that Count XI complies with Rule 8's liberal notice pleading requirement.

Accordingly, defendants' motion to dismiss is DENIED as to Count XI.

CONCLUSION

For the foregoing reasons and for good cause shown, the Court hereby PARTIALLY GRANTS and PARTIALLY DENIES defendant's motion. [Docket # 49]. *Plaintiffs' amended complaint, if they choose to amend, must be filed and served on or before March 21, 2005.*

IT IS SO ORDERED.

2005 WL 645529 (N.D.Cal.)

**Motions, Pleadings and Filings (Back to top)**

- 3:04CV00883 (Docket) (Mar. 04, 2004)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT 5

Content

# Why John Hancock Funds?

Why JH Funds? | CEO Corner | Privacy Statement | Code of Ethics for Senior Financial Officers
Business Continuity Plan | Portfolio Holding Disclosure Policy | Information About Sales Charges

## Why John Hancock Funds?

*For more than three decades, John Hancock Funds has been helping individual, corporate and institutional clients reach their most important financial goals. With so many fund companies to choose from, why should you invest with us?*

### A name you know and trust

When you invest with John Hancock Funds you are investing with one of the most recognized and respected name in the financial services industry. Our parent company has been helping individuals and institutions increase and protect wealth since 1862.

### Solutions across the investing spectrum

We offer equity, income, international and sector investment solutions managed by in-house and external investment managers. We take a disciplined, team approach to portfolio management and research, leveraging the expertise of seasoned investment professionals.

### Committed to you

Our shareholders come first. We work hard to provide you with the products you need to build a solid financial foundation. We believe in the value of the advice, and partner with financial professionals in a commitment to help you reach your long-term investing goals.

**John Hancock Funds At-A-Glance**

Managing more than $31.3 billion in mutual funds, private accounts and retirement plans for individual and institutional investors*

Complete range of funds: equity, sector, international, income, tax-free income, money market

More than one million shareholders worldwide

* as of December 30, 2004

Click here for a prospectus containing more complete information, including charges and expenses, for any of the John Hancock Funds' mutual funds. Please read the prospectus carefully before you invest or send money. These products are available for sale only within the United States.

Please keep in mind that mutual fund shares: Are not FDIC insured | May lose value | Come with no bank guarantee | Are not insured by any government agency

Copyright © 1999-2005 by John Hancock Funds, LLC and affiliated companies. Member NASD, 101 Huntington Avenue, Boston. MA 02199. 2005 Edition.

View our Terms of Use which includes important legal information.

# EXHIBIT 6

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

------------------------------------------------------X

LOREN CHAMBERLAIN, *on behalf of himself*
*and all other similarly situated common*
*shareholders of Aberdeen Global Income Fund, Inc.,*

RICHARD PUTAPCHUK, *on behalf of himself*
*and all other similarly situated common*
*shareholders of Aberdeen Asia-Pacific Income Fund, Inc.*

                              Plaintiffs,                    02 CV 5670 (SJ)

        - against -                                          **ORDER**

ABERDEEN ASSET MANAGEMENT LIMITED,
ABERDEEN ASSET MANAGERS (C.I.) LIMITED

                              Defendants.

------------------------------------------------------X

**FILED**
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y.
★    APR 1 2 2005    ★

P.M. _____
TIME A.M. _____

**A P P E A R A N C E S :**

WECHSLER HARWOOD HALEBIAN &
FEFFER LLP
488 Madison Avenue, 8th Floor
New York, NY 10022
By:    Joel Carl Feffer, Nadeem Faruqi
Attorneys for Plaintiffs

DECHERT LLP
30 Rockefeller Plaza
New York, NY 10112
By:    Melvin A. Schwarz
Attorney for Defendants

JOHNSON, Senior District Judge:

        On January 21, 2005 this Court issued a Memorandum and Order granting

Defendants' Motion to Dismiss based on a finding that there is no private right of action

1

under Section 36(a) of the Investment Company Act. Plaintiffs subsequently appealed this decision to the Second Circuit, but then withdrew the appeal in order to restore jurisdiction to this Court to consider a joint Motion to Vacate the Judgment by both parties pursuant to Federal Rule of Civil Procedure 60(b). (Stip. Withdrawing Appeal at 1.) The reason for the parties' request is that an order vacating the previous decision is a precondition to settlement, demanded by Plaintiffs. (Mem. Law Supp. Motion to Vacate at 3.)

Despite the public interest in preserving precedent, vacatur is authorized in order to permit settlement to proceed, particularly where the victor as well as the losing party is in agreement that vacatur would be desirable. See Major League Baseball Properties, Inc. v. Pacific Trading Cards, Inc., 150 F.3d 149 (2d Cir. 1998). The Court therefore grants the Rule 60(b) Motion, but notes that this does not constitute a reconsideration of the merits of the case or a negation of the substance of the previously issued Order; rather, the Motion is granted simply in order to permit the parties to proceed to settlement.

The previously issued Order is hereby VACATED. The parties are directed to file a proposed order of settlement and discontinuance within one month.

SO ORDERED.

Dated:  April 6, 2005
        Brooklyn, NY

                                            s/SJ
                                            Senior U.S.D.J.

2