## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| WILLIAM STEGALL, on Behalf of Himself and All Others Similarly Situated, | ) ) ) | |
| Plaintiff, | ) ) ) | |
| v. | ) ) | |
| CHARLES L. LADNER, JAMES F. CARLIN, WILLIAM H. CUNNINGHAM, RONALD R. DION, STEVEN PRUCHANSKY, NORMAN H. SMITH, JOHN P. TOOLAN, JAMES A. SHEPHERDSON, DENNIS S. ARONOWITZ, RICHARD P. CHAPMAN, JR., WILLIAM J. COSGROVE, RICHARD A. FARRELL, WILLIAM F. GLAVIN, JOHN A. MOORE, PATTI McGILL PETERSON, JOHN W. PRATT, JOHN HANCOCK FINANCIAL SERVICES, INC., JOHN HANCOCK ADVISERS, LLC, | ) ) ) ) ) ) ) ) ) ) ) ) ) | Civil Action No. 05-10062 DPW |
| Defendants. | ) ) | |

## MEMORANDUM IN SUPPORT OF DEFENDANTS' MOTION FOR LEAVE TO FILE SUPPLEMENTAL AUTHORITY IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS

Defendants Charles L. Ladner, James F. Carlin, William H. Cunningham, Ronald R. Dion, Steven Pruchansky, Norman H. Smith, John P. Toolan, James A. Shepherdson, Dennis S. Aronowitz, Richard P. Chapman, Jr., William J. Cosgrove, Richard A. Farrell, William F. Glavin, John A. Moore, Patti McGill Peterson, John W. Pratt, John Hancock Financial Services, Inc., and John Hancock Advisers, LLC, ("Defendants") respectfully move this Court to file supplemental authority in support of their Motion to Dismiss. Three recent cases, that have particular bearing on the matters raised in Defendants' Motion, were decided during or after briefing on Defendants' Motion had concluded.

On June 23, 2005, the Supreme Court decided the case of *Exxon Mobil Corp. v. Allapattah Servs., Inc.*, 125 S. Ct. 2611 (2005) (attached hereto as Exhibit A). In a decision authored by Justice Kennedy, the Court found that 28 U.S.C. § 1367 permits "supplemental jurisdiction over the claims of other plaintiffs in the same Article III case or controversy, even if those claims are for less" than the amount required for diversity jurisdiction, as long as all other elements of diversity jurisdiction are present and at least one plaintiff meets the amount-in-controversy requirement. *Id.* at 2615. This case is important to the instant matter because, in interpreting § 1367, Justice Kennedy declined to rely upon legislative history or any other extrinsic material, which are not authoritative, when the statutory language is clear and unambiguous. *Id.* at 2626.

Only nine days ago, the United States District Court for the Northern District of Illinois decided the case of *Jacobs v. Bremner*, No. 05C143, 2005 WL 1719307 (N.D. Ill. July 20, 2005) (attached hereto as Exhibit B). *Jacobs* involved the same allegations of mutual fund mismanagement based upon failures to file proofs of claim in class action settlements and was brought by the same counsel as the plaintiff in the instant case. The *Jacobs* court dismissed all of plaintiff's counts and specifically held, relying upon *Exxon Mobil*, that there is no implied private right of action under the clear and unambiguous language of § 36(a) of the Investment Company Act. *Id.* at *5. Further, the court found that § 36(b) of that same statute applies only to complaints about compensation. *Id.* at *7.

Two days ago, the United States District Court for the Northern District of Illinois dismissed in its entirety another matter involving the same allegations and same counsel for plaintiffs as the case at hand by relying on *Mutchka v. Harris*, 373 F. Supp.2d 1021 (C.D. Cal. 2005), *Exxon Mobil Corp.*, and its recent decision in *Jabobs*. In *Dull v. Arch*, No. 05C140

(N.D. Ill. July 27, 2005) (attached hereto as Exhibit C), the court dismissed the plaintiffs' claim under § 36(a) of the Investment Company Act because the plain and unambiguous language of that provision does not provide for a private right of action and the court refused the plaintiffs' request to consider non-binding legislative history. *Id.*, slip. op. at 4-5. The plaintiffs' § 36(b) claim was also dismissed because the plaintiffs alleged a breach of fiduciary duty pertaining to investment decisions, not compensation for services as required under the statute. *Id.*, slip. op. at 6.

**CONCLUSION**

Defendants believe that further briefing on the above three cases would be instructive to the Court in deciding Defendants' Motion to Dismiss. Accordingly, Defendants respectfully request leave of court to submit such briefing on this supplemental authority.

Defendants
CHARLES L. LADNER, et al.

By their attorneys,

Dated:  July 29, 2005

s/ Wm. Shaw McDermott
Wm. Shaw McDermott, BBO #330860
Steven P. Wright, BBO #648575
Jason N. Golub, BBO #660114
Kirkpatrick & Lockhart
Nicholson Graham LLP
75 State Street
Boston, MA   02109
(617) 261-3100

## CERTIFICATE OF SERVICE

     I, Wm. Shaw McDermott, hereby certify that a true copy of the above document was served electronically on July 29, 2005 upon all counsel of record.

                         /s/ Wm. Shaw McDermott
                         Wm. Shaw McDermott

# Attachment

# A

Westlaw.

125 S.Ct. 2611                                                                                           Page 1
125 S.Ct. 2611, 73 USLW 4574, 05 Cal. Daily Op. Serv. 5443, 2005 Daily Journal D.A.R. 7490, 18 Fla. L. Weekly
Fed. S 453
**(Cite as: 125 S.Ct. 2611)**

H

**Briefs and Other Related Documents**

Supreme Court of the United States
EXXON MOBIL CORPORATION, Petitioner,
v.
ALLAPATTAH SERVICES, INC., et al.
Maria Del Rosario Ortega, et al., Petitioners,
v.
Star-Kist Foods, Inc.
**Nos. 04-70, 04-79.**

Argued March 1, 2005.
Decided June 23, 2005.

**Background:** In first of two consolidated cases, gasoline dealers brought diversity class action against their gasoline supplier, alleging that supplier had breached sales agreement. The United States District Court for the Southern District of Florida, Gold, J., entered judgment for class representatives only, certifying case for interlocutory review. The United States Court of Appeals for the Eleventh Circuit, 333 F.3d 1248, ruled that District Court could exercise supplemental jurisdiction over claims of class members who did not meet minimum amount-in-controversy requirement. In second case, minor child and her family members brought personal injury action. The United States District Court for the District of Puerto Rico, 213 F.Supp.2d 84, Casellas, J., dismissed for lack of jurisdiction. The United States Court of Appeals for the First Circuit affirmed in part, 370 F.3d 124, ruling that District Court could not exercise supplemental jurisdiction over claims of family members that did not independently satisfy amount-in-controversy requirement. Certiorari was granted.

**Holding:** The United States Supreme Court, Justice Kennedy, held that supplemental jurisdiction statute permits exercise of diversity jurisdiction over additional plaintiffs who fail to satisfy minimum amount-in-controversy requirement, as long as other elements of diversity jurisdiction are present and at least one named plaintiff satisfies amount-in-controversy requirement,
abrogating _Meritcare, Inc. v. St. Paul Mercury Ins. Co.,_ 166 F.3d 214, _Trimble v. Asarco, Inc.,_ 232 F.3d

946, and _Leonhardt v. Western Sugar Co.,_ 160 F.3d 631.
Affirmed in part and reversed and remanded in part.

Justice Stevens filed dissenting opinion joined by Justice Breyer.

Justice Ginsburg filed dissenting opinion joined by Justices Stevens, O'Connor, and Breyer.

West Headnotes

**[1] Federal Courts** ⬤⟿5
170Bk5 Most Cited Cases
Federal district courts possess only that power authorized by Constitution and statute.

**[2] Federal Courts** ⬤⟿23
170Bk23 Most Cited Cases
Under supplemental jurisdiction statute, federal court sitting in diversity may exercise supplemental jurisdiction over additional plaintiffs who fail to satisfy minimum amount-in-controversy requirement, as long as other elements of diversity jurisdiction are present, at least one named plaintiff satisfies amount-in-controversy requirement, and additional plaintiffs' claims are part of same case or controversy as those of plaintiffs who allege sufficient amount in controversy; abrogating _Meritcare, Inc. v. St. Paul Mercury Ins. Co.,_ 166 F.3d 214, _Trimble v. Asarco, Inc.,_ 232 F.3d 946, and _Leonhardt v. Western Sugar Co.,_ 160 F.3d 631. 28 U.S.C.A. §§ 1332, 1367.

***2612 Syllabus**
In No. 04-70, Exxon dealers filed a class action against Exxon Corporation, invoking the Federal District Court's 28 U.S.C. § 1332(a) diversity jurisdiction. After the dealers won a jury verdict, the court certified the case for interlocutory review on the question whether it had properly exercised § 1367 supplemental jurisdiction over the claims of class members who had not met § 1332(a)'s minimum amount-in-controversy requirement. The Eleventh Circuit upheld this extension of supplemental jurisdiction. In No. 04-79, a girl and her family sought damages from Star-Kist Foods, Inc., in a diversity action. The District Court granted Star-Kist summary judgment, finding that none of the plaintiffs had met the amount-in-controversy requirement. The First Circuit ruled that the girl, but not her family, had alleged the requisite amount, and

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

125 S.Ct. 2611                                                              Page 2
125 S.Ct. 2611, 73 USLW 4574, 05 Cal. Daily Op. Serv. 5443, 2005 Daily Journal D.A.R. 7490, 18 Fla. L. Weekly Fed. S 453
**(Cite as: 125 S.Ct. 2611)**

then *2613 held that supplemental jurisdiction over the family's claims was improper because original jurisdiction is lacking in a diversity case if one plaintiff fails to satisfy the amount-in-controversy requirement.

*Held:* Where the other elements of jurisdiction are present and at least one named plaintiff in the action satisfies § 1332(a)'s amount-in-controversy requirement, § 1367 authorizes supplemental jurisdiction over the claims of other plaintiffs in the same Article III case or controversy, even if those claims are for less than the requisite amount. Pp. 2616-2628.

(a) Although district courts may not exercise jurisdiction absent a statutory basis, once a court has original jurisdiction over some claims in an action, it may exercise supplemental jurisdiction over additional claims arising from the same case or controversy. See *Mine Workers v. Gibbs*, 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218. This expansive interpretation does not apply to § 1332's complete diversity requirement, for incomplete diversity destroys original jurisdiction with respect to all claims, leaving nothing to which supplemental claims can adhere. But other statutory prerequisites, including the federal-question and amount-in-controversy requirements, can be analyzed claim by claim. Before § 1367 was enacted, every plaintiff had to separately satisfy the amount-in-controversy requirement, *Clark v. Paul Gray, Inc.,* 306 U.S. 583, 59 S.Ct. 744, 83 L.Ed. 1001; *Zahn v. International Paper Co.,* 414 U.S. 291, 94 S.Ct. 505, 38 L.Ed.2d 511, and the grant of original jurisdiction over claims involving particular parties did not itself confer supplemental jurisdiction over additional claims involving other parties, *Finley v. United States*, 490 U.S. 545, 556, 109 S.Ct. 2003, 104 L.Ed.2d 593. Pp. 2616-2619.

(b) All parties here agree that § 1367 overturned *Finley*, but there is no warrant for assuming that is all it did. To determine § 1367's scope requires examination of the statute's text in light of context, structure, and related statutory provisions. Section 1367(a) is a broad grant of supplemental jurisdiction over other claims within the same case or controversy, as long as the action is one in which district courts would have original jurisdiction. Its last sentence makes clear that this grant extends to claims involving joinder or intervention of additional parties. The question here is whether a diversity case in which the claims of some, but not all, plaintiffs

satisfy the amount-in-controversy requirement qualifies as a "civil action of which the district courts have original jurisdiction," § 1367(a). Pp. 2619-2620.

(c) The answer must be yes. When a well-pleaded complaint has at least one claim satisfying the amount-in-controversy requirement, and there are no other relevant jurisdictional defects, the district court, beyond all question, has original jurisdiction over that claim. A court with original jurisdiction over a single claim in the complaint has original jurisdiction over a "civil action" under § 1367(a), even if that action comprises fewer claims than were included in the complaint. Once a court has original jurisdiction over the action, it can then decide whether it has a constitutional and statutory basis for exercising supplemental jurisdiction over other claims in the action. Section 1367(b), which contains exceptions to § 1367(a)'s broad rule, does not withdraw supplemental jurisdiction over the claims of the additional parties here. In fact, its exceptions support this Court's conclusion. Pp. 2620-2621.

(d) The Court cannot accept the alternative view, or its supporting theories, that a district court lacks original jurisdiction *2614 over a civil action unless it has original jurisdiction over every claim in the complaint. The "indivisibility theory"--that all claims must stand or fall as a single, indivisible action--is inconsistent with the whole notion of supplemental jurisdiction and is belied by this Court's practice of allowing federal courts to cure jurisdictional defects by dismissing the offending parties instead of the entire action. And the statute's broad and general language does not permit the theory to apply in diversity cases when it does not apply in federal-question cases. The "contamination theory"--that inclusion of a claim or party falling outside the district court's original jurisdiction contaminates every other claim in the complaint--makes sense with respect to the complete diversity requirement because a nondiverse party's presence eliminates the justification for a federal forum. But it makes little sense with regard to the amount-in-controversy requirement, which is meant to ensure that a dispute is sufficiently important to warrant federal-court attention. It is fallacious to suppose, simply from the proposition that § 1332 imposes both requirements, that the contamination theory germane to the former also applies to the latter. This Court has already considered and rejected a virtually identical argument in the closely analogous removal-jurisdiction context. See *Chicago v. International College of Surgeons,*

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

125 S.Ct. 2611                                                                    Page 3
125 S.Ct. 2611, 73 USLW 4574, 05 Cal. Daily Op. Serv. 5443, 2005 Daily Journal D.A.R. 7490, 18 Fla. L. Weekly
Fed. S 453
**(Cite as: 125 S.Ct. 2611)**

522 U.S. 156, 118 S.Ct. 523, 139 L.Ed.2d 525. Pp. 2621-2625.

(e) In light of the statute's text and structure, § 1367's only plausible reading is that a court has original jurisdiction over a civil action comprising the claims for which there is no jurisdictional defect. Though a single nondiverse party can contaminate every other claim in a lawsuit, contamination does not occur with respect to jurisdictional defects going only to the substantive importance of individual claims. Thus, § 1367(a)'s threshold requirement is satisfied in cases, such as these, where some but not all of the plaintiffs in a diversity action allege a sufficient amount in controversy. Section 1367 by its plain text overruled both _Clark_ and _Zahn_ and authorized supplemental jurisdiction over all claims by diverse parties arising out of the same case or controversy, subject only to enumerated exceptions not applicable here. P. 2625.

(f) Because § 1367 is not ambiguous, this Court need not examine other interpretative tools, including legislative history. Even were it appropriate to do so, the Court would not give the legislative history significant weight. Pp. 2625-2627.

(g) The Class Action Fairness Act has no impact on the analysis of these cases. Pp. 2627-2628.

No. 04-70, 333 F.3d 1248, affirmed; and No. 04-79, 370 F.3d 124, reversed and remanded.

KENNEDY, J., delivered the opinion of the Court, in which REHNQUIST, C. J., and SCALIA, SOUTER, and THOMAS, JJ., joined. STEVENS, J., filed a dissenting opinion, in which BREYER, J., joined. GINSBURG, J., filed a dissenting opinion, in which Stevens, O'CONNOR, and BREYER, JJ., joined.

Robert A. Long, Jr., Washington, DC, for respondent in 04-79.

Carter G. Phillips, Counsel of Record, Virginia A. Seitz, Robert N. Hochman, *2615 Sidley, Austin, Brown & Wood, LLP, Washington, D.C., for Petitioner in 04-70.

Eugene E. Stearns, Counsel of Record, Stearns, Weaver, Miller, Weissler, Alhadeff & Sitterson, P.A., Miami, FL, Sidney M. Pertnoy, Pertnoy, Solowsky & Allen, P.A., Miami, FL, for Respondents in 04-70.

Eugene E. Stearns, Counsel of Record, Mark P.

Dikeman, Mona E. Markus, Matthew W. Buttrick, David C. Pollack, Stearns, Weaver, Miller, Weissler, Alhadeff & Sitterson, P.A., Miami, FL, Sidney M. Pertnoy, Pertnoy, Solowsky & Allen, P.A., Miami, FL, for Respondents in 04-70.

David C. Indiano, Indiano & Williams, P.S.C., San Juan, Puerto Rico, David J. Herman, Washington, D.C., Robert A. Long, Jr., Counsel of Record, Jeremy D. Kernodle, Covington & Burling, Washington, DC, Scott T. Rickman, San Francisco, CA, for Respondents in 04-79.

Freddie Perez-Gonzalez, Freddie Perez-Gonzales & Assoc., P.S.C., Hato Rey, PR, Robert H. Klonoff, Kansas City, MO, Donald B. Ayer, Counsel of Record, Michael S. Fried, Christian G. Vergonis, Jason J. Jarvis, Charles T. Kotuby, Jr., Jones Day, Washington, D.C., for Petitioners in 04-79.

Justice KENNEDY delivered the opinion of the Court.

These consolidated cases present the question whether a federal court in a diversity action may exercise supplemental jurisdiction over additional plaintiffs whose claims do not satisfy the minimum amount-in-controversy requirement, provided the claims are part of the same case or controversy as the claims of plaintiffs who do allege a sufficient amount in controversy. Our decision turns on the correct interpretation of 28 U.S.C. § 1367. The question has divided the Courts of Appeals, and we granted certiorari to resolve the conflict. 543 U.S. ----, 125 S.Ct. 314, 160 L.Ed.2d 221 (2004).

We hold that, where the other elements of jurisdiction are present and at least one named plaintiff in the action satisfies the amount-in-controversy requirement, § 1367 does authorize supplemental jurisdiction over the claims of other plaintiffs in the same Article III case or controversy, even if those claims are for less than the jurisdictional amount specified in the statute setting forth the requirements for diversity jurisdiction. We affirm the judgment of the Court of Appeals for the Eleventh Circuit in No. 04-70, and we reverse the judgment of the Court of Appeals for the First Circuit in No. 04-79.

I

In 1991, about 10,000 Exxon dealers filed a class-action suit against the Exxon Corporation in the United States District Court for the Northern District

125 S.Ct. 2611                                                                                                 Page 4
125 S.Ct. 2611, 73 USLW 4574, 05 Cal. Daily Op. Serv. 5443, 2005 Daily Journal D.A.R. 7490, 18 Fla. L. Weekly
Fed. S 453
(Cite as: 125 S.Ct. 2611)

of Florida. The dealers alleged an intentional and systematic scheme by Exxon under which they were overcharged for fuel purchased from Exxon. The plaintiffs invoked the District Court's § 1332(a) diversity jurisdiction. After a unanimous jury verdict in favor of the plaintiffs, the District Court certified the case for interlocutory review, asking whether it had properly exercised § 1367 supplemental jurisdiction over the claims of class members who did not meet the jurisdictional minimum amount in controversy.

**\*2616** The Court of Appeals for the Eleventh Circuit upheld the District Court's extension of supplemental jurisdiction to these class members. _Allapattah Services, Inc. v. Exxon Corp.,_ 333 F.3d 1248 (2003). "[W]e find," the court held, "that § 1367 clearly and unambiguously provides district courts with the authority in diversity class actions to exercise supplemental jurisdiction over the claims of class members who do not meet the minimum amount in controversy as long as the district court has original jurisdiction over the claims of at least one of the class representatives." _Id., at_ 1256. This decision accords with the views of the Courts of Appeals for the Fourth, Sixth, and Seventh Circuits. See _Rosmer v. Pfizer, Inc.,_ 263 F.3d 110 (C.A.4 2001); _Olden v. LaFarge Corp.,_ 383 F.3d 495 (C.A.6 2004); _Stromberg Metal Works, Inc. v. Press Mechanical, Inc.,_ 77 F.3d 928 (C.A.7 1996); _In re Brand Name Prescription Drugs Antitrust Litigation,_ 123 F.3d 599 (C.A.7 1997). The Courts of Appeals for the Fifth and Ninth Circuits, adopting a similar analysis of the statute, have held that in a diversity class action the unnamed class members need not meet the amount-in-controversy requirement, provided the named class members do. These decisions, however, are unclear on whether all the named plaintiffs must satisfy this requirement. _In re Abbott Labs.,_ 51 F.3d 524 (C.A.5 1995); _Gibson v. Chrysler Corp.,_ 261 F.3d 927 (C.A.9 2001).

In the other case now before us the Court of Appeals for the First Circuit took a different position on the meaning of § 1367(a). 370 F.3d 124 (2004). In that case, a 9-year-old girl sued Star-Kist in a diversity action in the United States District Court for the District of Puerto Rico, seeking damages for unusually severe injuries she received when she sliced her finger on a tuna can. Her family joined in the suit, seeking damages for emotional distress and certain medical expenses. The District Court granted summary judgment to Star-Kist, finding that none of the plaintiffs met the minimum amount-in-

controversy requirement. The Court of Appeals for the First Circuit, however, ruled that the injured girl, but not her family members, had made allegations of damages in the requisite amount.

The Court of Appeals then addressed whether, in light of the fact that one plaintiff met the requirements for original jurisdiction, supplemental jurisdiction over the remaining plaintiffs' claims was proper under § 1367. The court held that § 1367 authorizes supplemental jurisdiction only when the district court has original jurisdiction over the action, and that in a diversity case original jurisdiction is lacking if one plaintiff fails to satisfy the amount-in-controversy requirement. Although the Court of Appeals claimed to "express no view" on whether the result would be the same in a class action, _id.,_ at 143, n. 19, its analysis is inconsistent with that of the Court of Appeals for the Eleventh Circuit. The Court of Appeals for the First Circuit's view of § 1367 is, however, shared by the Courts of Appeal for the Third, Eighth, and Tenth Circuits, and the latter two Courts of Appeals have expressly applied this rule to class actions. See _Meritcare, Inc. v. St. Paul Mercury Ins. Co.,_ 166 F.3d 214 (C.A.3 1999); _Trimble v. Asarco, Inc.,_ 232 F.3d 946 (C.A.8 2000); _Leonhardt v. Western Sugar Co.,_ 160 F.3d 631 (C.A.10 1998).

## II
### A

[1] The district courts of the United States, as we have said many times, are "courts of limited jurisdiction. They possess only that power authorized by Constitution and statute," **\*2617**_Kokkonen v. Guardian Life Ins. Co. of America,_ 511 U.S. 375, 377, 114 S.Ct. 1673, 128 L.Ed.2d 391 (1994). In order to provide a federal forum for plaintiffs who seek to vindicate federal rights, Congress has conferred on the district courts original jurisdiction in federal-question cases--civil actions that arise under the Constitution, laws, or treaties of the United States. 28 U.S.C. § 1331. In order to provide a neutral forum for what have come to be known as diversity cases, Congress also has granted district courts original jurisdiction in civil actions between citizens of different States, between U.S. citizens and foreign citizens, or by foreign states against U.S. citizens. § 1332. To ensure that diversity jurisdiction does not flood the federal courts with minor disputes, § 1332(a) requires that the matter in controversy in a diversity case exceed a specified amount, currently $75,000. § 1332(a).

Although the district courts may not exercise

125 S.Ct. 2611, 73 USLW 4574, 05 Cal. Daily Op. Serv. 5443, 2005 Daily Journal D.A.R. 7490, 18 Fla. L. Weekly Fed. S 453
**(Cite as: 125 S.Ct. 2611)**

jurisdiction absent a statutory basis, it is well established--in certain classes of cases--that, once a court has original jurisdiction over some claims in the action, it may exercise supplemental jurisdiction over additional claims that are part of the same case or controversy. The leading modern case for this principle is *Mine Workers v. Gibbs,* 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966). In *Gibbs,* the plaintiff alleged the defendant's conduct violated both federal and state law. The District Court, *Gibbs* held, had original jurisdiction over the action based on the federal claims. *Gibbs* confirmed that the District Court had the additional power (though not the obligation) to exercise supplemental jurisdiction over related state claims that arose from the same Article III case or controversy. *Id.,* at 725, 86 S.Ct. 1130 ("The federal claim must have substance sufficient to confer subject matter jurisdiction on the court ... .[A]ssuming substantiality of the federal issues, there is *power* in federal courts to hear the whole").

As we later noted, the decision allowing jurisdiction over pendent state claims in *Gibbs* did not mention, let alone come to grips with, the text of the jurisdictional statutes and the bedrock principle that federal courts have no jurisdiction without statutory authorization. *Finley v. United States,* 490 U.S. 545, 548, 109 S.Ct. 2003, 104 L.Ed.2d 593 (1989). In *Finley,* we nonetheless reaffirmed and rationalized *Gibbs* and its progeny by inferring from it the interpretive principle that, in cases involving supplemental jurisdiction over additional claims between parties properly in federal court, the jurisdictional statutes should be read broadly, on the assumption that in this context Congress intended to authorize courts to exercise their full Article III power to dispose of an " 'entire action before the court [which] comprises but one constitutional "case." ' " 490 U.S., at 549, 109 S.Ct. 2003 (quoting *Gibbs, supra,* at 725, 86 S.Ct. 1130).

We have not, however, applied *Gibbs'* expansive interpretive approach to other aspects of the jurisdictional statutes. For instance, we have consistently interpreted § 1332 as requiring complete diversity: In a case with multiple plaintiffs and multiple defendants, the presence in the action of a single plaintiff from the same State as a single defendant deprives the district court of original diversity jurisdiction over the entire action. *Strawbridge v. Curtiss,* 3 Cranch 267, 2 L.Ed. 435 (1806); *Owen Equipment & Erection Co. v. Kroger,* 437 U.S. 365, 375, 98 S.Ct. 2396, 57 L.Ed.2d 274 (1978). The complete diversity requirement is not

mandated by the Constitution, *State Farm Fire & Casualty Co. v. Tashire,* 386 U.S. 523, 530- 531, 87 S.Ct. 1199, 18 L.Ed.2d 270 (1967), or by the plain text of § 1332(a). The Court, nonetheless, has adhered to the complete diversity **\*2618** rule in light of the purpose of the diversity requirement, which is to provide a federal forum for important disputes where state courts might favor, or be perceived as favoring, home-state litigants. The presence of parties from the same State on both sides of a case dispels this concern, eliminating a principal reason for conferring § 1332 jurisdiction over any of the claims in the action. See *Wisconsin Dept. of Corrections v. Schacht,* 524 U.S. 381, 389, 118 S.Ct. 2047, 141 L.Ed.2d 364 (1998); *Newman-Green, Inc. v. Alfonzo-Larrain,* 490 U.S. 826, 829, 109 S.Ct. 2218, 104 L.Ed.2d 893 (1989). The specific purpose of the complete diversity rule explains both why we have not adopted *Gibbs* ' expansive interpretive approach to this aspect of the jurisdictional statute and why *Gibbs* does not undermine the complete diversity rule. In order for a federal court to invoke supplemental jurisdiction under *Gibbs,* it must first have original jurisdiction over at least one claim in the action. Incomplete diversity destroys original jurisdiction with respect to all claims, so there is nothing to which supplemental jurisdiction can adhere.

In contrast to the diversity requirement, most of the other statutory prerequisites for federal jurisdiction, including the federal-question and amount-in-controversy requirements, can be analyzed claim by claim. True, it does not follow by necessity from this that a district court has authority to exercise supplemental jurisdiction over all claims provided there is original jurisdiction over just one. Before the enactment of § 1367, the Court declined in contexts other than the pendent-claim instance to follow *Gibbs'* expansive approach to interpretation of the jurisdictional statutes. The Court took a more restrictive view of the proper interpretation of these statutes in so-called pendent-party cases involving supplemental jurisdiction over claims involving additional parties--plaintiffs or defendants--where the district courts would lack original jurisdiction over claims by each of the parties standing alone.

Thus, with respect to plaintiff-specific jurisdictional requirements, the Court held in *Clark v. Paul Gray, Inc.,* 306 U.S. 583, 59 S.Ct. 744, 83 L.Ed. 1001 (1939), that every plaintiff must separately satisfy the amount-in-controversy requirement. Though *Clark* was a federal-question case, at that time federal-

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

125 S.Ct. 2611                                                                                                           Page 6
125 S.Ct. 2611, 73 USLW 4574, 05 Cal. Daily Op. Serv. 5443, 2005 Daily Journal D.A.R. 7490, 18 Fla. L. Weekly
Fed. S 453
(Cite as: 125 S.Ct. 2611)

question jurisdiction had an amount-in-controversy requirement analogous to the amount-in-controversy requirement for diversity cases. "Proper practice," _Clark_ held, "requires that where each of several plaintiffs is bound to establish the jurisdictional amount with respect to his own claim, the suit should be dismissed as to those who fail to show that the requisite amount is involved." _Id.,_ at 590, 59 S.Ct. 744. The Court reaffirmed this rule, in the context of a class action brought invoking § 1332(a) diversity jurisdiction, in _Zahn v. International Paper Co.,_ 414 U.S. 291, 94 S.Ct. 505, 38 L.Ed.2d 511 (1973). It follows "inescapably" from _Clark,_ the Court held in _Zahn,_ that "any plaintiff without the jurisdictional amount must be dismissed from the case, even though others allege jurisdictionally sufficient claims." 414 U.S., at 300, 94 S.Ct. 505.

The Court took a similar approach with respect to supplemental jurisdiction over claims against additional defendants that fall outside the district courts' original jurisdiction. In _Aldinger v. Howard,_ 427 U.S. 1, 96 S.Ct. 2413, 49 L.Ed.2d 276 (1976), the plaintiff brought a 42 U.S.C. § 1983 action against county officials in district court pursuant to the statutory grant of jurisdiction in 28 U.S.C. § 1343(3) (1976 ed.). The plaintiff further alleged the court had supplemental jurisdiction over her related state-law claims against **2619 the county, even though the county was not suable under § 1983 and so was not subject to § 1343(3)'s original jurisdiction. The Court held that supplemental jurisdiction could not be exercised because Congress, in enacting § 1343(3), had declined (albeit implicitly) to extend federal jurisdiction over any party who could not be sued under the federal civil rights statutes. 427 U.S., at 16-19, 96 S.Ct. 2413. "Before it can be concluded that [supplemental] jurisdiction [over additional parties] exists," _Aldinger_ held, "a federal court must satisfy itself not only that Art[icle] III permits it, but that Congress in the statutes conferring jurisdiction has not expressly or by implication negated its existence." _Id.,_ at 18, 96 S.Ct. 2413.

In _Finley v. United States,_ 490 U.S. 545, 109 S.Ct. 2003, 104 L.Ed.2d 593 (1989), we confronted a similar issue in a different statutory context. The plaintiff in _Finley_ brought a Federal Tort Claims Act negligence suit against the Federal Aviation Administration in District Court, which had original jurisdiction under § 1346(b). The plaintiff tried to add related claims against other defendants, invoking the District Court's supplemental jurisdiction over so-called pendent parties. We held that the District Court lacked a sufficient statutory basis for exercising supplemental jurisdiction over these claims. Relying primarily on _Zahn, Aldinger,_ and _Kroger,_ we held in _Finley_ that "a grant of jurisdiction over claims involving particular parties does not itself confer jurisdiction over additional claims by or against different parties." 490 U.S., at 556, 109 S.Ct. 2003. While _Finley_ did not "limit or impair" _Gibbs'_ liberal approach to interpreting the jurisdictional statutes in the context of supplemental jurisdiction over additional claims involving the same parties, 490 U.S., at 556, 109 S.Ct. 2003, _Finley_ nevertheless declined to extend that interpretive assumption to claims involving additional parties. _Finley_ held that in the context of parties, in contrast to claims, "we will not assume that the full constitutional power has been congressionally authorized, and will not read jurisdictional statutes broadly." _Id.,_ at 549, 109 S.Ct. 2003.

As the jurisdictional statutes existed in 1989, then, here is how matters stood: First, the diversity requirement in § 1332(a) required complete diversity; absent complete diversity, the district court lacked original jurisdiction over all of the claims in the action. _Strawbridge,_ 3 Cranch, at 267-268, 2 L.Ed. 435; _Kroger,_ 437 U.S., at 373-374, 98 S.Ct. 2396. Second, if the district court had original jurisdiction over at least one claim, the jurisdictional statutes implicitly authorized supplemental jurisdiction over all other claims between the same parties arising out of the same Article III case or controversy. _Gibbs,_ 383 U.S., at 725, 86 S.Ct. 1130. Third, even when the district court had original jurisdiction over one or more claims between particular parties, the jurisdictional statutes did not authorize supplemental jurisdiction over additional claims involving other parties. _Clark, supra,_ at 590, 59 S.Ct. 744; _Zahn, supra,_ at 300-301, 94 S.Ct. 505; _Finley, supra,_ at 556, 109 S.Ct. 2003.

B

In _Finley_ we emphasized that "[w]hatever we say regarding the scope of jurisdiction conferred by a particular statute can of course be changed by Congress." 490 U.S., at 556, 109 S.Ct. 2003. In 1990, Congress accepted the invitation. It passed the Judicial Improvements Act, 104 Stat. 5089, which enacted § 1367, the provision which controls these cases.

Section 1367 provides, in relevant part:
"(a) Except as provided in subsections (b) and (c)

125 S.Ct. 2611                                                                              Page 7
125 S.Ct. 2611, 73 USLW 4574, 05 Cal. Daily Op. Serv. 5443, 2005 Daily Journal D.A.R. 7490, 18 Fla. L. Weekly
Fed. S 453
**(Cite as: 125 S.Ct. 2611)**

or as expressly provided otherwise *2620 by Federal statute, in any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution. Such supplemental jurisdiction shall include claims that involve the joinder or intervention of additional parties.

"(b) In any civil action of which the district courts have original jurisdiction founded solely on section 1332 of this title, the district courts shall not have supplemental jurisdiction under subsection (a) over claims by plaintiffs against persons made parties under Rule 14, 19, 20, or 24 of the Federal Rules of Civil Procedure, or over claims by persons proposed to be joined as plaintiffs under Rule 19 of such rules, or seeking to intervene as plaintiffs under Rule 24 of such rules, when exercising supplemental jurisdiction over such claims would be inconsistent with the jurisdictional requirements of section 1332."

All parties to this litigation and all courts to consider the question agree that § 1367 overturned the result in *Finley.* There is no warrant, however, for assuming that § 1367 did no more than to overrule *Finley* and otherwise to codify the existing state of the law of supplemental jurisdiction. We must not give jurisdictional statutes a more expansive interpretation than their text warrants, 490 U.S., at 549, 556, 109 S.Ct. 2003; but it is just as important not to adopt an artificial construction that is narrower than what the text provides. No sound canon of interpretation requires Congress to speak with extraordinary clarity in order to modify the rules of federal jurisdiction within appropriate constitutional bounds. Ordinary principles of statutory construction apply. In order to determine the scope of supplemental jurisdiction authorized by § 1367, then, we must examine the statute's text in light of context, structure, and related statutory provisions.

[2] Section 1367(a) is a broad grant of supplemental jurisdiction over other claims within the same case or controversy, as long as the action is one in which the district courts would have original jurisdiction. The last sentence of § 1367(a) makes it clear that the grant of supplemental jurisdiction extends to claims involving joinder or intervention of additional parties. The single question before us, therefore, is whether a diversity case in which the claims of some plaintiffs

satisfy the amount-in-controversy requirement, but the claims of others plaintiffs do not, presents a "civil action of which the district courts have original jurisdiction." If the answer is yes, § 1367(a) confers supplemental jurisdiction over all claims, including those that do not independently satisfy the amount-in-controversy requirement, if the claims are part of the same Article III case or controversy. If the answer is no, § 1367(a) is inapplicable and, in light of our holdings in *Clark* and *Zahn,* the district court has no statutory basis for exercising supplemental jurisdiction over the additional claims.

We now conclude the answer must be yes. When the well-pleaded complaint contains at least one claim that satisfies the amount-in-controversy requirement, and there are no other relevant jurisdictional defects, the district court, beyond all question, has original jurisdiction over that claim. The presence of other claims in the complaint, over which the district court may lack original jurisdiction, is of no moment. If the court has original jurisdiction over a single claim in the complaint, it has original jurisdiction over a "civil action" *2621 within the meaning of § 1367(a), even if the civil action over which it has jurisdiction comprises fewer claims than were included in the complaint. Once the court determines it has original jurisdiction over the civil action, it can turn to the question whether it has a constitutional and statutory basis for exercising supplemental jurisdiction over the other claims in the action.

Section 1367(a) commences with the direction that § § 1367(b) and (c), or other relevant statutes, may provide specific exceptions, but otherwise § 1367(a) is a broad jurisdictional grant, with no distinction drawn between pendent-claim and pendent-party cases. In fact, the last sentence of § 1367(a) makes clear that the provision grants supplemental jurisdiction over claims involving joinder or intervention of additional parties. The terms of § 1367 do not acknowledge any distinction between pendent jurisdiction and the doctrine of so-called ancillary jurisdiction. Though the doctrines of pendent and ancillary jurisdiction developed separately as a historical matter, the Court has recognized that the doctrines are "two species of the same generic problem," *Kroger,* 437 U.S., at 370, 98 S.Ct. 2396. Nothing in § 1367 indicates a congressional intent to recognize, preserve, or create some meaningful, substantive distinction between the jurisdictional categories we have historically labeled pendent and ancillary.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

125 S.Ct. 2611                                                                                  Page 8
125 S.Ct. 2611, 73 USLW 4574, 05 Cal. Daily Op. Serv. 5443, 2005 Daily Journal D.A.R. 7490, 18 Fla. L. Weekly
Fed. S 453
**(Cite as: 125 S.Ct. 2611)**

If § 1367(a) were the sum total of the relevant statutory language, our holding would rest on that language alone. The statute, of course, instructs us to examine § 1367(b) to determine if any of its exceptions apply, so we proceed to that section. While § 1367(b) qualifies the broad rule of § 1367(a), it does not withdraw supplemental jurisdiction over the claims of the additional parties at issue here. The specific exceptions to § 1367(a) contained in § 1367(b), moreover, provide additional support for our conclusion that § 1367(a) confers supplemental jurisdiction over these claims. Section 1367(b), which applies only to diversity cases, withholds supplemental jurisdiction over the claims of plaintiffs proposed to be joined as indispensable parties under Federal Rule of Civil Procedure 19, or who seek to intervene pursuant to Rule 24. Nothing in the text of § 1367(b), however, withholds supplemental jurisdiction over the claims of plaintiffs permissively joined under Rule 20 (like the additional plaintiffs in No. 04- 79) or certified as class-action members pursuant to Rule 23 (like the additional plaintiffs in No. 04-70). The natural, indeed the necessary, inference is that § 1367 confers supplemental jurisdiction over claims by Rule 20 and Rule 23 plaintiffs. This inference, at least with respect to Rule 20 plaintiffs, is strengthened by the fact that § 1367(b) explicitly excludes supplemental jurisdiction over claims against defendants joined under Rule 20.

We cannot accept the view, urged by some of the parties, commentators, and Courts of Appeals, that a district court lacks original jurisdiction over a civil action unless the court has original jurisdiction over every claim in the complaint. As we understand this position, it requires assuming either that all claims in the complaint must stand or fall as a single, indivisible "civil action" as a matter of definitional necessity--what we will refer to as the "indivisibility theory"--or else that the inclusion of a claim or party falling outside the district court's original jurisdiction somehow contaminates every other claim in the complaint, depriving the court of original jurisdiction over any of these claims--what we will refer to as the "contamination theory."

The indivisibility theory is easily dismissed, as it is inconsistent with the whole notion of supplemental jurisdiction. If a *2622 district court must have original jurisdiction over every claim in the complaint in order to have "original jurisdiction" over a "civil action," then in _Gibbs_ there was no civil

action of which the district court could assume original jurisdiction under § 1331, and so no basis for exercising supplemental jurisdiction over any of the claims. The indivisibility theory is further belied by our practice--in both federal-question and diversity cases--of allowing federal courts to cure jurisdictional defects by dismissing the offending parties rather than dismissing the entire action. _Clark,_ for example, makes clear that claims that are jurisdictionally defective as to amount in controversy do not destroy original jurisdiction over other claims. 306 U.S., at 590, 59 S.Ct. 744 (dismissing parties who failed to meet the amount-in-controversy requirement but retaining jurisdiction over the remaining party). If the presence of jurisdictionally problematic claims in the complaint meant the district court was without original jurisdiction over the single, indivisible civil action before it, then the district court would have to dismiss the whole action rather than particular parties.

We also find it unconvincing to say that the definitional indivisibility theory applies in the context of diversity cases but not in the context of federal-question cases. The broad and general language of the statute does not permit this result. The contention is premised on the notion that the phrase "original jurisdiction of all civil actions" means different things in § 1331 and § 1332. It is implausible, however, to say that the identical phrase means one thing (original jurisdiction in all actions where at least one claim in the complaint meets the following requirements) in § 1331 and something else (original jurisdiction in all actions where every claim in the complaint meets the following requirements) in § 1332.

The contamination theory, as we have noted, can make some sense in the special context of the complete diversity requirement because the presence of nondiverse parties on both sides of a lawsuit eliminates the justification for providing a federal forum. The theory, however, makes little sense with respect to the amount-in-controversy requirement, which is meant to ensure that a dispute is sufficiently important to warrant federal-court attention. The presence of a single nondiverse party may eliminate the fear of bias with respect to all claims, but the presence of a claim that falls short of the minimum amount in controversy does nothing to reduce the importance of the claims that do meet this requirement.

It is fallacious to suppose, simply from the

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

125 S.Ct. 2611                                                                                                    Page 9
125 S.Ct. 2611, 73 USLW 4574, 05 Cal. Daily Op. Serv. 5443, 2005 Daily Journal D.A.R. 7490, 18 Fla. L. Weekly
Fed. S 453
**(Cite as: 125 S.Ct. 2611)**

proposition that § 1332 imposes both the diversity requirement and the amount-in-controversy requirement, that the contamination theory germane to the former is also relevant to the latter. There is no inherent logical connection between the amount-in-controversy requirement and § 1332 diversity jurisdiction. After all, federal-question jurisdiction once had an amount-in-controversy requirement as well. If such a requirement were revived under § 1331, it is clear beyond peradventure that § 1367(a) provides supplemental jurisdiction over federal-question cases where some, but not all, of the federal-law claims involve a sufficient amount in controversy. In other words, § 1367(a) unambiguously overrules the holding and the result in *Clark.* If that is so, however, it would be quite extraordinary to say that § 1367 did not also overrule *Zahn,* a case that was premised in substantial part on the holding in *Clark.*

In addition to the theoretical difficulties with the argument that a district court has original jurisdiction over a civil action only if it has original jurisdiction over each **\*2623** individual claim in the complaint, we have already considered and rejected a virtually identical argument in the closely analogous context of removal jurisdiction. In *Chicago v. International College of Surgeons,* 522 U.S. 156, 118 S.Ct. 523, 139 L.Ed.2d 525 (1997), the plaintiff brought federal- and state-law claims in state court. The defendant removed to federal court. The plaintiff objected to removal, citing the text of the removal statute, § 1441(a). That statutory provision, which bears a striking similarity to the relevant portion of § 1367, authorizes removal of "any civil action ... of which the district courts of the United States have original jurisdiction ... ." The *College of Surgeons* plaintiff urged that, because its state-law claims were not within the District Court's original jurisdiction, § 1441(a) did not authorize removal. We disagreed. The federal law claims, we held, "suffice to make the actions 'civil actions' within the 'original jurisdiction' of the district courts .... Nothing in the jurisdictional statutes suggests that the presence of related state law claims somehow alters the fact that [the plaintiff's] complaints, by virtue of their federal claims, were 'civil actions' within the federal courts' 'original jurisdiction.' " *Id.,* at 166, 118 S.Ct. 523. Once the case was removed, the District Court had original jurisdiction over the federal law claims and supplemental jurisdiction under § 1367(a) over the state-law claims. *Id.,* at 165, 118 S.Ct. 523.

The dissent in *College of Surgeons* argued that

because the plaintiff sought on-the-record review of a local administrative agency decision, the review it sought was outside the scope of the District Court's jurisdiction. *Id.,* at 177, 118 S.Ct. 523 (opinion of GINSBURG, J.). We rejected both the suggestion that state-law claims involving administrative appeals are beyond the scope of § 1367 supplemental jurisdiction, *id.,* at 168-172, 118 S.Ct. 523 (opinion of the Court), and the claim that the administrative review posture of the case deprived the District Court of original jurisdiction over the federal-law claims in the case, *id.,* at 163-168, 118 S.Ct. 523. More importantly for present purposes, *College of Surgeons* stressed that a district court has original jurisdiction of a civil action for purposes of § 1441(a) as long as it has original jurisdiction over a subset of the claims constituting the action. Even the *College of Surgeons* dissent, which took issue with the Court's interpretation of § 1367, did not appear to contest this view of § 1441(a).

Although *College of Surgeons* involved additional claims between the same parties, its interpretation of § 1441(a) applies equally to cases involving additional parties whose claims fall short of the jurisdictional amount. If we were to adopt the contrary view that the presence of additional parties means there is no "civil action ... of which the district courts ... have original jurisdiction," those cases simply would not be removable. To our knowledge, no court has issued a reasoned opinion adopting this view of the removal statute. It is settled, of course, that absent complete diversity a case is not removable because the district court would lack original jurisdiction. *Caterpillar Inc. v. Lewis,* 519 U.S. 61, 73, 117 S.Ct. 467, 136 L.Ed.2d 437 (1996). This, however, is altogether consistent with our view of § 1441(a). A failure of complete diversity, unlike the failure of some claims to meet the requisite amount in controversy, contaminates every claim in the action.

We also reject the argument, similar to the attempted distinction of *College of Surgeons* discussed above, that while the presence of additional claims over which the district court lacks jurisdiction does not mean the civil action is outside the purview of § 1367(a), the presence of additional **\*2624** parties does. The basis for this distinction is not altogether clear, and it is in considerable tension with statutory text. Section 1367(a) applies by its terms to any civil action of which the district courts have original jurisdiction, and the last sentence of § 1367(a) expressly contemplates that the court may have supplemental jurisdiction over additional parties. So

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

125 S.Ct. 2611                                                                                    Page 10
125 S.Ct. 2611, 73 USLW 4574, 05 Cal. Daily Op. Serv. 5443, 2005 Daily Journal D.A.R. 7490, 18 Fla. L. Weekly
Fed. S 453
**(Cite as: 125 S.Ct. 2611)**

it cannot be the case that the presence of those parties destroys the court's original jurisdiction, within the meaning of § 1367(a), over a civil action otherwise properly before it. Also, § 1367(b) expressly withholds supplemental jurisdiction in diversity cases over claims by plaintiffs joined as indispensable parties under Rule 19. If joinder of such parties were sufficient to deprive the district court of original jurisdiction over the civil action within the meaning of § 1367(a), this specific limitation on supplemental jurisdiction in § 1367(b) would be superfluous. The argument that the presence of additional parties removes the civil action from the scope of § 1367(a) also would mean that § 1367 left the *Finley* result undisturbed. *Finley,* after all, involved a Federal Tort Claims Act suit against a federal defendant and state-law claims against additional defendants not otherwise subject to federal jurisdiction. Yet all concede that one purpose of § 1367 was to change the result reached in *Finley.*

Finally, it is suggested that our interpretation of § 1367(a) creates an anomaly regarding the exceptions listed in § 1367(b): It is not immediately obvious why Congress would withhold supplemental jurisdiction over plaintiffs joined as parties "needed for just adjudication" under Rule 19 but would allow supplemental jurisdiction over plaintiffs permissively joined under Rule 20. The omission of Rule 20 plaintiffs from the list of exceptions in § 1367(b) may have been an "unintentional drafting gap," *Meritcare,* 166 F.3d, at 221 and n. 6. If that is the case, it is up to Congress rather than the courts to fix it. The omission may seem odd, but it is not absurd. An alternative explanation for the different treatment of Rule 19 and Rule 20 is that Congress was concerned that extending supplemental jurisdiction to Rule 19 plaintiffs would allow circumvention of the complete diversity rule: A nondiverse plaintiff might be omitted intentionally from the original action, but joined later under Rule 19 as a necessary party. See *Stromberg Metal Works,* 77 F.3d, at 932. The contamination theory described above, if applicable, means this ruse would fail, but Congress may have wanted to make assurance double sure. More generally, Congress may have concluded that federal jurisdiction is only appropriate if the district court would have original jurisdiction over the claims of all those plaintiffs who are so essential to the action that they could be joined under Rule 19.

To the extent that the omission of Rule 20 plaintiffs from the list of § 1367(b) exceptions is anomalous, moreover, it is no more anomalous than the inclusion

of Rule 19 plaintiffs in that list would be if the alternative view of § 1367(a) were to prevail. If the district court lacks original jurisdiction over a civil diversity action where any plaintiff's claims fail to comply with all the requirements of § 1332, there is no need for a special § 1367(b) exception for Rule 19 plaintiffs who do not meet these requirements. Though the omission of Rule 20 plaintiffs from § 1367(b) presents something of a puzzle on our view of the statute, the inclusion of Rule 19 plaintiffs in this section is at least as difficult to explain under the alternative view.

And so we circle back to the original question. When the well-pleaded complaint in district court includes multiple claims, all part of the same case or controversy, and some, but not all, of the claims **\*2625** are within the court's original jurisdiction, does the court have before it "any civil action of which the district courts have original jurisdiction"? It does. Under § 1367, the court has original jurisdiction over the civil action comprising the claims for which there is no jurisdictional defect. No other reading of § 1367 is plausible in light of the text and structure of the jurisdictional statute. Though the special nature and purpose of the diversity requirement mean that a single nondiverse party can contaminate every other claim in the lawsuit, the contamination does not occur with respect to jurisdictional defects that go only to the substantive importance of individual claims.

It follows from this conclusion that the threshold requirement of § 1367(a) is satisfied in cases, like those now before us, where some, but not all, of the plaintiffs in a diversity action allege a sufficient amount in controversy. We hold that § 1367 by its plain text overruled *Clark* and *Zahn* and authorized supplemental jurisdiction over all claims by diverse parties arising out of the same Article III case or controversy, subject only to enumerated exceptions not applicable in the cases now before us.

C

The proponents of the alternative view of § 1367 insist that the statute is at least ambiguous and that we should look to other interpretive tools, including the legislative history of § 1367, which supposedly demonstrate Congress did not intend § 1367 to overrule *Zahn.* We can reject this argument at the very outset simply because § 1367 is not ambiguous. For the reasons elaborated above, interpreting § 1367 to foreclose supplemental jurisdiction over plaintiffs in diversity cases who do not meet the minimum

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

125 S.Ct. 2611, 73 USLW 4574, 05 Cal. Daily Op. Serv. 5443, 2005 Daily Journal D.A.R. 7490, 18 Fla. L. Weekly Fed. S 453
**(Cite as: 125 S.Ct. 2611)**

amount in controversy is inconsistent with the text, read in light of other statutory provisions and our established jurisprudence. Even if we were to stipulate, however, that the reading these proponents urge upon us is textually plausible, the legislative history cited to support it would not alter our view as to the best interpretation of § 1367.

Those who urge that the legislative history refutes our interpretation rely primarily on the House Judiciary Committee Report on the Judicial Improvements Act. H.R.Rep. No. 101-734 (1990) (House Report or Report). This Report explained that § 1367 would "authorize jurisdiction in a case like *Finley*, as well as essentially restore the pre-*Finley* understandings of the authorization for and limits on other forms of supplemental jurisdiction." House Report, at 28. The Report stated that § 1367(a) "generally authorizes the district court to exercise jurisdiction over a supplemental claim whenever it forms part of the same constitutional case or controversy as the claim or claims that provide the basis of the district court's original jurisdiction," and in so doing codifies *Gibbs* and fills the statutory gap recognized in *Finley*. House Report, at 28-29, and n. 15. The Report then remarked that § 1367(b) "is not intended to affect the jurisdictional requirements of [§ 1332] in diversity-only class actions, as those requirements were interpreted prior to *Finley*," citing, without further elaboration, *Zahn* and *Supreme Tribe of Ben-Hur v. Cauble*, 255 U.S. 356, 41 S.Ct. 338, 65 L.Ed. 673 (1921). House Report, at 29, and n. 17. The Report noted that the "net effect" of § 1367(b) was to implement the "principal rationale" of *Kroger*, House Report, at 29, and n. 16, effecting only "one small change" in pre-*Finley* practice with respect to diversity actions: § 1367(b) would exclude "Rule 23(a) plaintiff-intervenors to the same extent as those sought to be joined as plaintiffs under Rule 19." House Report, at 29. (It is evident that **\*2626** the report here meant to refer to Rule 24, not Rule 23.)

As we have repeatedly held, the authoritative statement is the statutory text, not the legislative history or any other extrinsic material. Extrinsic materials have a role in statutory interpretation only to the extent they shed a reliable light on the enacting Legislature's understanding of otherwise ambiguous terms. Not all extrinsic materials are reliable sources of insight into legislative understandings, however, and legislative history in particular is vulnerable to two serious criticisms. First, legislative history is itself often murky, ambiguous, and contradictory.

Judicial investigation of legislative history has a tendency to become, to borrow Judge Leventhal's memorable phrase, an exercise in " 'looking over a crowd and picking out your friends.' " See Wald, Some Observations on the Use of Legislative History in the 1981 Supreme Court Term, 68 Iowa L.Rev. 195, 214 (1983). Second, judicial reliance on legislative materials like committee reports, which are not themselves subject to the requirements of Article I, may give unrepresentative committee members--or, worse yet, unelected staffers and lobbyists--both the power and the incentive to attempt strategic manipulations of legislative history to secure results they were unable to achieve through the statutory text. We need not comment here on whether these problems are sufficiently prevalent to render legislative history inherently unreliable in all circumstances, a point on which Members of this Court have disagreed. It is clear, however, that in this instance both criticisms are right on the mark.

First of all, the legislative history of § 1367 is far murkier than selective quotation from the House Report would suggest. The text of § 1367 is based substantially on a draft proposal contained in a Federal Court Study Committee working paper, which was drafted by a Subcommittee chaired by Judge Posner. Report of the Subcommittee on the Role of the Federal Courts and Their Relationship to the States 567-568 (Mar. 12, 1990), reprinted in Judicial Conference of the United States, 1 Federal Courts Study Committee, Working Papers and Subcommittee Reports (July 1, 1990). See also Judicial Conference of the United States, Report of the Federal Courts Study Committee 47-48 (Apr. 2, 1990) (Study Committee Report) (echoing, in brief summary form, the Subcommittee Working Paper proposal and noting that the Subcommittee Working Paper "contains additional material on this subject"); House Report, at 27 ("[Section 1367] implements a recommendation of the Federal Courts Study Committee found on pages 47 and 48 of its report"). While the Subcommittee explained, in language echoed by the House Report, that its proposal "basically restores the law as it existed prior to *Finley*," Subcommittee Working Paper, at 561, it observed in a footnote that its proposal would overrule *Zahn* and that this would be a good idea, Subcommittee Working Paper, at 561, n. 33. Although the Federal Courts Study Committee did not expressly adopt the Subcommittee's specific reference to *Zahn*, it neither explicitly disagreed with the Subcommittee's conclusion that this was the best reading of the proposed text nor substantially

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

125 S.Ct. 2611                                                                                                              Page 12
125 S.Ct. 2611, 73 USLW 4574, 05 Cal. Daily Op. Serv. 5443, 2005 Daily Journal D.A.R. 7490, 18 Fla. L. Weekly
Fed. S 453
**(Cite as: 125 S.Ct. 2611)**

modified the proposal to avoid this result. Study Committee Report, at 47-48. Therefore, even if the House Report could fairly be read to reflect an understanding that the text of § 1367 did not overrule *Zahn,* the Subcommittee Working Paper on which § 1367 was based reflected the opposite understanding. The House Report is no more authoritative than the Subcommittee Working Paper. The utility of either can extend no further than the light it sheds *2627 on how the enacting Legislature understood the statutory text. Trying to figure out how to square the Subcommittee Working Paper's understanding with the House Report's understanding, or which is more reflective of the understanding of the enacting legislators, is a hopeless task.

Second, the worst fears of critics who argue legislative history will be used to circumvent the Article I process were realized in this case. The telltale evidence is the statement, by three law professors who participated in drafting § 1367, see House Report, at 27, n. 13, that § 1367 "on its face" permits "supplemental jurisdiction over claims of class members that do not satisfy section 1332's jurisdictional amount requirement, which would overrule *[Zahn].* [There is] a disclaimer of intent to accomplish this result in the legislative history .... It would have been better had the statute dealt explicitly with this problem, and the legislative history was an attempt to correct the oversight." Rowe, Burbank, & Mengler, Compounding or Creating Confusion About Supplemental Jurisdiction?  A Reply to Professor Freer, 40 Emory L.J. 943, 960, n. 90 (1991). The professors were frank to concede that if one refuses to consider the legislative history, one has no choice but to "conclude that section 1367 has wiped *Zahn* off the books." *Ibid.* So there exists an acknowledgment, by parties who have detailed, specific knowledge of the statute and the drafting process, both that the plain text of § 1367 overruled *Zahn* and that language to the contrary in the House Report was a *post hoc* attempt to alter that result. One need not subscribe to the wholesale condemnation of legislative history to refuse to give any effect to such a deliberate effort to amend a statute through a committee report.

In sum, even if we believed resort to legislative history were appropriate in these cases--a point we do not concede--we would not give significant weight to the House Report. The distinguished jurists who drafted the Subcommittee Working Paper, along with three of the participants in the drafting of § 1367,

agree that this provision, on its face, overrules *Zahn.* This accords with the best reading of the statute's text, and nothing in the legislative history indicates directly and explicitly that Congress understood the phrase "civil action of which the district courts have original jurisdiction" to exclude cases in which some but not all of the diversity plaintiffs meet the amount in controversy requirement.

No credence, moreover, can be given to the claim that, if Congress understood § 1367 to overrule *Zahn,* the proposal would have been more controversial. We have little sense whether any Member of Congress would have been particularly upset by this result. This is not a case where one can plausibly say that concerned legislators might not have realized the possible effect of the text they were adopting. Certainly, any competent legislative aide who studied the matter would have flagged this issue if it were a matter of importance to his or her boss, especially in light of the Subcommittee Working Paper. There are any number of reasons why legislators did not spend more time arguing over § 1367, none of which are relevant to our interpretation of what the words of the statute mean.

D

Finally, we note that the Class Action Fairness Act (CAFA), Pub.L. 109-2, 119 Stat. 4, enacted this year, has no bearing on our analysis of these cases. Subject to certain limitations, the CAFA confers federal diversity jurisdiction over class actions where the aggregate amount in controversy exceeds $5 million. It abrogates the *2628 rule against aggregating claims, a rule this Court recognized in *Ben-Hur* and reaffirmed in *Zahn.* The CAFA, however, is not retroactive, and the views of the 2005 Congress are not relevant to our interpretation of a text enacted by Congress in 1990. The CAFA, moreover, does not moot the significance of our interpretation of § 1367, as many proposed exercises of supplemental jurisdiction, even in the class-action context, might not fall within the CAFA's ambit. The CAFA, then, has no impact, one way or the other, on our interpretation of § 1367.

* * *

The judgment of the Court of Appeals for the Eleventh Circuit is affirmed. The judgment of the Court of Appeals for the First Circuit is reversed, and the case is remanded for proceedings consistent with this opinion.

*It is so ordered.*

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

125 S.Ct. 2611                                                                                                                    Page 13
125 S.Ct. 2611, 73 USLW 4574, 05 Cal. Daily Op. Serv. 5443, 2005 Daily Journal D.A.R. 7490, 18 Fla. L. Weekly
Fed. S 453
**(Cite as: 125 S.Ct. 2611)**

Justice STEVENS, with whom Justice BREYER joins, dissenting.

Justice GINSBURG's carefully reasoned opinion, *post*, at 2631 (dissenting opinion), demonstrates the error in the Court's rather ambitious reading of this opaque jurisdictional statute. She also has demonstrated that "ambiguity" is a term that may have different meanings for different judges, for the Court has made the remarkable declaration that its reading of the statute is so obviously correct--and Justice GINSBURG's so obviously wrong--that the text does not even qualify as "ambiguous." See *ante,* at 2625. Because ambiguity is apparently in the eye of the beholder, I remain convinced that it is unwise to treat the ambiguity *vel non* of a statute as determinative of whether legislative history is consulted. Indeed, I believe that we as judges are more, rather than less, constrained when we make ourselves accountable to *all* reliable evidence of legislative intent. See *Koons Buick Pontiac GMC, Inc. v. Nigh,* 543 U.S. ----, ----, 125 S.Ct. 460, 463 and n. 1, 160 L.Ed.2d 389 (2004) (STEVENS, J., concurring).

The legislative history of 28 U.S.C. § 1367 provides powerful confirmation of Justice GINSBURG's interpretation of that statute. It is helpful to consider in full the relevant portion of the House Report, which was also adopted by the Senate:

"This section would authorize jurisdiction in a case like *Finley* [v. *United States,* 490 U.S. 545, 109 S.Ct. 2003, 104 L.Ed.2d 593 (1989)], as well as essentially restore the pre-*Finley* understandings of the authorization for and limits on other forms of supplemental jurisdiction. In federal question cases, it broadly authorizes the district courts to exercise supplemental jurisdiction over additional claims, including claims involving the joinder of additional parties. In diversity cases, the district courts may exercise supplemental jurisdiction, except when doing so would be inconsistent with the jurisdictional requirements of the diversity statute.

. . . . .

"Subsection 114(b) [§ 1367(b)] prohibits a district court in a case over which it has jurisdiction founded solely on the general diversity provision, 28 U.S.C. § 1332, from exercising supplemental jurisdiction in specified circumstances. [Footnote 16: 'The net effect of subsection (b) is to implement the principal rationale of *Owen*

*Equipment & Erection Co. v. Kroger,* 437 U.S. 365, 98 S.Ct. 2396, 57 L.Ed.2d 274 (1978)'.] In diversity-only actions the district courts may not hear plaintiffs' supplemental claims when exercising supplemental jurisdiction would encourage plaintiffs to evade **\*2629** the jurisdictional requirement of 28 U.S.C. § 1332 by the simple expedient of naming initially only those defendants whose joinder satisfies section 1332's requirements and later adding claims not within original federal jurisdiction against other defendants who have intervened or been joined on a supplemental basis. In accord with case law, the subsection also prohibits the joinder or intervention of persons a plaintiffs if adding them is inconsistent with section 1332's requirements. The section is not intended to affect the jurisdictional requirements of 28 U.S.C. § 1332 in diversity-only class actions, as those requirements were interpreted prior to Finley. [Footnote 17: 'See *Supreme Tribe of Ben-Hur v. Cauble,* 255 U.S. 356, 41 S.Ct. 338, 65 L.Ed. 673 (1921); *Zahn v. International Paper Co.,* 414 U.S. 291, 94 S.Ct. 505, 38 L.Ed.2d 511 (1973)'.]

"Subsection (b) makes one small change in pre-*Finley* practice. Anomalously, under current practice, the same party might intervene as of right under Federal Rule of Civil Procedure 23(a) and take advantage of supplemental jurisdiction, but not come within supplemental jurisdiction if parties already in the action sought to effect the joinder under Rule 19. Subsection (b) would eliminate this anomaly, excluding Rule 23(a) plaintiff-intervenors to the same extent as those sought to be joined as plaintiffs under Rule 19." H.R.Rep. No. 101-734, pp. 28-29 (1990) (footnote omitted) (hereinafter House Report or Report). [FN1]

> FN1. The last quoted paragraph was intended to refer to Rule 24, not Rule 23. See *ante,* at 2626.

Not only does the House Report specifically say that § 1367 was not intended to upset *Zahn v. International Paper Co.,* 414 U.S. 291, 94 S.Ct. 505, 38 L.Ed.2d 511 (1973), but its entire explanation of the statute demonstrates that Congress had in mind a very specific and relatively modest task--undoing this Court's 5-to-4 decision in *Finley v. United States,* 490 U.S. 545, 109 S.Ct. 2003, 104 L.Ed.2d 593 (1989). In addition to overturning that unfortunate and much-criticized decision, [FN2] the statute, according to the Report, codifies and preserves the "the pre-*Finley* understandings of the authorization for and limits on

125 S.Ct. 2611                                                                                                Page 14
125 S.Ct. 2611, 73 USLW 4574, 05 Cal. Daily Op. Serv. 5443, 2005 Daily Journal D.A.R. 7490, 18 Fla. L. Weekly
Fed. S 453
(Cite as: 125 S.Ct. 2611)

other forms of supplemental jurisdiction," House Report, at 28, with the exception of making "one small change in pre-*Finley* practice," *id.,* at 29, which is not relevant here.

> FN2. As I pointed out in my dissent in *Finley,* the majority's decision was "not faithful to our precedents," 490 U.S., at 558, 109 S.Ct. 2003, and casually dismissed the accumulated wisdom of judges such as Henry Friendly, who had "special learning and expertise in matters of federal jurisdiction," *id.,* at 565, 109 S.Ct. 2003.

The sweeping purpose that the Court's decision imputes to Congress bears no resemblance to the House Report's description of the statute. But this does not seem to trouble the Court, for its decision today treats statutory interpretation as a pedantic exercise, divorced from any serious attempt at ascertaining congressional intent. Of course, there are situations in which we do not honor Congress' apparent intent unless that intent is made "clear" in the text of a statute--in this way, we can be certain that Congress considered the issue and intended a disfavored outcome, see, *e.g., Landgraf v. USI Film Products,* 511 U.S. 244, 114 S.Ct. 1483, 128 L.Ed.2d 229 (1994) (requiring clear statement for retroactive civil legislation). But that principle provides no basis for discounting the House Report, given that our cases have never recognized a presumption in *favor* of expansive diversity jurisdiction.

**\*2630** The Court's reasons for ignoring this virtual billboard of congressional intent are unpersuasive. That a subcommittee of the Federal Courts Study Committee believed that an earlier, substantially similar version of the statute overruled *Zahn,* see *ante,* at 2627, only highlights the fact that the statute is ambiguous. What is determinative is that the House Report explicitly rejected that broad reading of the statutory text. Such a report has special significance as an indicator of legislative intent. In Congress, committee reports are normally considered the authoritative explication of a statute's text and purposes, and busy legislators and their assistants rely on that explication in casting their votes. Cf. *Garcia v. United States,* 469 U.S. 70, 76, 105 S.Ct. 479, 83 L.Ed.2d 472 (1984) ("In surveying legislative history we have repeatedly stated that the authoritative source for finding the Legislature's intent lies in the Committee Reports on the bill, which 'represen[t] the considered and collective understanding of those Congressmen involved in

drafting and studying proposed legislation' " (quoting *Zuber v. Allen,* 396 U.S. 168, 186, 90 S.Ct. 314, 24 L.Ed.2d 345 (1969)) (brackets in original)).

The Court's second reason--its comment on the three law professors who participated in drafting § 1367, see *ante,* at 2627--is similarly off the mark. In the law review article that the Court refers to, the professors were merely saying that the text of the statute was susceptible to an overly broad (and simplistic) reading, and that clarification in the House Report was therefore appropriate. See Rowe, Burbank, & Mengler, Compounding or Creating Confusion About Supplemental Jurisdiction? A Reply to Professor Freer, 40 Emory L.J. 943, 960, n. 90 (1991). [FN3] Significantly, the reference to *Zahn* in the House Report does not at all appear to be tacked-on or out of place; indeed, it is wholly consistent with the Report's broader explanation of Congress' goal of overruling *Finley* and preserving pre-*Finley* law. To suggest that these professors participated in a "deliberate effort to amend a statute through a committee report," *ante,* at 2627, reveals an unrealistic view of the legislative process, not to mention disrespect for three law professors who acted in the role of public servants. To be sure, legislative history can be manipulated. But, in the situation before us, there is little reason to fear that an unholy conspiracy of "unrepresentative committee members," *ante,* at 2626, law professors, and "unelected staffers and lobbyists," *ibid.,* endeavored to torpedo Congress' attempt to overrule (without discussion) two longstanding features of this Court's diversity jurisprudence.

> FN3. The professors' account of the challenges they faced in drafting § 1367 gives some sense, I think, of why that statute has proved difficult to interpret: "More broadly, codifying a complex area like supplemental jurisdiction--as Professor Freer's discussion illustrates--is itself complex business. A danger is that that result of the effort to deal with all the foreseeables will be a statute too prolix and baroque for everyday use and application by practitioners and judges. Section 1367 reflects an effort to provide sufficient detail without overdoing it. The statute is concededly not perfect. What it accomplishes, however, is to change the direction taken by the Supreme Court in *Finley,* to provide basic guidance (in particular the legislative history's general

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

125 S.Ct. 2611                                                                                            Page 15
125 S.Ct. 2611, 73 USLW 4574, 05 Cal. Daily Op. Serv. 5443, 2005 Daily Journal D.A.R. 7490, 18 Fla. L. Weekly
Fed. S 453
**(Cite as: 125 S.Ct. 2611)**

approval of pre-*Finley* case law, which has treated some specific issues Professor Freer raises), and then to trust the federal courts under the changed direction to interpret the statute sensibly...." 40 Emory L. J., at 961.

After nearly 20 pages of complicated analysis, which explores subtle doctrinal nuances and coins various neologisms, the Court announces that § 1367 could not reasonably be read another way. See *2631 *ante,* at 2625. That conclusion is difficult to accept. Given Justice GINSBURG's persuasive account of the statutory text and its jurisprudential backdrop, and given the uncommonly clear legislative history, I am confident that the majority's interpretation of § 1367 is mistaken. I respectfully dissent.

Justice GINSBURG, with whom Justice STEVENS, Justice O'CONNOR, and Justice BREYER join, dissenting.

These cases present the question whether Congress, by enacting 28 U.S.C. § 1367, overruled this Court's decisions in *Clark v. Paul Gray, Inc.,* 306 U.S. 583, 589, 59 S.Ct. 744, 83 L.Ed. 1001 (1939) (reaffirming the holding of *Troy Bank v. G.A. Whitehead & Co.,* 222 U.S. 39, 40, 32 S.Ct. 9, 56 L.Ed. 81 (1911)), and *Zahn v. International Paper Co.,* 414 U.S. 291, 94 S.Ct. 505, 38 L.Ed.2d 511 (1973). *Clark* held that, when federal-court jurisdiction is predicated on a specified amount in controversy, each plaintiff joined in the litigation must independently meet the jurisdictional amount requirement. *Zahn* confirmed that in class actions governed by Federal Rule of Civil Procedure 23(b)(3), "[e]ach [class member] ... must satisfy the jurisdictional amount, and any [class member] who does not must be dismissed from the case." 414 U.S., at 301, 94 S.Ct. 505.

Section 1367, all agree, was designed to overturn this Court's decision in *Finley v. United States,* 490 U.S. 545, 109 S.Ct. 2003, 104 L.Ed.2d 593 (1989). *Finley* concerned not diversity-of-citizenship jurisdiction (28 U.S.C. § 1332), but original federal-court jurisdiction in cases arising under federal law (28 U.S.C. § 1331). The plaintiff in *Finley* sued the United States under the Federal Tort Claims Act (FTCA), 28 U.S.C. § 1346(b), to recover for the death of her husband and children in an airplane crash. She alleged that the Federal Aviation Administration's negligence contributed to the fatal accident. She later amended her complaint to add state-law tort claims against two other defendants, a municipality and a utility company. 490 U.S., at 546-

547, 109 S.Ct. 2003. No independent basis for federal subject-matter jurisdiction existed over the state-law claims. The plaintiff could not have brought her entire action in state court, because federal jurisdiction in FTCA actions is exclusive. § 1346(b). Hence, absent federal jurisdiction embracing the state-law claims, she would be obliged to pursue two discrete actions, one in federal court, the other in state court. This Court held, nevertheless, that the District Court lacked jurisdiction over the "pendent-party" state-law claims. *Id.,* at 555-556, 109 S.Ct. 2003. In so holding, the Court stressed that Congress held the control rein. *Id.,* at 547-549, 109 S.Ct. 2003. Congress could reverse the result in *Finley,* and permit pendent jurisdiction over state-law claims against additional defendants, if it so chose. *Id.,* at 556, 109 S.Ct. 2003. Congress did so in § 1367.

What more § 1367 wrought is an issue on which courts of appeals have sharply divided. Compare *Stromberg Metal Works, Inc. v. Press Mechanical, Inc.,* 77 F.3d 928, 930 (C.A.7 1996) (§ 1367 "supersedes *Clark* and allows pendent-party jurisdiction when the additional parties have claims worth less than [the jurisdictional minimum]"), and *In re Abbott Labs.,* 51 F.3d 524, 529 (C.A.5 1995) ("[U]nder § 1367 a district court can exercise supplemental jurisdiction over members of a class, although they did not meet the amount-in-controversy requirement, as did the class representatives."), with *Meritcare Inc. v. St. Paul Mercury Ins. Co.,* 166 F.3d 214, 222 (C.A.3 1999) (§ 1367 "preserves the prohibition against aggregation outlined in [*Zahn* and *Clark*]"), and *2632*Leonhardt v. Western Sugar Co.,* 160 F.3d 631, 641 (C.A.10 1998) (§ 1367 does not alter "the historical rules prohibiting aggregation of claims, including *Zahn's* prohibition of such aggregation in diversity class actions"). The Court today holds that § 1367, although prompted by *Finley,* a case in which original access to federal court was predicated on a federal question, notably enlarges federal diversity jurisdiction. The Court reads § 1367 to overrule *Clark* and *Zahn,* thereby allowing access to federal court by co-plaintiffs or class members who do not meet the now in excess of $75,000 amount-in-controversy requirement, so long as at least one co-plaintiff, or the named class representative, has a jurisdictionally sufficient claim. *Ante,* at 2615.

The Court adopts a plausibly broad reading of § 1367, a measure that is hardly a model of the careful drafter's art. There is another plausible reading,

125 S.Ct. 2611                                                                                          Page 16
125 S.Ct. 2611, 73 USLW 4574, 05 Cal. Daily Op. Serv. 5443, 2005 Daily Journal D.A.R. 7490, 18 Fla. L. Weekly
Fed. S 453
**(Cite as: 125 S.Ct. 2611)**

however, one less disruptive of our jurisprudence regarding supplemental jurisdiction. If one reads § 1367(a) to instruct, as the statute's text suggests, that the district court must first have "original jurisdiction" over a "civil action" before supplemental jurisdiction can attach, then _Clark_ and _Zahn_ are preserved, and supplemental jurisdiction does not open the way for joinder of plaintiffs, or inclusion of class members, who do not independently meet the amount-in-controversy requirement. For the reasons that follow, I conclude that this narrower construction is the better reading of § 1367.

I
A

Section 1367, captioned "Supplemental jurisdiction," codifies court-recognized doctrines formerly labeled "pendent" and "ancillary" jurisdiction. Pendent jurisdiction involved the enlargement of federal-question litigation to include related state-law claims. Ancillary jurisdiction evolved primarily to protect defending parties, or others whose rights might be adversely affected if they could not air their claims in an ongoing federal-court action. Given jurisdiction over the principal action, federal courts entertained certain matters deemed ancillary regardless of the citizenship of the parties or the amount in controversy.

_Mine Workers v. Gibbs,_ 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966), the leading pendent jurisdiction case, involved a claim against a union for wrongfully inducing the plaintiff's discharge. The plaintiff stated a federal claim under the Taft-Hartley Act, and an allied state-law claim of unlawful conspiracy to interfere with his employment contract. This Court upheld the joinder of federal and state claims. "[T]here is _power_ in federal courts to hear the whole," the Court said, when the state and federal claims "derive from a common nucleus of operative fact" and are so linked that the plaintiff "would ordinarily be expected to try them all in one judicial proceeding." _Id.,_ at 725, 86 S.Ct. 1130.

_Gibbs_ involved the linkage of federal and state claims against the same defendant. In _Finley v. United States,_ 490 U.S. 545, 109 S.Ct. 2003, 104 L.Ed.2d 593, the Court contained _Gibbs._ Without congressional authorization, the Court admonished, the pendent jurisdiction umbrella could not be stretched to cover the joinder of additional parties. _Gibbs_ had departed from earlier decisions recognizing that "jurisdiction [must] be explicitly

conferred," the Court said. 490 U.S., at 556, 109 S.Ct. 2003. _Aldinger v. Howard,_ 427 U.S. 1, 96 S.Ct. 2413, 49 L.Ed.2d 276 (1976), the Court observed, although resting "on a much narrower basis," R. Fallon, D. Meltzer, & D. Shapiro, Hart and Wechsler's The Federal Courts and the Federal System 925 (5th ed.2003) (hereinafter Hart & Wechsler), had already signaled that "the _Gibbs_ \*2633 approach would not be extended to the pendent-party field," _Finley,_ 490 U.S., at 556, 109 S.Ct. 2003. While the _Finley_ Court did not "limit or impair" _Gibbs_ itself, 490 U.S., at 556, 109 S.Ct. 2003, for further development of pendent jurisdiction, the Court made it plain, the initiative would lie in Congress' domain. _Id.,_ at 555-556, 109 S.Ct. 2003. [FN1]

> FN1. "[B]oth the _Finley_ result and its implications" sparked "considerable criticism." Hart & Wechsler 926; see also 13B C. Wright, A. Miller, E. Cooper, & R. Freer, Federal Practice and Procedure § 3567.2, p. 91 (2d ed. Supp.2005) (hereinafter Wright & Miller) (characterizing the _Finley_ decision as "surprising").

Ancillary jurisdiction, which evolved as a more sprawling doctrine than pendent jurisdiction, was originally rooted in "the notion that [when] federal jurisdiction in [a] principal suit effectively controls the property or fund under dispute, other claimants thereto should be allowed to intervene in order to protect their interests, without regard to jurisdiction." _Aldinger,_ 427 U.S., at 11, 96 S.Ct. 2413; see, _e.g., Freeman v. Howe,_ 24 How. 450, 16 L.Ed. 749 (1861). In _Owen Equipment & Erection Co. v. Kroger,_ 437 U.S. 365, 98 S.Ct. 2396, 57 L.Ed.2d 274 (1978), the Court addressed the permissible scope of the doctrine in relation to the liberal provisions of the Federal Rules of Civil Procedure for joinder of parties and claims.

_Kroger_ commenced as a suit between a citizen of Iowa and a Nebraska corporation. When the Nebraska defendant impleaded an Iowa corporation as a third-party defendant under Rule 14(a), the plaintiff asserted state-law claims against the impleaded party. No independent basis of federal jurisdiction existed over the newly asserted claims, for both plaintiff and impleaded defendant were citizens of Iowa. 437 U.S., at 370. The Court held that the plaintiff could not draw in a co-citizen defendant in this manner. _Id.,_ at 377, 98 S.Ct. 2396.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

125 S.Ct. 2611
125 S.Ct. 2611, 73 USLW 4574, 05 Cal. Daily Op. Serv. 5443, 2005 Daily Journal D.A.R. 7490, 18 Fla. L. Weekly
Fed. S 453
(Cite as: 125 S.Ct. 2611)

Federal courts, by the time of *Kroger,* were routinely exercising ancillary jurisdiction over compulsory counterclaims, impleader claims, cross-claims among defendants, and claims of parties who intervened "of right." See *id.,* at 375, n. 18, 98 S.Ct. 2396 (collecting cases). In *Kroger,* however,

> "the nonfederal claim ... was asserted by the plaintiff, who voluntarily chose to bring suit upon a state-law claim in a federal court. By contrast, ancillary jurisdiction typically involve[d] claims by a defending party haled into court against his will, or by another person whose rights might be irretrievably lost unless he could assert them in an ongoing action in a federal court." *Id.,* at 376, 98 S.Ct. 2396.

Having "chosen the federal rather than the state forum," the Court said, the plaintiff had to "accept its limitations." *Ibid.*

In sum, in federal-question cases before § 1367's enactment, the Court recognized pendent-claim jurisdiction, *Gibbs,* 383 U.S., at 725, 86 S.Ct. 1130, but not pendent-party jurisdiction, *Finley,* 490 U.S., at 555-556, 109 S.Ct. 2003. As to ancillary jurisdiction, the Court adhered to the limitation that in diversity cases, throughout the litigation, all plaintiffs must remain diverse from all defendants. See *Kroger,* 437 U.S., at 374, 98 S.Ct. 2396.

Although pendent jurisdiction and ancillary jurisdiction evolved discretely, [FN2] the Court has recognized that they are "two species of the same generic problem: Under *\*2634* what circumstances may a federal court hear and decide a state-law claim arising between citizens of the same State?" *Id.,* at 370, 98 S.Ct. 2396. *Finley* regarded that question as one properly addressed to Congress. See 490 U.S., at 549, 556, 109 S.Ct. 2003; 13 Wright & Miller § 3523, p. 127 (2d ed. Supp.2005); Hart & Wechsler 924-926.

> FN2. See generally 13B Wright & Miller § § 3567, 3567.1, 3567.2 (2d ed.1984) (discussing pendent jurisdiction); 13 *id.,* § 3523 (discussing ancillary jurisdiction); Hart & Wechsler 922-926 (discussing pendent jurisdiction); *id.,* at 1488-1490 (discussing ancillary jurisdiction).

### B

Shortly before the Court decided *Finley,* Congress had established the Federal Courts Study Committee to take up issues relating to "the federal courts' congestion, delay, expense, and expansion." Judicial

Conference of the United States, Report of the Federal Courts Study Committee 3 (Apr. 2, 1990) (hereinafter Committee Report). The Committee's charge was to conduct a study addressing the "crisis" in federal courts caused by the "rapidly growing" caseload. *Id.,* at 6 (internal quotation marks omitted).

Among recommendations, the Committee urged Congress to "authorize federal courts to assert pendent jurisdiction over parties without an independent federal jurisdictional base." *Id.,* at 47. If adopted, this recommendation would overrule *Finley.* Earlier, a subcommittee had recommended that Congress overrule both *Finley* and *Zahn.* Report of the Subcommittee on the Role of the Federal Courts and Their Relationship to the States 547, 561, n. 33 (Mar. 12, 1990), reprinted in 1 Judicial Conference of the United States, Federal Courts Study Committee, Working Papers and Subcommittee Reports (July 1, 1990) (hereinafter Subcommittee Report). In the subcommittee's view, "[f]rom a policy standpoint," *Zahn* "ma[de] little sense." Subcommittee Report 561, n. 33. [FN3] The full Committee, however, urged only the overruling of *Finley* and did not adopt the recommendation to overrule *Zahn.* Committee Report 47-48.

> FN3. Anomalously, in holding that each class member "must satisfy the jurisdictional amount," *Zahn v. International Paper Co.,* 414 U.S. 291, 301, 94 S.Ct. 505, 38 L.Ed.2d 511 (1973), the *Zahn* Court did not refer to *Supreme Tribe of Ben-Hur v. Cauble,* 255 U.S. 356, 366, 41 S.Ct. 338, 65 L.Ed. 673 (1921), which established that in a class action, the citizenship of the named plaintiff is controlling. But see *Zahn,* 414 U.S., at 309-310, 94 S.Ct. 505 (Brennan, J., dissenting) (urging *Zahn's* inconsistency with *Ben-Hur*).

As a separate matter, a substantial majority of the Committee "strongly recommend[ed]" the elimination of diversity jurisdiction, save for "complex multi-state litigation, interpleader, and suits involving aliens." *Id.,* at 38-39; accord Subcommittee Report 454-458. "[N]o other step," the Committee's Report maintained, "will do anywhere nearly as much to reduce federal caseload pressures and contain the growth of the federal judiciary." Committee Report 39.

Congress responded by adopting, as part of the Judicial Improvements Act of 1990, 104 Stat. 5089,

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

125 S.Ct. 2611                                                                                Page 18
125 S.Ct. 2611, 73 USLW 4574, 05 Cal. Daily Op. Serv. 5443, 2005 Daily Journal D.A.R. 7490, 18 Fla. L. Weekly
Fed. S 453
**(Cite as: 125 S.Ct. 2611)**

[FN4] recommendations of the Federal Courts Study Committee ranked by the House Committee on the Judiciary as "modest" and "noncontroversial". H.R.Rep. No. 101-734, pp. 15-16 (1990) (hereinafter H.R. Rep.); see also 136 Cong. Rec. 36288 (1990). Congress did not take up the Study Committee's immodest proposal to curtail diversity jurisdiction. It did, however, enact a supplemental jurisdiction statute, codified as 28 U.S.C. § 1367.

> FN4. The omnibus Act encompassed the Civil Justice Reform Act of 1990 (Title I), the creation of new judgeships (Title II), the Federal Courts Study Committee Implementation Act of 1990 (Title III), and the establishment of the National Commission on Judicial Discipline and Removal (Title IV).

*2635 II
A

Section 1367, by its terms, operates only in civil actions "of which the district courts have original jurisdiction." The "original jurisdiction" relevant here is diversity-of-citizenship jurisdiction, conferred by § 1332. The character of that jurisdiction is the essential backdrop for comprehension of § 1367.

The Constitution broadly provides for federal-court jurisdiction in controversies "between Citizens of different States." Art. III, § 2, cl. 1. This Court has read that provision to demand no more than "minimal diversity," i.e., so long as one party on the plaintiffs' side and one party on the defendants' side are of diverse citizenship, Congress may authorize federal courts to exercise diversity jurisdiction. See State Farm Fire & Casualty Co. v. Tashire, 386 U.S. 523, 530-531, 87 S.Ct. 1199, 18 L.Ed.2d 270 (1967). Further, the Constitution includes no amount-in-controversy limitation on the exercise of federal jurisdiction. But from the start, Congress, as its measures have been construed by this Court, has limited federal court exercise of diversity jurisdiction in two principal ways. First, unless Congress specifies otherwise, diversity must be "complete," i.e., all parties on plaintiffs' side must be diverse from all parties on defendants' side. Strawbridge v. Curtiss, 3 Cranch 267, 2 L.Ed. 435 (1806); see 13B Wright, Miller & Cooper § 3605 (2d ed.1984). Second, each plaintiff's stake must independently meet the amount-in-controversy specification: "When two or more plaintiffs, having separate and distinct demands, unite for convenience and economy in a single suit, it is essential that the demand of each be of the requisite

jurisdictional amount." Troy Bank, 222 U.S., at 40, 32 S.Ct. 9.

The statute today governing federal court exercise of diversity jurisdiction in the generality of cases, § 1332, like all its predecessors, incorporates both a diverse-citizenship requirement and an amount-in-controversy specification. [FN5] As to the latter, the statute reads: "The district courts shall have original jurisdiction [in diversity-of-citizenship cases] where the matter in controversy exceeds the sum ... of $75,000." § 1332(a). This Court has long held that, in determining whether the amount-in-controversy requirement has been satisfied, a single plaintiff may aggregate two or more claims against a single defendant, even if the claims are unrelated. See, e.g., *2636 Edwards v. Bates County, 163 U.S. 269, 273, 16 S.Ct. 967, 41 L.Ed. 155 (1896). But in multiparty cases, including class actions, we have unyieldingly adhered to the nonaggregation rule stated in Troy Bank. See Clark, 306 U.S., at 589, 59 S.Ct. 744 (reaffirming the "familiar rule that when several plaintiffs assert separate and distinct demands in a single suit, the amount involved in each separate controversy must be of the requisite amount to be within the jurisdiction of the district court, and that those amounts cannot be added together to satisfy jurisdictional requirements"); Snyder v. Harris, 394 U.S. 332, 339-340, 89 S.Ct. 1053, 22 L.Ed.2d 319 (1969) (abandonment of the nonaggregation rule in class actions would undercut the congressional "purpose ... to check, to some degree, the rising caseload of the federal courts").

> FN5. Endeavoring to preserve the "complete diversity" rule first stated in Strawbridge v. Curtiss, 3 Cranch 267, 2 L.Ed. 435 (1806), the Court's opinion drives a wedge between the two components of 28 U.S.C. § 1332, treating the diversity-of-citizenship requirement as essential, the amount-in-controversy requirement as more readily disposable. See ante, at 2618, 2622. Section 1332 itself, however, does not rank order the two requirements. What "[o]rdinary princip[l]e] of statutory construction" or "sound canon of interpretation," ante, at 2620, allows the Court to slice up § 1332 this way? In partial explanation, the Court asserts that amount in controversy can be analyzed claim-by-claim, but the diversity requirement cannot. See ante, at 2618. It is not altogether clear why that should be so.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

125 S.Ct. 2611

Page 19

125 S.Ct. 2611, 73 USLW 4574, 05 Cal. Daily Op. Serv. 5443, 2005 Daily Journal D.A.R. 7490, 18 Fla. L. Weekly Fed. S 453
**(Cite as: 125 S.Ct. 2611)**

The cure for improper joinder of a nondiverse party is the same as the cure for improper joinder of a plaintiff who does not satisfy the jurisdictional amount. In both cases, original jurisdiction can be preserved by dismissing the nonqualifying party. See *Caterpillar Inc. v. Lewis,* 519 U.S. 61, 64, 117 S.Ct. 467, 136 L.Ed.2d 437 (1996) (diversity); *Newman-Green, Inc. v. Alfonzo-Larrain,* 490 U.S. 826, 836-838, 109 S.Ct. 2218, 104 L.Ed.2d 893 (1989) (same); *Zahn,* 414 U.S., at 295, 300, 94 S.Ct. 505 (amount in controversy); *Clark v. Paul Gray, Inc.,* 306 U.S. 583, 590, 59 S.Ct. 744, 83 L.Ed. 1001 (1939) (same).

This Court most recently addressed "[t]he meaning of [§ 1332's] 'matter in controversy' language" in *Zahn,* 414 U.S., at 298, 94 S.Ct. 505. *Zahn,* like *Snyder* decided four years earlier, was a class action. In *Snyder,* no class member had a claim large enough to satisfy the jurisdictional amount. But in *Zahn,* the named plaintiffs had such claims. 414 U.S., at 292, 94 S.Ct. 505. Nevertheless, the Court declined to depart from its "longstanding construction of the 'matter in controversy' requirement of § 1332." *Id.,* at 301, 94 S.Ct. 505. The *Zahn* Court stated:

"*Snyder* invoked the well-established rule that each of several plaintiffs asserting separate and distinct claims must satisfy the jurisdictional-amount requirement if his claim is to survive a motion to dismiss. This rule plainly mandates not only that there may be no aggregation and that the entire case must be dismissed where none of the plaintiffs claims [meets the amount-in-controversy requirement] but also requires that any plaintiff without the jurisdictional amount must be dismissed from the case, even though others allege jurisdictionally sufficient claims." *Id.,* at 300, 94 S.Ct. 505.

The rule that each plaintiff must independently satisfy the amount-in-controversy requirement, unless Congress ex-pressly orders otherwise, was thus the solidly established reading of § 1332 when Congress enacted the Judicial Improvements Act of 1990, which added § 1367 to Title 28.

**B**

These cases present the question whether Congress abrogated the nonaggregation rule long tied to § 1332 when it enacted § 1367. In answering that question, "context [should provide] a crucial guide." *Rosario Ortega v. Star-Kist Foods, Inc.,* 370 F.3d 124, 135 (2004). The Court should assume, as it ordinarily does, that Congress legislated against a background of law already in place and the historical development of that law. See *National Archives and Records Admin. v. Favish,* 541 U.S. 157, 169, 124 S.Ct. 1570, 158 L.Ed.2d 319 (2004). Here, that background is the statutory grant of diversity jurisdiction, the amount-in-controversy condition that Congress, from the start, has tied to the grant, and the nonaggregation rule this Court has long applied to the determination of the "matter in controversy."

Section 1367(a) provides:

"Except as provided in subsections (b) and (c) or as expressly provided otherwise by Federal statute, in any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution. **\*2637** Such supplemental jurisdiction shall include claims that involve the joinder or intervention of additional parties."

The Court is unanimous in reading § 1367(a) to permit pendent-party jurisdiction in federal-question cases, and thus to overrule *Finley.* The basic jurisdictional grant, § 1331, provides that "[t]he district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States." Since 1980, § 1331 has contained no amount-in-controversy requirement. See 94 Stat. 2369 (eliminating § 1331's amount-in-controversy requirement). Once there is a civil action presenting a qualifying claim arising under federal law, § 1331's sole requirement is met. District courts, we have held, may then adjudicate, additionally, state-law claims "deriv[ing] from a common nucleus of operative fact." *Gibbs,* 383 U.S., at 725, 86 S.Ct. 1130. Section 1367(a) enlarges that category to include not only state-law claims against the defendant named in the federal claim, but also "[state-law] claims that involve the joinder or intervention of additional parties." [FN6]

FN6. The Court noted in *Zahn,* 414 U.S., at 302, n. 11, 94 S.Ct. 505, that when the exercise of § 1331 federal-question jurisdiction and § 1332 diversity jurisdiction were conditioned on the same jurisdictional-amount limitation, the same nonaggregation rule applied under both heads of federal jurisdiction. But cf. *ante,* at 2622. The Court added, however, that "Congress ha[d] exempted major areas of

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

125 S.Ct. 2611                                                                                          Page 20
125 S.Ct. 2611, 73 USLW 4574, 05 Cal. Daily Op. Serv. 5443, 2005 Daily Journal D.A.R. 7490, 18 Fla. L. Weekly
Fed. S 453
**(Cite as: 125 S.Ct. 2611)**

federal-question jurisdiction from any jurisdictional-amount requirements," thus diminishing the impact of § 1331's "matter in controversy" specification in cases arising under federal law. _Zahn,_ 414 U.S., at 302, n. 11, 94 S.Ct. 505.

The Court divides, however, on the impact of § 1367(a) on diversity cases controlled by § 1332. Under the majority's reading, § 1367(a) permits the joinder of related claims cut loose from the nonaggregation rule that has long attended actions under § 1332. Only the claims specified in § 1367(b) [FN7] would be excluded from § 1367(a)'s expansion of § 1332's grant of diversity jurisdiction. And because § 1367(b) contains no exception for joinder of plaintiffs under Rule 20 or class actions under Rule 23, the Court concludes, _Clark_ and _Zahn_ have been overruled. [FN8]

FN7. Title 28 § 1367(b) provides: "In any civil action of which the district courts have original jurisdiction founded solely on section 1332 of this title, the district courts shall not have supplemental jurisdiction under subsection (a) over claims by plaintiffs against persons made parties under Rule 14, 19, 20, or 24 of the Federal Rules of Civil Procedure, or over claims by persons proposed to be joined as plaintiffs under Rule 19 of such rules, or seeking to intervene as plaintiffs under Rule 24 of such rules, when exercising supplemental jurisdiction over such claims would be inconsistent with the jurisdictional requirements of section 1332."

FN8. Under the Court's construction of § 1367, see _ante,_ at 2621, 2625, Beatriz Ortega's family members can remain in the action because their joinder is merely permissive, see Fed. Rule Civ. Proc. 20. If, however, their presence was "needed for just adjudication," Rule 19, their dismissal would be required. The inclusion of those who may join, and exclusion of those who should or must join, defies rational explanation, but cf. _ante,_ at 2624, and others adopting the interpretation the Court embraces have so acknowledged, see _Stromberg Metal Works, Inc. v. Press Mechanical, Inc.,_ 77 F.3d 928, 932 (C.A.7 1996) (recognizing the anomaly and inquiring: "What sense can this make?"); cf.

14B Wright, Miller & Cooper § 3704, p. 168 (3d ed.1998) (distinction between Rule 19 and Rule 20 "seems incongruous, and serves no apparent public policy purpose").

The Court's reading is surely plausible, especially if one detaches § 1367(a) from its context and attempts no reconciliation with prior interpretations of § 1332's amount-in-controversy requirement. But **\*2638** § 1367(a)'s text, as the First Circuit held, can be read another way, one that would involve no rejection of _Clark_ and _Zahn._

As explained by the First Circuit in _Ortega,_ and applied to class actions by the Tenth Circuit in _Leonhardt,_ see _supra,_ at 2632, § 1367(a) addresses "civil action[s] of which the district courts have original jurisdiction," a formulation that, in diversity cases, is sensibly read to incorporate the rules on joinder and aggregation tightly tied to § 1332 at the time of § 1367's enactment. On this reading, a complaint must first meet that "original jurisdiction" measurement. If it does not, no supplemental jurisdiction is authorized. If it does, § 1367(a) authorizes "supplemental jurisdiction" over related claims. In other words, § 1367(a) would preserve undiminished, as part and parcel of § 1332 "original jurisdiction" determinations, both the "complete diversity" rule and the decisions restricting aggregation to arrive at the amount in controversy. [FN9] Section 1367(b)'s office, then, would be "to prevent the erosion of the complete diversity [and amount-in-controversy] requirement[s] that might otherwise result from an expansive application of what was once termed the doctrine of ancillary jurisdiction." See Pfander, Supplemental Jurisdiction and Section 1367: The Case for a Sympathetic Textualism, 148 U. Pa. L.Rev. 109, 114 (1999); _infra,_ at 2639-2640. In contrast to the Court's construction of § 1367, which draws a sharp line between the diversity and amount-in-controversy components of § 1332, see _ante,_ at 2618; _supra,_ at 2635, n. 5, the interpretation presented here does not sever the two jurisdictional requirements.

FN9. On this reading of § 1367(a), it is immaterial that § 1367(b) "does not withdraw supplemental jurisdiction over the claims of the additional parties at issue here." _Ante,_ at 2620. Because those claims would not come within § 1367(a) in the first place, Congress would have had no reason to list them in § 1367(b). See _infra,_ at 2638-2639.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

125 S.Ct. 2611                                                                          Page 21
125 S.Ct. 2611, 73 USLW 4574, 05 Cal. Daily Op. Serv. 5443, 2005 Daily Journal D.A.R. 7490, 18 Fla. L. Weekly
Fed. S 453
**(Cite as: 125 S.Ct. 2611)**

The more restrained reading of § 1367 just outlined would yield affirmance of the First Circuit's judgment in *Ortega,* and reversal of the Eleventh Circuit's judgment in *Exxon.* It would not discard entirely, as the Court does, the judicially developed doctrines of pendent and ancillary jurisdiction as they existed when *Finley* was decided. [FN10] Instead, it would recognize § 1367 essentially as a codification of those doctrines, placing them under a single heading, but largely retaining their substance, with overriding *Finley* the only basic change: Supplemental jurisdiction, once the district court has original jurisdiction, would now include "claims that involve the joinder or intervention of additional parties." § 1367(a).

> FN10. The Court's opinion blends the two doctrines, according no significance to their discrete development. See *ante,* at 2617-2619.

Pendent jurisdiction, as earlier explained, see *supra,* at 2632-2633, applied only in federal-question cases and allowed plaintiffs to attach nonfederal claims to their jurisdiction-qualifying claims. Ancillary jurisdiction applied primarily, although not exclusively, in diversity cases and "typically involve[d] claims *by a defending party* haled into court against his will." *Kroger,* 437 U.S., at 376, 98 S.Ct. 2396 (emphasis added); see also *id.,* at 375, n. 18, 98 S.Ct. 2396; *supra,* at 2633-2634. As the First Circuit observed, neither doctrine permitted a plaintiff to circumvent the dual requirements of § 1332 (diversity of citizenship and amount in controversy) "simply by joining her [jurisdictionally inadequate] claim in an action brought by [a] jurisdictionally competent **\*2639** diversity plaintiff." *Ortega,* 370 F.3d, at 138.

Not only would the reading I find persuasive "alig[n] statutory supplemental jurisdiction with the judicially developed doctrines of pendent and ancillary jurisdiction," *ibid.,* it would also synchronize § 1367 with the removal statute, 28 U.S.C. § 1441. As the First Circuit carefully explained:

> "Section 1441, like § 1367, applies only if the 'civil action' in question is one 'of which the district courts ... have original jurisdiction.' § 1441(a). Relying on that language, the Supreme Court has interpreted § 1441 to prohibit removal unless the entire action, as it stands at the time of removal, could have been filed in federal court in the first instance. *See, e.g., Syngenta Crop Protection, Inc.*

*v. Henson,* 537 U.S. 28, 33, 123 S.Ct. 366, 154 L.Ed.2d 368 (2002); *Okla. Tax Comm'n v. Graham,* 489 U.S. 838, 840, 109 S.Ct. 1519, 103 L.Ed.2d 924 (1989) (per curiam). Section 1441 has thus been held to incorporate the well-pleaded complaint rule, see *City of Chicago [v. International College of Surgeons,* 522 U.S. 156, 163, 118 S.Ct. 523, 139 L.Ed.2d 525 (1997)]; [FN11] the complete diversity rule, see *Caterpillar, Inc. v. Lewis,* 519 U.S. 61, 73, 117 S.Ct. 467, 136 L.Ed.2d 437 (1996); and rules for calculating the amount in controversy, see *St. Paul Mercury Indem. Co. v. Red Cab Co.,* 303 U.S. 283, 291-292, 58 S.Ct. 586, 82 L.Ed. 845 (1938)." *Ortega,* 370 F.3d, at 138 (citations omitted and footnote added).

> FN11. The point of the Court's extended discussion of *Chicago v. International College of Surgeons,* 522 U.S. 156, 118 S.Ct. 523, 139 L.Ed.2d 525 (1997), in the instant case, see *ante,* at 2622-2623, slips from my grasp. There was no disagreement in that case, and there is none now, that 28 U.S.C. § 1367(a) is properly read to authorize the exercise of supplemental jurisdiction in removed cases. *International College of Surgeons* was unusual in that the federal court there was asked to review a decision of a local administrative agency. Such review, it was unsuccessfully argued, was "appellate" in character, and therefore outside the ken of a court empowered to exercise "original" jurisdiction. Compare 522 U.S., at 166-168, 118 S.Ct. 523, with *id.,* at 176-177, 118 S.Ct. 523 (GINSBURG, J., dissenting).

The less disruptive view I take of § 1367 also accounts for the omission of Rule 20 plaintiffs and Rule 23 class actions in § 1367(b)'s text. If one reads § 1367(a) as a plenary grant of supplemental jurisdiction to federal courts sitting in diversity, one would indeed look for exceptions in § 1367(b). Finding none for permissive joinder of parties or class actions, one would conclude that Congress effectively, even if unintentionally, overruled *Clark* and *Zahn.* But if one recognizes that the nonaggregation rule delineated in *Clark* and *Zahn* forms part of the determination whether "original jurisdiction" exists in a diversity case, see *supra,* at 2622, then plaintiffs who do not meet the amount-in-controversy requirement would fail at the § 1367(a) threshold. Congress would have no reason to resort

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

125 S.Ct. 2611                                                                                                 Page 22
125 S.Ct. 2611, 73 USLW 4574, 05 Cal. Daily Op. Serv. 5443, 2005 Daily Journal D.A.R. 7490, 18 Fla. L. Weekly
Fed. S 453
(Cite as: 125 S.Ct. 2611)

to a § 1367(b) exception to turn such plaintiffs away
from federal court, given that their claims, from the
start, would fall outside the court's § 1332
jurisdiction. See Pfander, 148 U. Pa. L.Rev., at 148.

Nor does the more moderate reading assign different
meanings to "original jurisdiction" in diversity and
federal-question cases. See ante, at 2622. As the
First Circuit stated:

" '[O]riginal jurisdiction' in § 1367(a) has the same
meaning in every case: [An] underlying statutory
grant of original jurisdiction must be satisfied.
What differs between federal question and
diversity *2640 cases is not the meaning of
'original jurisdiction' but rather the [discrete]
requirements of sections 1331 and 1332. Under §
1331, the sole issue is whether a federal question
appears on the face of the plaintiff's well-pleaded
complaint; the [citizenship] of the parties and the
amounts they stand to recover [do not bear on that
determination]. Section 1332, by contrast,
predicates original jurisdiction on the identity of
the parties (i.e., [their] complete diversity) and
their [satisfaction of the amount-in-controversy
specification]. [In short,] the 'original jurisdiction'
language in § 1367 operates differently in federal-
question and diversity cases not because the
meaning of that term varies, but because the
[jurisdiction-granting] statutes are different."
Ortega, 370 F.3d, at 139-140.

What is the utility of § 1367(b) under my reading of
§ 1367(a)? Section 1367(a) allows parties other
than the plaintiff to assert reactive claims once
entertained under the heading ancillary jurisdiction.
See supra, at 2633 (listing claims, including
compulsory counterclaims and impleader claims,
over which federal courts routinely exercised
ancillary jurisdiction). As earlier observed, see
supra, at 14, § 1367(b) stops plaintiffs from
circumventing § 1332's jurisdictional requirements
by using another's claim as a hook to add a claim that
the plaintiff could not have brought in the first
instance. Kroger is the paradigm case. See supra, at
2633. There, the Court held that ancillary
jurisdiction did not extend to a plaintiff's claim
against a nondiverse party who had been impleaded
by the defendant under Rule 14. Section 1367(b),
then, is corroborative of § 1367(a)'s coverage of
claims formerly called ancillary, but provides
exceptions to assure that accommodation of added
claims would not fundamentally alter "the
jurisdictional requirements of section 1332." See
Pfander, supra, at 135-137.

While § 1367's enigmatic text [FN12] defies
flawless interpretation, see supra, at 2637, n. 8,
[FN13] the precedent-preservative reading, I am
persuaded, better accords with the *2641 historical
and legal context of Congress' enactment of the
supplemental jurisdiction statute, see supra, at 2633-
2634, 2636, and the established limits on pendent and
ancillary jurisdiction, see supra, at 2632-2633. It
does not attribute to Congress a jurisdictional
enlargement broader than the one to which the
legislators adverted, cf. Finley, 490 U.S., at 549, 109
S.Ct. 2003, and it follows the sound counsel that
"close questions of [statutory] construction should be
resolved in favor of continuity and against change."
Shapiro, Continuity and Change in Statutory
Interpretation, 67 N.Y.U.L.Rev. 921, 925 (1992).
[FN14]

FN12. The Court notes the passage this year
of the Class Action Fairness Act (CAFA),
Pub.L. 109-2, 119 Stat. 4, ante, at 2627-
2628, only to dismiss that legislation as
irrelevant. Subject to several exceptions and
qualifications, CAFA provides for federal-
court adjudication of state-law-based class
actions in which diversity is "minimal" (one
plaintiff's diversity from one defendant
suffices), and the "matter in controversy" is
an aggregate amount in excess of
$5,000,000. Significant here, CAFA's
enlargement of federal-court diversity
jurisdiction was accomplished, "clearly and
conspicuously," by amending § 1332. Cf.
Rosario Ortega, 370 F.3d 124, 142 (C.A.1
2004).

FN13. If § 1367(a) itself renders
unnecessary the listing of Rule 20 plaintiffs
and Rule 23 class actions in § 1367(b), see
supra, at 2639, then it is similarly
unnecessary to refer, as § 1367(b) does, to
"persons proposed to be joined as plaintiffs
under Rule 19." On one account, Congress
bracketed such persons with persons
"seeking to intervene as plaintiffs under
Rule 24" to modify pre- § 1367 practice.
Before enactment of § 1367, courts
entertained, under the heading ancillary
jurisdiction, claims of Rule 24(a) intervenors
"of right," see Owen Equipment & Erection
Co. v. Kroger, 437 U.S. 365, 375, n. 18, 98
S.Ct. 2396, 57 L.Ed.2d 274 (1978), but
denied ancillary jurisdiction over claims of

125 S.Ct. 2611, 73 USLW 4574, 05 Cal. Daily Op. Serv. 5443, 2005 Daily Journal D.A.R. 7490, 18 Fla. L. Weekly Fed. S 453
**(Cite as: 125 S.Ct. 2611)**

"necessary" Rule 19 plaintiffs, see 13 Wright & Miller § 3523, p. 127 (2d ed. Supp.2005). Congress may have sought simply to underscore that those seeking to join as plaintiffs, whether under Rule 19 or Rule 24, should be treated alike, *i.e.,* denied joinder when "inconsistent with the jurisdictional requirements of section 1332." See *Ortega,* 370 F.3d, at 140, and n. 15 (internal quotation marks omitted); H.R. Rep., at 29 ("Subsection (b) makes one small change in pre-*Finley* practice," *i.e.,* it eliminates the Rule 19/Rule 24 anomaly.).

FN14. While the interpretation of § 1367 described in this opinion does not rely on the measure's legislative history, that history, as Justice STEVENS has shown, see *ante,* at 2628 (dissenting opinion), is corroborative of the statutory reading set out above.

\* \* \*

For the reasons stated, I would hold that § 1367 does not overrule *Clark* and *Zahn.* I would therefore affirm the judgment of the Court of Appeals for the First Circuit and reverse the judgment of the Court of Appeals for the Eleventh Circuit.

125 S.Ct. 2611, 73 USLW 4574, 05 Cal. Daily Op. Serv. 5443, 2005 Daily Journal D.A.R. 7490, 18 Fla. L. Weekly Fed. S 453

**Briefs and Other Related Documents (Back to top)**

• 2005 WL 588859, 73 USLW 3528 (Oral Argument) Oral Argument (Mar. 01, 2005)

• 2005 WL 483367 (Appellate Brief) Supplemental Brief of Exxon Corporation%tc (Feb. 25, 2005)Original Image of this Document (PDF)

• 2005 WL 470920 (Appellate Brief) Respondents' Supplemental Merits Brief%tc (Feb. 24, 2005)Original Image of this Document (PDF)

• 2005 WL 122086 (Appellate Brief) Brief for the United States as Amicus Curiae Supporting Respondents%tc (Jan. 18, 2005)Original Image of this Document (PDF)

• 2005 WL 139838 (Appellate Brief) Brief of the Product Liability Advisory Council, Inc. as Amicus Curiae in Support of Respondents%tc (Jan. 18, 2005)Original Image of this Document (PDF)

• 2005 WL 139840 (Appellate Brief) Brief for Respondent%tc (Jan. 18, 2005)Original Image of this Document (PDF)

• 2005 WL 154149 (Appellate Brief) Brief of Respondents%tc (Jan. 18, 2005)Original Image of this Document (PDF)

• 2004 WL 2802974 (Appellate Brief) Brief for Petitioners%tc (Dec. 06, 2004)Original Image of this Document (PDF)

• 2004 WL 2812088 (Appellate Brief) Brief of Petitioner Exxon Corporation%tc (Dec. 06, 2004)Original Image of this Document (PDF)

• 2004 WL 2825480 (Joint Appendix) (Dec. 06, 2004)

• 2004 WL 2831810 (Appellate Brief) Brief for the United States as Amicus Curiae Supporting Petitioners%tc (Dec. 06, 2004)Original Image of this Document (PDF)

• 2004 WL 3168775 (Joint Appendix) (Dec. 06, 2004)

• 2004 WL 2092635 (Appellate Petition, Motion and Filing) Memorandum in Opposition (Sep. 15, 2004)

• 2004 WL 2021258 (Appellate Petition, Motion and Filing) Respondents' Supplemental Brief (Sep. 07, 2004)

• 2004 WL 1950705 (Appellate Petition, Motion and Filing) Reply Brief of Petitioner (Aug. 31, 2004)

• 2004 WL 1900744 (Appellate Petition, Motion and Filing) Brief in Opposition (Aug. 20, 2004)

• 2004 WL 1607383 (Appellate Petition, Motion and Filing) Petition for Writ of Certiorari (Jul. 16, 2004)

•         04-79        (Docket) (Jul. 16, 2004)

•         04-70        (Docket) (Jul. 15, 2004)

• 2004 WL 1588576 (Appellate Petition, Motion and Filing) Petition for a Writ of Certiorari (Jul. 14, 2004)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

125 S.Ct. 2611
125 S.Ct. 2611, 73 USLW 4574, 05 Cal. Daily Op. Serv. 5443, 2005 Daily Journal D.A.R. 7490, 18 Fla. L. Weekly Fed. S 453
Page 24

**(Cite as: 125 S.Ct. 2611)**

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# Attachment
# B

Westlaw.

2005 WL 1719307                                                          Page 1
--- F.Supp.2d ---
**(Cite as: 2005 WL 1719307 (N.D.Ill.))**

Only the Westlaw citation is currently available.

United States District Court,
N.D. Illinois,
Eastern Division.
James JACOBS, etc., Plaintiff,
v.
Robert P. BREMNER, et al., Defendants.
**No. 05 C 143.**

July 20, 2005.

Joseph Henry Bates, J. Allen Carney, Cauley
Bowman Carney & Williams LLP, Little Rock, AR,
Marvin Alan Miller, Jennifer Winter Sprengel,
Matthew Eric Van Tine, Miller Faucher & Cafferty
LLP, Chicago, Randall K. Pulliam, Baron & Budd,
P.C., Dallas, TX, for Plaintiff.

James L. Thompson, James Kevin McCall, Jenner &
Block, LLC, Samuel Seth Cohen, Craig M. White,
Wildman, Harrold, Allen & Dixon, Chicago, for
Defendants.

MEMORANDUM OPINION AND ORDER

SHADUR, Senior District J.

*1 James Jacobs ("Jacobs") has filed a class-action
Complaint against a number of defendants acting as
mutual fund directors, advisors and affiliates of the
Nuveen Family of Funds. Alleging that defendants
failed to ensure that the funds participated in dozens
of securities class action settlements for which they
were eligible, Jacobs seeks to bring a direct action on
behalf of all shareholders in a number of the Nuveen
funds, including some other than those in which he
has invested.

In particular Jacobs asserts five claims: (1) state law
breach of fiduciary duty, (2) state law negligence, (3)
violation of Section 36(a) of the Investment
Company Act of 1940 ("Act"), [FN1] (4) violation of
Section 36(b) and (5) violation of Section 47(b).
Federal jurisdiction is proper under the Act and 28
U.S.C. § 1331(a), and supplemental jurisdiction
extends to the state law claims under 28 U.S.C. §
1367(a) ("Section 1367(a)") because they arise out of
a common nucleus of operative fact.

> FN1. As do virtually all other opinions

involving the Act, this opinion will refer to
its relevant provisions by their original
internal section numbers--15 U.S.C. § 80a-
35(a) as "Section 36(a)," 15 U.S.C. § 80a-
35(b) as "Section 36(b)," and 15 U.S.C. §
80a-46(b) as "Section 47(b)"--rather than
their codified numbers in Title 15.

Defendants have responded with a Fed.R.Civ.P.
("Rule") 12(b)(6) motion challenging the legal
sufficiency of all five counts. For that purpose the
plaintiff's allegations, coupled with reasonable
inferences, must be accepted as true (Bressner v.
Ambroziak, 379 F.3d 478, 480 (7th Cir.2004), and
dismissal is warranted only "if it is clear that no relief
could be granted under any set of facts that could be
proved consistent with the allegations" (Hishon v.
King & Spalding, 467 U.S. 69, 73 (1984)). For the
reasons stated in this opinion, (1) the motion is
granted in its entirety as to Jacobs' federal claims and
(2) the state claims are dismissed without prejudice,
so that the action itself is dismissed.

Before this Court turns to the substance of each of
Jacobs' federal claims, one preliminary matter
requires attention. Defendants argue that Jacobs lacks
standing to bring claims on behalf of investors in
funds that Jacobs admits that he does not own and
has never owned. That issue would require
immediate resolution before any consideration of the
merits if it applied to *all* of Jacobs' claims, for a
ruling adverse to Jacobs on that score would negate
the existence of federal subject matter jurisdiction
(Steel Co. v. Citizens for a Better Env't, 523 U.S. 83,
93-102 (1998)).

But it is undisputed that Jacobs invested in, and
therefore does have standing to sue on behalf of all
investors in, the Nuveen Large-Cap Value Fund (J.
Mem. 5; D. Mem. 3), [FN2] and that means this
Court can consider the merits of Jacobs' claims at
least as to that fund. And because analysis leads to
the conclusion that Jacobs' federal claims must be
dismissed, the question of standing as to the other
funds is rendered moot.

> FN2. References to the parties' submissions
take the form "J." (for Jacobs, of course) and
"D." (for defendants).

Section 36(a)

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

In relevant part Section 36(a) provides:
   The [Securities and Exchange] Commission is
   authorized to bring an action in the proper district
   court of the United States...alleging that a person
   serving or acting in one or more of the following
   capacities has engaged within five years of the
   commencement of the action or is about to engage
   in any act or practice constituting a breach of
   fiduciary duty involving personal misconduct....

   *2 As a threshold matter defendants argue that the
clear statutory language does not permit Jacobs rather
than the Commission to initiate a Section 36(a) claim.
Beyond that, defendants submit that none of the
conduct that Jacobs has alleged constitutes "a breach
of fiduciary duty involving personal misconduct."
Each of those contentions will be discussed in turn.

*Private Right of Action*

   As with many statutes, the plain text of Section 36(a)
does not explicitly provide for a private right of
action. Nevertheless "[f]ederal courts have widely
implied private causes of action under the ICA [Act]
for over thirty years," and that general willingness
extends to Section 36(a) (*In re Nuveen Fund Litig.,*
No. 94 C 360, 1996 WL 328006, at *5 (N.D. Ill. June
11) (collecting cases); see also J. Mem. 12 n.8).

   To justify finding a private right of action in the
absence of specific statutory language, courts have
typically relied on the legislative history of
amendments to the Act. For example, Congress
amended the Act in 1980 to ensure that all of its
protections and provisions would apply to business
development companies as well as to mutual funds
and investment companies. In the course of doing so,
the House Committee commented specifically on a
private right of action under Section 36(a) (H.R.Rep.
No. 96-1341, 96th Cong., 2d Sess. 28-29 (1980),
*reprinted in* 1980 U.S.C.C.A.N. 4800, 4811
(footnotes omitted)):
   The Committee wishes to make plain that it
   expects the courts to imply private rights of action
   under this legislation, where the plaintiff falls
   within the class of persons protected by the
   statutory provision in question. Such a right would
   be consistent with and further Congress' intent in
   enacting that provision, and where such actions
   would not improperly occupy an area traditionally
   the concern of state law. In appropriate instances,
   for example, breaches of fiduciary duty involving
   personal misconduct should be remedied under
   section 36(a) of the Investment Company Act.
   With respect to business development companies,
   the Committee contemplates suits by shareholders

as well as by the Commission, since these are the
persons the provision is designed to protect, and
such private rights of action will assist in carrying
out the remedial purposes of section 36.

   Even before that, the Senate had addressed the issue
of private rights of action under Section 36(a) in the
course of adding Section 36(b) to the Act in 1970.
Because the latter provision expressly includes a
private right of action, the Senate Report went out of
its way to head off any potential expressio unius
argument by explaining that the provision of a private
right of action in Section 36(b) "should not be read
by implication to affect" the practice of implying a
private right of action under 36(a) (S.R.Rep. No. 91-
184, 91st Cong., 1st Sess. 16 (1970), *reprinted in*
1970 U .S.C.C.A.N. 4897, 4931; see also *Fogel v.
Chestnutt,* 668 F.2d 100, 111-12 (2d Cir.1981)).

   *3 Defendants contend that two Supreme Court
cases of the past decade or so--*Central Bank of
Denver, N.A. v. First Interstate Bank of Denver, N.A.,*
511 U.S. 164 (1994) and *Alexander v. Sandoval,* 532
U.S. 275 (2001)--require a change in the prevailing
practice. Both cases expressed concern that judges
may overreach by inferring legislative intent from
Congress' silence or failure to act. But even though
the circumstances of this case might perhaps be
reasonably distinguished from *Central Bank* and
*Sandoval,* dismissal is required when last month's
opinion in *Exxon Mobil Corp. v. Allapattah Servs.,
Inc.,* 125 S.Ct. 2611 (2005) is added to the mix.
[FN3]

          FN3. Neither counsel can of course be
          criticized for inattention to *Exxon Mobil,*
          which was handed down after briefing on
          the current motion had been completed.

   *Central Bank* criticized the practice of using
congressional inaction to infer acquiescence in the
prevailing legal landscape. In deciding whether
Section 10(b) of the Securities Exchange Act of 1934
encompassed aiding and abetting liability, the Court
(511 U.S. at 186) acknowledged that courts had long
interpreted Section 10(b) to cover such liability and
that Congress had never overturned those decisions
through amendment. Even so, *Central Bank, id.* at
186-87 ultimately gave little weight to arguments
based on acquiescence because "[i]t does not
follow...that Congress' failure to overturn a statutory
precedent is reason for this Court to adhere to it" (*id.*
at 186).

   But other portions of *Central Bank* make clear that

2005 WL 1719307                                                                                    Page 3
--- F.Supp.2d ---
**(Cite as: 2005 WL 1719307 (N.D.Ill.))**

its rejection of an acquiescence argument was not absolute. For example, the Court noted that the relevant committee reports made only "oblique references to aiding and abetting liability" and that competing arguments from the legislative history in that case "would not point to a definitive answer" (*id.* at 185, 187). And that of course left open the possibility that different circumstances might lead to different conclusions.

Section 36(a) clearly presents a different circumstance. In stark contrast to the Section 10(b) situation, the legislative history as to private rights of action under Section 36(a) contains specific and affirmative statements of intent. Thus the Court's legitimate concern about implying congressional intent on the basis of mere inaction or "failure to overturn statutory precedent" is not in issue here. For that reason, *Central Bank* has not itself deterred courts from continuing to imply private rights of action under Section 36(a) (see, e.g., *Nuveen,* 1996 WL 328006, at *6).

*Sandoval* presents a higher hurdle. Picking up on the general tone of *Central Bank,* the Court there (532 U.S. at 287) quotes this passage from Justice Scalia's concurring opinion in *Lampf, Pleva, Lipkind, Prupis & Petigrow v. Gilbertson,* 501 U.S. 350, 365 (1991) in addressing the particular issue of private rights of action and concluding that courts must not imply such rights in the absence of specific statutory authorization:

  Raising up causes of action where a statute has not created them may be a proper function for common-law courts, but not for federal tribunals.

*4 Hence restraint must be exercised even though creating a private right of action might create a good fit with the policy goals of the statute (*id.* at 286-87). And it must be exercised even if the statute was enacted before *Cort v. Ash,* 422 U.S. 66, 78 (1975), when Congress might reasonably have expected such rights to be implied freely (*Sandoval,* 532 U.S. at 287-88).

In short, *Sandoval, id.* at 288 establishes that the text of the statute-- and not any "contemporary legal context"--must be the touchstone of any private right of action. Because the text of Section 36(a) does not explicitly include a private right of action, defendants contend that *Sandoval* applies and the previously implied right should be disavowed. And some post-Sandoval cases have bought that argument as to provisions of the Act--one such recent District Court opinion dealing with Section 36(a)(*Mutchka v. Harris,* No. SACV0534JVSANX, 2005 WL

1414304, at *4 (C.D. Cal. June 8)).

But as was true of *Central Bank,* the principles at play in *Sandoval* do not graft seamlessly onto the present circumstances. In particular, *Sandoval* 's special concern with courts making an unchecked policy judgment that an implied private right of action would be consistent with the general purpose of the statute is not implicated as to Section 36(a). As to that provision, the basis for the implied action is not mere congressional silence or acquiescence, but rather repeated and specific pronouncements of intent. Silence in the face of legal context is not the same as repeated specific statements of intent, and although *Central Bank* and *Sandoval* clearly forbid courts from relying on the former, the latter might nevertheless remain acceptable even after those cases because it does not involve unguided judicial decisionmaking.

But any such possibility was effectively extinguished by *Exxon Mobil,* which teaches that even affirmative statements of specific intent in congressional committee reports are impotent in the face of unambiguous statutory language. *Exxon Mobil* addressed a conflict between unambiguous statutory language and an unambiguous statement of congressional intent in the course of resolving whether Section 1367(a) confers jurisdiction in class actions where some but not all of the class members meet the amount-in-controversy requirement. Its approach to that conflict dictates the outcome here.

Section 1367 was adopted in 1990 in direct response to the year-old decision in *Finley v. United States,* 490 U.S. 545 (1989). And the House Judiciary Committee Report--which was also adopted by the Senate--stated expressly that Section 1367(b) was "not intended to affect the jurisdictional requirements of [28 U.S.C. § 1332] in diversity-only class actions, as those requirements were interpreted prior to *Zahn* " (H.R.Rep. No. 101-734, 101st Cong., 2d Sess. 29 (1990), *reprinted in* 1990 U.S.C.C.A.N. 6860, 6875). On that score the Report, *id.* at 29 n.17 specifically cited *Zahn v. Int'l Paper Co.,* 414 U.S. 291 (1973) as an example of such unaffected requirements. Thus Congress directly anticipated the question later at issue in *Exxon Mobil* and left a "virtual billboard of congressional intent" as to how that question should be resolved (*Exxon Mobil,* 125 S.Ct. at 2630 (Stevens, J., dissenting)). [FN4]

  FN4. Despite the above-quoted Committee Report language and despite Justice Stevens' characterization (which is persuasive to this

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2005 WL 1719307                                                                                      Page 4
--- F.Supp.2d ---
**(Cite as: 2005 WL 1719307 (N.D.Ill.))**

Court, for what little that may be worth), the *Exxon Mobil* majority said it did not consider the legislative history unambiguous. For example, even though the Committee Report stated that *Zahn* would remain intact, Justice Kennedy noted for the Court that the Subcommittee Working Paper "observed in a footnote that its proposal would overrule *Zahn* and that this would be a good idea..." and concluded that "[t]rying to figure out how to square the Subcommittee Working Paper's understanding with the House Report's understanding, or which is more reflective of the understanding of the enacting legislators, is a hopeless task" (*Exxon, 125 S.Ct. at 2626-27*). It is frankly troubling to this Court to ascribe ambiguity to a mere footnote in a preliminary document such as a subcommittee's working paper, when it is the official Committee Reports that are normally thought of as constituting the official evidence as to the legislative branch's final product. But in all events the Court majority did not rest its outcome on that conclusion, instead making it clear that recourse to the legislative history was not in order "simply because § 1367 is not ambiguous" (*id.* at 2625).

**\*5** Even so, the *Exxon Mobil* majority resolved the question in precisely the opposite direction. In its view the plain terms of Section 1367(b) overruled *Zahn*, and no legislative history can undo what the plain language of a statute accomplishes. In short, *Exxon Mobil* declares that it is impermissible to consult legislative history when the statutory language is unambiguous.

After *Exxon Mobil*, there is simply no room to imply a private right of action under Section 36(a). Even were *Central Bank* and *Sandoval* to be discounted on the basis that they were concerned primarily with interpreting congressional silence, *Exxon Mobil* forecloses any possibility of using Section 36(a)'s clear legislative history to create a private right of action where the unambiguous statutory language creates none. Because the plain statutory text of Section 36(a) provides a right of action only for the SEC, the inquiry as to whether a private right of action exists ends there and must be answered in the negative. And because that answer leaves Jacobs without standing to bring suit under Section 36(a), his claim under that provision must be and is dismissed.

*Personal Misconduct*

What has just been said is enough to dispatch Jacobs' Section 36(a) claim. But lest Jacobs think that he was simply the victim of bad timing because of the interposition of the *Exxon Mobil* decision, it is worth a moment or two to explain why his Section 36(a) claim also fails for the additional reason that he has not sufficiently alleged "personal misconduct" on the part of defendants. Jacobs views "personal misconduct" as encompassing general nonfeasance of a fiduciary duty (J. Mem.13). But that position is not consistent with either the legislative history or the statutory text of Section 36(a), both of which point toward a significantly more limited construction.

As for the legislative history, it does not at all support the notion that Congress intended Section 36(a) to provide a general remedy for all breaches of fiduciary duties. As *Daily Income Fund, Inc. v. Fox, 464 U.S. 523, 536 (1984)*(quoting *Burks v. Lasker, 441 U.S. 471, 480 (1979)*) has explained, Congress' concerns in the Act were much more specific, focusing on "conflicts of interest" and abuse of trust rather than on mere ineptitude:

> Congress adopted the ICA because of its concern with "the potential for abuse inherent in the structure of investment companies."

In light of those concerns, courts have typically read Section 36(a) claims to require "some sort of element of self-dealing" (*In re Nuveen Funds Litig., 1996 WL 328006, at *10-12*). [FN5]

> FN5. Although a 1970 amendment to the Act revised the language of Section 36(a), that revision provides no comfort to Jacobs. Congress there changed the applicable standard from "gross misconduct" to "personal misconduct," but nothing in that change suggests any intention to abandon the established "self-dealing" baseline in favor of a new standard embracing generic breaches of fiduciary duties.

In his effort to recast the legislative history to support a broader view of "personal misconduct," Jacobs points to snippets from some committee reports issued during congressional consideration of amendments to the Act. But in each such instance a reading of the full passage in the report, from which he has quoted only selectively, confirms rather than negating Congress' primary concern with conflicts of interest, enrichment at the expense of investors and self-dealing.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2005 WL 1719307                                                                Page 5
--- F.Supp.2d ---
**(Cite as: 2005 WL 1719307 (N.D.Ill.))**

**\*6** Nothing in the legislative history that Jacobs addresses reflects a desire to reach out via Section 36(a) to generic fiduciary breaches that do not implicate such policies. And given that "Congress enacted the ICA in order to insure against the investment adviser using its position of power to further its self-interest at the expense of the investment company it manages" (*In re Nuveen Fund Litig.,* 1996 WL 328006, at \*12), the legislative history--viewed fairly and as a whole--does not support Section 36(a)'s sweeping expansion of the scope of Section 36(a).

Textual analysis leads to the same conclusion. After all, the statutory reference to "a breach of fiduciary duty involving personal misconduct" would be patently redundant if "personal misconduct" were read to encompass any general breach of a fiduciary duty. And that would run afoul of the basic principle that statutory language should be interpreted to avoid superfluity (see, e.g., *Ratzlaf v. United States,* 510 U.S. 135, 140-41 (1994)). On its face, then, the statute recognizes the existence of--but does not itself encompass--some breaches of fiduciary duties that do *not* "involv[e] personal misconduct."

Section 36(b)(1), a neighboring subsection of the Act, again reinforces that distinction:

> It shall not be necessary to allege or prove that any defendant engaged in personal misconduct, and the plaintiff shall have the burden of proving a breach of fiduciary duty.

That section also makes sense only if "personal misconduct" is a subset of, rather than coterminous with, "a breach of a fiduciary duty."

At the end of the day, Jacobs' attempt to broaden the reach of Section 36(a) to include general nonfeasance of a fiduciary duty is unavailing. Congress plainly did not create Section 36(a) as a catchall for any fiduciary breach. For that reason the prevailing caselaw has read "personal misconduct" to require some showing of self-dealing. Jacobs has advanced no such allegations, instead setting out a garden-variety fiduciary claim, which remains the domain of state law.

In sum, not just one but two independent grounds call for the rejection of Jacobs' Section 36(a) claim. It is dismissed.

### Section 36(b)

Section 36(b) creates "a fiduciary duty with respect to the receipt of compensation for services." Jacobs urges that a breach of a fiduciary duty while in performance of a service contract for fees violates that provision, so that defendants are "not entitled to any compensation from Plaintiff and the class" (J. Mem.14).

Jacobs has framed his Section 36(b) claim as a direct action against defendants (J. Mem.8-11). Because Section 36(b) speaks in terms of an action "by a security holder of such registered investment company on behalf of such company," some courts have read that language as referring to derivative actions (see *Burks,* 441 U.S. at 477, 484; *Olmsted v. Pruco Life Ins. Co.,* 283 F.3d 429, 433 (2d Cir.2002))--or even as limiting the availability of relief under Section 36(b) to derivative actions alone (*Mutchka,* 2005 WL 1414304, at \*3).

**\*7** Such a limited reading might perhaps cut Jacobs' Section 36(b) claim off at the pass. But our Court of Appeals has said that even though the statutory text does not appear to permit direct claims, the determination of what constitutes a claim "should generally draw upon state corporation law" (*Boland v. Eagle,* 113 F.3d 706, 715 (7th Cir.1997)). If then Massachusetts law would conceptualize the rights and injuries asserted by Jacobs as derivative, Section 36(b)'s language could perhaps accommodate that definition so long as doing so would still be consistent with the Act's general purpose of providing shareholder relief (see *Strougo v. Bassini,* 282 F.3d 162, 176-77 (2d Cir.2002)).

But no such inquiry is needed here, for in any event Jacobs' purported Section 36(b) claim is fatally deficient in a key respect: It is clearly outside the scope of that section as defined by *Green v. Nuveen Advisory Corp.,* 295 F.3d 738 (7th Cir.2002). *Green* involved a shareholders' suit brought under Section 36(b) against the advisors of a closed-end bond fund on the ground that the advisors' compensation plans contained terms that unlawfully created a financial incentive to increase the fund's leverage without considering whether the fund would benefit. Even if an inherent conflict of interest could be said to exist, *Green,* 295 F.3d at 743-44 nevertheless held that Section 36(b) would not be the proper avenue for relief unless the plaintiff were to allege that the action was taken in an effort to pump up fees. [FN6]

> FN6. And that means that if actual abuse exists--for example, if the advisor increased the fund's leverage (and thus its fees) even though it knew the fund would suffer--any lawsuit on behalf of the shareholders would raise two distinct issues: one pertaining to

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2005 WL 1719307                                                                    Page 6
--- F.Supp.2d ---
**(Cite as: 2005 WL 1719307 (N.D.Ill.))**

"the receipt of fees and the compensation structure," and another pertaining to "the leveraging decision" itself (*id.* at 743 n.8).

Essentially *Green* delineated the limits of Section 36(b) by construing it in connection with Section 36(a): It viewed complaints about the terms of the compensation agreement as the province of Section 36(b), whereas "fund mismanagement issues are within the purview of § 36(a)" (*id.* at 744 n.9). Or put differently, if a complaint's allegations pertain to a substantive investment decision rather than to the structure of the compensation plan, then Section 36(b) is an improper basis for the claim and a plaintiff should instead "seek recourse under other sections of the ICA, or alternatively under state law" (*id.* at 744 (internal quotation marks omitted)).

Here Jacobs' "real complaint" is that defendants made a poor management decision by failing to participate in dozens of settlement agreements for which some fund was eligible, and he has not alleged any inherent improprieties in the compensation agreement itself. In terms of the *Green* dichotomy, that means his allegations of mismanagement can be addressed in federal terms only under Section 36(a), if at all. [FN7]

> FN7. Defendants' related argument that Jacobs' Section 36(b) claim is doomed because it does not allege excessive compensation relative to services rendered goes nowhere. *Green,* 295 F.3d at 743 n.8 expressly declined to follow other Courts of Appeals that have required specific factual allegations of excessive fees to state a valid Section 36(b) claim. So defendants' attempted reliance (D.Mem.8-9, D.R. Mem.11-12) on *Migdal v. Rowe Price-Fleming Int'l, Inc ., 248 F.3d 321 (4th Cir.2001)* and *Gartenberg v. Merrill Lynch Asset Mgmt., 694 F.2d 923 (2d Cir.1982)*--both of which held that plaintiffs must allege facts relating to the relationship between fees and services and both of which were rejected by *Green*--is misplaced.

As a final note, it bears mention that the textual and legislative history arguments previously addressed as to Jacobs' unsuccessful Section 36(a) claim have equal force as to Section 36(b). Only a brief recap is needed in that regard.

As to the statutory text, just as turning Section 36(a) into a catchall for general breaches of fiduciary duty would render the "personal misconduct" term surplusage, turning Section 36(b) into a catchall for breaches of fiduciary duties would render the "compensation for services" language unnecessary. Advisors do not work for free, so any breach of a fiduciary duty will automatically relate to compensation at some basic level. If the intention had been to allow all fiduciary breaches to be remedied under Section 36(b), there would be no need for a special category of "a fiduciary duty with respect to the receipt of compensation for services." But just such a category is statutorily specified, and that shows the broad interpretation sought by Jacobs is at odds with the statutory design.

**\*8** As for legislative history, *Green,* 295 F.3d at 743 (citations omitted) concluded that both Sections 36(a) and 36(b) were motivated by the same preoccupation with self-dealing:

> By passing § 36(b), [Congress] attempted to diminish the risk of adviser self-dealing under the predominant industry practice....

Because Jacobs does not allege any form of self-dealing in any respect, the concerns that prompted Congress to amend the Act to add Section 36(b) are absent. In the context of all the factors at play, that also mitigates against expanding Section 36(b)'s scope to cover general breaches of fiduciary duty.

In short, Jacobs' Section 36(b) claim is clearly at odds with *Green,* and it must be dismissed on that basis alone. Elementary principles of statutory construction as well as analysis of the legislative history highlight additional problems with Jacobs' attempts to extend Section 36(b) to reach the facts that he has alleged. For all of those reasons, his Section 36(b) claim is dismissed as well. [FN8]

> FN8. Lastly in that respect, because the flaws identified here would not be resolved if Jacobs were to attempt to replead a derivative action, his Section 36(b) claim is dismissed without leave to replead.

### Section 47(b)

Both parties agree that Section 47(b) provides a remedy only for the violation of some other section of the Act (J. Mem.15, D.R. Mem.13). Because Jacobs' claims under both Section 36(a) and 36(b) have succumbed, there can be no viable Section 47(b) claim. It too is dismissed.

### State Law Claims

When all federal claims are dismissed before trial, *United Mine Workers v. Gibbs,* 383 U.S. 715, 716

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2005 WL 1719307
--- F.Supp.2d ---
**(Cite as: 2005 WL 1719307 (N.D.Ill.))**

(1966) authorizes dismissal without prejudice of any remaining state claims so that those claims can be pursued in state court. Indeed, in the absence of countervailing conditions--for example, the presence of one of the three exceptions identified in *Wright v. Associated Ins. Cos.,* 29 F.3d 1244, 1251-52 (7th Cir.1994)--that course is generally preferred (*id.*). Accordingly Jacobs' asserted state law claims of negligence and breach of fiduciary duty are dismissed without prejudice.

Conclusion

Jacobs has failed to bring any proper claim under the Act. Neither Section 36(a) nor Section 36(b) encompasses the garden-variety claim of breach of fiduciary duty that he has asserted. And without a predicate violation under one of those two provisions, Section 47(b) is not in play either. Consequently defendants' Rule 12(b)(6) motion is granted as to all federal claims, which are dismissed with prejudice, while Jacobs' state claims are dismissed without prejudice. [FN9]

> FN9. Because this opinion marks the swan song of this Court's outgoing law clerk Samuel Jordan, III in terms of providing input at the District Court level (though Sam is currently working on a draft of a Court of Appeals opinion), this Court would be remiss if it failed to acknowledge his splendid work throughout the year now ending. During the year Sam's work in generating draft opinions and discharging all of the other clerkship responsibilities has been impeccable. Having said that, this Court hastens to add that if the final work product that has resulted from its own sentence by sentence (indeed, word by word) vetting of any of the draft opinions generated by Sam contains errors, they are to be placed at this Court's doorstep and not his.

2005 WL 1719307 (N.D.Ill.)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Attachment

C

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

GORMAN L. DULL, *et. al.*,          )
                                    )
          Plaintiffs                )
                                    )          Case No. 05 C 140
          v.                        )
                                    )
DAVID C. ARCH, *et al.*,            )
                                    )
          Defendants.               )

### MEMORANDUM OPINION AND ORDER

AMY J. ST. EVE, District Court Judge:

Plaintiffs Gorman L. Dull, Anna Dull, and Julian W. Meadows have commenced this

putative class action against the Van Kampen Funds, Inc., Van Kampen Asset Management, Inc.,

and various individual defendants. Defendants Van Kampen Funds Inc. and Van Kampen Asset

Management Inc. have moved to dismiss the complaint in its entirety for failure to state a claim,

pursuant to Rule 12(b)(6). For the reasons discussed below, Defendants' motion is granted.

### FACTUAL ALLEGATIONS

The Court assumes the following allegations from the Complaint are true (R. 1-1;

Compl.):

Defendant Van Kampen Funds, Inc. (the "Funds") is the parent of Van Kampen Asset

Management, Inc. (collectively, the "Van Kampen Defendants" or "Defendants"). It markets,

sponsors, and provides advisory, distribution, and administrative services to the Van Kampen

Family of Funds, which consists of approximately 42 funds. (*Id.* ¶ 11.) Plaintiffs Gorman and

Anna Dull and Julian Meadows owned one of these open-ended mutual funds with equity

securities holdings in the Van Kampen Family of Funds. (*Id.* ¶ 10.) Plaintiffs have brought this

case as a purported class action on behalf of all persons owning one of the Funds at any time between January 10, 2000, through January 10, 2005 (the "Class Period"). (*Id.* ¶ 16.)

Defendants David Arch, J. Miles Branagan, Jerry D. Choate, Rod Dammeyer, Linda Hutton Heagy, R. Craig Kennedy, Howard J. Kerr, Jack E. Nelson, Hugo F. Sonnenschein, Suzanne Woolsey, Mitchell Merin, Richard Powers, III, and Wayne Whalen are members of the Board of Directors for the Funds (collectively, the "Director Defendants"). (*Id.* ¶ 12.) The Funds' Board of Directors oversees the management of the Funds. (*Id.*)

Plaintiffs allege that the Van Kampen Family of Funds held assets of approximately $62 billion. (*Id.* ¶ 23.) They contend that during the Class Period approximately 26 of the 42 Van Kampen Funds owned equity securities traded on the United States' stock exchanges. (*Id.*) Plaintiffs allege that during the Class Period, the Funds failed to participate in the settlement of multiple securities fraud class actions in which they were eligible to participate. (*Id.* ¶¶ 5, 24.) Consequently, Plaintiffs have suffered losses by forfeiting their amount of settlement proceeds in these securities class actions. (*Id.* ¶¶ 26, 27.)

Plaintiffs have brought a five count complaint against Defendants. Count One alleges that Defendants breached their fiduciary duty to Plaintiffs. In Count Two, Plaintiffs allege negligence. Count Three is premised on Section 36(a) of the Investment Company Act of 1940 ("ICA"). Count Four alleges that Defendants violated Section 36(b) of the ICA. Finally, Count Five is based on a violation of Section 47(a) of the ICA. Defendants seek to dismiss all counts.

## ANALYSIS

### I.     Legal Standard

A Rule 12(b)(6) motion "test[s] the sufficiency of a complaint." *Johnson v. Rivera,* 272

F.3d 519, 520-21 (7th Cir. 2001). When deciding a motion to dismiss pursuant to Rule 12(b)(6),

the Court views "the complaint in the light most favorable to the plaintiff, taking as true all

well-pleaded factual allegations and making all possible inferences from those allegations in his

or her favor." *Lee v. City of Chicago*, 330 F.3d 456, 459 (7th Cir. 2003). "A complaint should

not be dismissed unless it appears beyond doubt that the plaintiff can prove no set of facts in

support of his claim which would entitle him to relief." *Cole v. U.S. Capital*, 389 F.3d 719, 724

(7th Cir. 2004) (quotations and citations omitted). "The issue is not whether a plaintiff will

ultimately prevail but whether the claimant is entitled to offer evidence to support the claims."

*Id.*, quoting *Scheuer v. Rhodes*, 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974).

## II.   Private Causes of Action Under the ICA

Defendants seek to dismiss Counts Three and Five on the ground that no private cause of

actions exist to enforce Sections 36(a) and 47(b) of the ICA[1]. Even if one does exist, Defendants

argue that Plaintiffs have failed to state a claim.

The Supreme Court has expressly stated, "like substantive federal law itself, private

rights of action to enforce federal law must be created by Congress." *Alexander v. Sandoval*, 532

U.S. 275, 286, 121 S.Ct. 1511, 149 L.Ed.2d 517 (2001). Even the Supreme Court has

acknowledged that it has "retreated from [its] previous willingness to imply a cause of action

where Congress has not provided one." *Correctional Services Corp. v. Malesko*, 534 U.S. 61,

67, 122 S.Ct. 515, 151 L.Ed.2d 456 (2001). "Raising up causes of action where a statute has not

---

[1] In *DH2, Inc. v. Athanassiades*, 359 F.Supp.2d 708, 714-15 (N.D. Ill. 2005), the Court recently held that Section 17(j) of the ICA does not provide for a private right of action. Although Defendants cited that case in their motion papers, Plaintiffs failed to even mention it, much less attempt to distinguish it. (R. 35-1; Pl.'s Resp.)

created them may be a proper function for common-law courts, but not for federal tribunals." *Alexander*, 532 U.S. at 287, 121 S.Ct. 1511 (citations and quotations omitted).

In determining whether the ICA creates a private cause of action, the Court begins "with the text and structure" of the statute. *Alexander*, 532 U.S. at 288, 121 S.Ct. 1511. *See also Exxon Mobil Corp. v. Allapattah Services, Inc.*, 125 S.Ct. 2611, 2620 (2005). As the Seventh Circuit recently noted: "[t]he plainness or ambiguity of statutory language is determined by reference to the language itself, the specific context in which that language is used, and the broader context of the statute as a whole. Our inquiry must cease if the statutory language is unambiguous and the statutory scheme is coherent and consistent." *Ioffe v. Skokie Motor Sales, Inc.*, __ F.3d __, 2005 WL 1592955, *2 (7th Cir. July 7, 2005) (citations and quotations omitted).

### A. Section 36(a)

Section 36(a) provides "[t]he Commission is authorized to bring an action ... alleging that a person ... has engaged ... in any act or practice constituting a breach of fiduciary duty involving personal misconduct in respect of any registered investment company for which such person so serves or acts –

> (1)   as officer, director, member of any advisory board, investment adviser, or depositor; or
>
> (2)   as principal underwriter, if such registered company is an open-end company, unite investment trust, or face-amount certificate company.

15 U.S.C. § 80a-35.

The plain language of Section 36(a) unambiguously states that the Commission can bring an action under it. It does not provide for a private right of action. *See Mutchka v. Harris,* 373 F.Supp.2d 1021 (C.D. Cal. 2005).

4

In contrast to Section 36(a), Section 36(b) of the ICA explicitly provides for a private right of action. "Obviously ... when Congress wished to provide a private damage remedy, it knew how to do so and did so expressly." *Olmsted v. Pruco Life Ins. Co. of New Jersey*, 283 F.3d 429, 433 (2d Cir. 2002), quoting *Touche Ross & Co. v. Redington*, 442 U.S. 560, 572, 99 S.Ct. 2479, 61 L.Ed.2d 82 (1979).

Plaintiffs rely heavily on the legislative history of the ICA to support a private cause of action under Section 36(a). Because the statute is unambiguous, the Court need not look to the legislative history. *See Exxon Mobil Corp. v. Allapattah Services, Inc.*, 125 S.Ct. 2611, 2625. Plaintiffs ask the Court to rely on non-binding precedent and to look beyond the plain meaning of the statute to find a private cause of action under Section 36(a) of the ICA. The Court refuses to do so. *Id.* at 2626 ("the authoritative statement is the statutory text, not the legislative history or any other extrinsic material"). Accordingly, the Court dismisses Count Three with prejudice.

**B.     Section 47(b)**

Plaintiffs concede that Section 47(b) of the ICA is remedial in nature. It provides, in part, for rescission of a contract that violates the ICA. 15 U.S.C. § 80a-46(b)(2). It does not provide for an independent cause of action where no violation of the ICA has occurred. Because Plaintiffs' ICA claims fail for the reasons discussed in this opinion, their Section 47(b) claim fails as well. Count Five is dismissed without prejudice.

**III.     Failure to State a Claim**

Count IV is premised on a violation of Section 36(b) of the ICA. Section 36(b) states, in relevant part:

> [T]he investment adviser of a registered investment company shall be deemed to have a fiduciary duty with respect to the receipt of compensation for services, or of payments of

5

> a material nature, paid by such registered investment company, ... to such investment adviser or any affiliated person of such investment adviser. An action may be brought under this subsection ... by a security holder of such registered investment company on behalf of such company, against such investment adviser, or any affiliated person of such investment adviser, ... for breach of fiduciary duty in respect of such compensation or payments paid by such registered investment company ... to such investment adviser or person.

15 U.S.C. § 80a-35(b). As the Seventh Circuit has noted, "Congress enacted § 36(b) to provide a narrow federal remedy that is significantly more circumscribed than common law fiduciary duty doctrines." *Green v. Nuveen Advisory Corp.*, 295 F.3d 738, 743 (7th Cir. 2002) (citations and quotations omitted). Section 36(b) actions pertain to compensation for services, not investment decisions. *Id. See also Jacobs v. Bremner, et al.*, 05 C 143, 2005 WL 1719307, **6-7 (N.D. Ill. July 20, 2005).

.      In Count IV, Plaintiffs allege that the Advisor Defendants, the Parent Company and other affiliates breached their fiduciary duty under Section 36(b) of the ICA "by failing to submit Proof of Claim forms or to otherwise participate in settled securities class actions and thereby recover money rightfully belonging to the Fund investors and which would have been immediately allocated to the individual investors through the recalculation of the [per share net asset value]." (R. 1-1, Compl. ¶ 43.) These allegations plainly do not relate to "a fiduciary duty with respect to the receipt of compensation for services." Accordingly, they fail[2].

IV.    **State Law Claims**

Plaintiffs premise federal jurisdiction on their federal ICA claims. Plaintiffs' state law

---

[2] Given that the Court has dismissed Plaintiffs' complaint, the Court need not address Defendants' standing arguments at this time.

6

claims rely solely on the Court's supplemental jurisdiction, pursuant to 28 U.S.C. § 1367(a).

Because the Court is dismissing the ICA claims, only Plaintiffs' state law claims remain.  The

Court declines to exercise its discretion to retain supplemental jurisdiction over these state law

claims.  *See Wright v. Associated Ins. Cos., Inc.,* 29 F.3d 1244, 1251 (7th Cir. 1994) ("[T]he

general rule is that, when all federal claims are dismissed before trial, the district court should

relinquish jurisdiction over pendent state-law claims rather than resolving them on the merits").

Accordingly, Counts One and Two are dismissed without prejudice.

## CONCLUSION

For the reasons discussed herein, the Court grants Defendants' motion to dismiss

Plaintiff's Complaint.  Counts One, Two, Four and Five are dismissed without prejudice.  Count

Three is dismissed with prejudice.

Dated: July 27, 2005

ENTERED

AMY J. ST. EVE
**United States District Court Judge**

8